# EXHIBIT A

Daniel L. Rasmussen, Bar No. 120276
dlr@paynefears.com
Scott O. Luskin, Bar No. 238082
sol@paynefears.com
PAYNE & FEARS LLP
Attorneys at Law
801 S. Figueroa Street, Suite 1150
Los Angeles, California 90017
Telephone:   (213) 439-9911
Facsimile:    (213) 439-9922

THOMAS F.A. HETHERINGTON
(Texas Bar No. 24007359)*
tom.hetherington@emhllp.com
JARRETT E. GANER
(Texas Bar No. 24055570)*
jarrett.ganer@emhllp.com
SHANNON A. LANG (SBN 257470)
shannon.lang@emhllp.com
EDISON, McDOWELL & HETHERINGTON LLP
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
Telephone:   (713) 337-5580
Facsimile:    (713) 337-8850
* admitted *pro hac vice*

Attorneys for Defendant
PHL VARIABLE INSURANCE COMPANY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, a National Association, as Securities Intermediary for LIMA ACQUISITION, LP,<br><br>Plaintiff,<br><br>v.<br><br>PHL VARIABLE INSURANCE COMPANY,<br><br>Defendant. | Case No. CV12-03046-RGK (MRWx)<br><br>**DECLARATION OF SHANNON A. LANG IN SUPPORT OF PHL VARIABLE INSURANCE COMPANY'S MOTION *IN LIMINE* NO. 12**<br><br>Judge:      Hon. R. Gary Klausner<br><br>Date:       April 2, 2013<br>Time:       9:00 a.m.<br>Courtroom:   850 |

1    I, Shannon A. Lang, hereby declare as follows:

2    1.    I am an attorney with Edison, McDowell & Hetherington LLP and

3  represent Defendant PHL Variable Insurance Company ("PHL") in the above-

4  captioned matter.

5    2.    Attached hereto as Exhibit A1 are true and correct copies of excerpts of

6  PHL Annual Regulatory Filings for 2008 to 2011, produced by Plaintiff with

7  production numbers USBANK3046-002959, 3061–62, 3073, 3265, 3369–70, 3381,

8  3575, 3682–83, 3694, 3902, 4008–09, and 4020.

9    3.    Attached hereto as Exhibit A2 is a true and correct copy of the expert

10  report of William Hager, served by Plaintiff on January 14, 2013.

11

12    I declare under penalty of perjury that the foregoing is true and correct.

13  Executed on February 15, 2013.

14

15

16    Shannon A. Lang

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A1

LIFE AND ACCIDENT AND HEALTH COMPANIES—ASSOCIATION EDITION

# ANNUAL STATEMENT
## FOR THE YEAR ENDED DECEMBER 31, 2008
OF THE CONDITION AND AFFAIRS OF THE

## PHL VARIABLE INSURANCE COMPANY

| NAIC Group Code | 0403 | 0403 | NAIC Company Code | 93548 | Employer's ID Number | 06-1045829 |
|---|---|---|---|---|---|---|
| | (Current Period) | (Prior Period) | | | | |

Organized under the Laws of _____ Connecticut _____, State of Domicile or Port of Entry _____ Connecticut

Country of Domicile _____ United States

| Incorporated/Organized | 07/15/1981 | Commenced Business | 07/15/1981 |
|---|---|---|---|

Statutory Home Office _____ One American Row _____ Hartford, CT 06115
(Street and Number) (City or Town, State and Zip Code)

Main Administrative Office _____ One American Row _____ Hartford, CT 06115 _____ 860-403-5000
(Street and Number) (City or Town, State and Zip Code) (Area Code) (Telephone Number)

Mail Address _____ P. O. Box 5056 _____, _____ Hartford, CT 06102-5056
(Street and Number or P.O. Box) (City or Town, State and Zip Code)

Primary Location of Books and Records _____ One American Row _____ Hartford, CT 06115 _____ 860-403-5000-3679
(Street and Number) (City or Town, State and Zip Code) (Area Code) (Telephone Number)

Internet Website Address _____ www.phoenixwm.com

Statutory Statement Contact _____ Daniel Edward Roy _____ 860-403-5000-3679
(Name) (Area Code) (Telephone Number) (Extension)

_____ Dan.Roy@phoenixwm.com _____ 860-403-5344
(E-mail Address) (FAX Number)

## OFFICERS

| Name | Title | Name | Title |
|---|---|---|---|
| Philip Konrad Polkinghorn | President | John Henry Beers | VP & Secretary |
| Peter Alexander Hofmann # | Sr. Exec. VP, CFO, & Treasurer | Robert Joseph Lombardi # | VP & Appointed Actuary |

### OTHER OFFICERS

| | | | |
|---|---|---|---|
| Steven Lee Bray | VP & Assistant Secretary | Bento Joseph Cuevo Jr. | Vice President |
| John Ruben Flores | VP & Chief Compliance Officer | Byron Burdick Frank | VP & Illustration Actuary |
| William Hayward | Vice President | Michael David Marshall | Vice President |
| Kathleen Ann McGah | VP & Assistant Secretary | Gina Collopy O'Connell | Senior Vice President |
| David Roger Pellerin | Senior VP & Chief Accounting Officer | Zafar Rashid | Senior Vice President |
| Tracy Leon Rich | Executive VP & Assistant Secretary | Christopher Matthew Wilkos | Senior VP & Corporate Portfolio Manager |
| James David Wehr | Executive VP & Chief Investment Officer | | |

### DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Christopher Matthew Wilkos | James David Wehr | Philip Konrad Polkinghorn |

State of _____ CONNECTICUT

County of _____ HARTFORD _____ ss

The officers of this reporting entity, being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures Manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

| Philip Konrad Polkinghorn | John Henry Beers | Peter Alexander Hofmann |
|---|---|---|
| President | VP & Secretary | Sr. Exec. VP, CFO, & Treasurer |

a. Is this an original filing? Yes [ X ] No [ ]

Subscribed and sworn to before me this

_____ day of _____ FEBRUARY, 2009

b. If no,
1. State the amendment number _____
2. Date filed _____
3. Number of pages attached _____

Jeannine Phillips, Statutory Reporting Assistant
April 30, 2011

USBANK3046-002959

**ANNUAL STATEMENT FOR THE YEAR 2008 OF THE PHL VARIABLE INSURANCE COMPANY**

DIRECT BUSINESS IN THE STATE OF   Consolidated

DURING THE YEAR   2008

NAIC Group Code   0405

## LIFE INSURANCE

NAIC Company Code   93548

| DIRECT PREMIUMS AND ANNUITY CONSIDERATIONS | 1 Ordinary | 2 Credit Life (Group and Individual) | 3 Group | 4 Industrial | 5 Total |
|---|---|---|---|---|---|
| 1. Life insurance | 594,707,659 | 0 | 0 | | 594,707,659 |
| 2. Annuity considerations | 584,466,159 | 0 | 0 | | 584,466,159 |
| 3. Deposit type contract funds | 4,237,473 | XXX | 0 | XXX | 4,237,473 |
| 4. Other considerations | 0 | 0 | 0 | | 0 |
| 5. Totals (Sum of Lines 1 to 4) | 1,183,411,329 | 0 | 0 | | 1,183,411,329 |
| DIRECT DIVIDENDS TO POLICYHOLDERS | | | | | |
| Life insurance: | | | | | |
| 6.1 Paid in cash or left on deposit | 0 | 0 | 0 | | 0 |
| 6.2 Applied to pay renewal premiums | 0 | 0 | 0 | | 0 |
| 6.3 Applied to provide paid-up additions or shorten the endowment or premium-paying period | 0 | 0 | 0 | | 0 |
| 6.4 Other | 0 | 0 | 0 | | 0 |
| 6.5 Totals (Sum of 6.1 to 6.4) | 0 | 0 | 0 | | 0 |
| Annuities: | | | | | |
| 7.1 Paid in cash or left on deposit | 0 | 0 | 0 | | 0 |
| 7.2 Applied to provide paid-up annuities | 0 | 0 | 0 | | 0 |
| 7.3 Other | 0 | 0 | 0 | | 0 |
| 7.4 Totals (Sum of Lines 7.1 to 7.3) | 0 | 0 | 0 | | 0 |
| 8. Grand Totals (Lines 6.5 plus 7.4) | 0 | 0 | 0 | | 0 |
| DIRECT CLAIMS AND BENEFITS PAID | | | | | |
| 9. Death benefits | 142,648,167 | 0 | 0 | | 142,648,167 |
| 10. Matured endowments | 0 | 0 | 0 | | 0 |
| 11. Annuity benefits | 53,589,405 | 0 | 0 | | 53,589,405 |
| 12. Surrender values and withdrawals for life contracts | 659,274,770 | 0 | 0 | | 659,274,770 |
| 13. Aggregate write-ins for miscellaneous direct claims and benefits paid | 0 | 0 | 0 | | 0 |
| 14. All other benefits, except accident and health | 64,754 | 0 | 0 | | 64,754 |
| 15. Totals | 855,577,095 | 0 | 0 | | 855,577,095 |
| DETAILS OF WRITE-INS | | | | | |
| 1301. | | | | | |
| 1302. | | | | | |
| 1303. | | | | | |
| 1398. Summary of Line 13 from overflow page | 0 | 0 | 0 | | 0 |
| 1399. Totals (Lines 1301 thru 1303 plus 1398) (Line 13 above) | 0 | 0 | 0 | | 0 |

| DIRECT DEATH BENEFITS AND MATURED ENDOWMENTS INCURRED | Ordinary 1 No. | 2 Amount | Credit Life (Group and Individual) 3 No. of Ind. Pols. & Gr. Certifs. | 4 Amount | Group 5 No. of Certifs. | 6 Amount | Industrial 7 No. | 8 Amount | Total 9 No. | 10 Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 16. Unpaid December 31, prior year | 11 | 37,035,524 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 37,035,524 |
| 17. Incurred during current year | 341 | 156,662,993 | 0 | 0 | 0 | 0 | 0 | 0 | 341 | 156,662,993 |
| Settled during current year: | | | | | | | | | | |
| 18.1 By payment in full | 276 | 142,712,921 | 0 | 0 | 0 | 0 | 0 | 0 | 276 | 142,712,921 |
| 18.2 By payment on compromised claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18.3 Totals paid | 276 | 142,712,921 | 0 | 0 | 0 | 0 | 0 | 0 | 276 | 142,712,921 |
| 18.4 Reduction by compromise | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18.5 Amount rejected | 1 | 600,000 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 600,000 |
| 18.6 Total settlements | 277 | 143,312,921 | 0 | 0 | 0 | 0 | 0 | 0 | 277 | 143,312,921 |
| 19. Unpaid Dec. 31, current year (16+17-18.6) | 75 | 50,405,596 | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 50,405,596 |

| POLICY EXHIBIT | Ordinary 1 No. | 2 Amount | 3 (a) | 4 Amount | Group No. of Policies 5 | 6 Amount | 7 No. | 8 Amount | 9 No. | 10 Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 20. In force December 31, prior year | 66,048 | 70,502,325,275 | | 0 | 0 | 0 | 0 | 0 | 66,048 | 70,502,325,275 |
| 21. Issued during year | 16,369 | 18,574,398,430 | | 0 | 0 | 0 | 0 | 0 | 16,369 | 18,574,398,430 |
| 22. Other changes to in force (Net) | (4,837) | (4,864,833,000) | | 0 | 0 | 0 | 0 | 0 | (4,837) | (4,864,833,000) |
| 23. In force December 31 of current year | 77,580 | 84,211,890,705 | (a) | 0 | 0 | 0 | 0 | 0 | 77,580 | 84,211,890,705 |

(a) Includes Individual Credit Life Insurance:   Loans less than or equal to 60 months at issue, prior year $ _____0  current year $ _____0
Includes Group Credit Life Insurance:  Loans greater than 60 months but NOT GREATER THAN 120 MONTHS, prior year $ _____0  current year $ _____0
Loans greater than 60 months at issue BUT NOT GREATER THAN 120 MONTHS, prior year $ _____0  current year $ _____0

## ACCIDENT AND HEALTH INSURANCE

| | 1 Direct Premiums | 2 Direct Premiums Earned | 3 Dividends Paid Or Credited On Direct Business | 4 Direct Losses Paid | 5 Direct Losses Incurred |
|---|---|---|---|---|---|
| 24. Group Policies (b) | | | 0 | 0 | 0 |
| 24.1 Federal Employees Health Benefits Program premium (b) | | | | | |
| 24.2 Credit (Group and Individual) | | | | | |
| 24.3 Collectively Renewable Policies (b) | | | | | |
| 24.4 Medicare Title XVIII exempt from state taxes or fees | | | | | |
| Other Individual Policies: | | | | | |
| 25.1 Non-cancellable (b) | 0 | 0 | 0 | 0 | 0 |
| 25.2 Guaranteed renewable (b) | 0 | 0 | 0 | 0 | 0 |
| 25.3 Non-renewable for stated reasons only (b) | 0 | 0 | 0 | 0 | 0 |
| 25.4 Other accident only | 0 | 0 | 0 | 0 | 0 |
| 25.5 All other (b) | 0 | 0 | 0 | 0 | 0 |
| 25.6 Totals (Sum of Lines 25.1 to 25.5) | 0 | 0 | 0 | 0 | 0 |
| 26. Totals (Lines 24 + 24.1 + 24.2 + 24.3 + 24.4 + 25.6) | 0 | 0 | 0 | 0 | 0 |

NONE

(b) For health business on indicated lines report: Number of persons insured under PPO managed care products _____0  and number of persons insured under indemnity only products _____0

24.GT

USBANK3046-003061

ANNUAL STATEMENT FOR THE YEAR 2008 OF THE PHL VARIABLE INSURANCE COMPANY

# EXHIBIT OF LIFE INSURANCE

| | Individual | | Ordinary | | Credit Life (Group and Individual) | | Group | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 Number of Policies | 2 Amount of Insurance (a) | 3 Number of Policies | 4 Amount of Insurance (a) | 5 Number of Individual Policies and Group Certificates | 6 Amount of Insurance (a) | 7 Policies | 8 Number of Certificates | 9 Amount of Insurance (a) | 10 Total Amount of Insurance (a) |
| 1. In force end of prior year | 0 | 0 | 37,975 | 70,625,998 | 0 | 0 | 0 | 0 | 0 | 70,625,998 |
| 2. Issued during year | | | 16,399 | 16,574,398 | | | XXX | | | 16,574,398 |
| 3. Reinsurance assumed | | | 27 | 112,734 | | | XXX | | | 112,734 |
| 4. Revived during year | | | 27 | 35,377 | | | XXX | | | 35,377 |
| 5. Increased during year (net) | | | 0 | 10,685 | | | XXX | | | 10,685 |
| 6. Subtotals, Lines 2 to 5 | | | 16,396 | 16,607,527 | | | XXX | | | 16,607,527 |
| 7. Additions by dividends during year | XXX | | XXX | 0 | XXX | | XXX | | | 0 |
| 8. Aggregate write-ins for increases | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 9. Totals (Lines 1 and 6 to 8) | | | 55,777 | 89,291,925 | | | XXX | | | 89,291,925 |
| 10. Death | | | 90 | 150,403 | | | XXX | | | 150,403 |
| 11. Maturity | | | 0 | 0 | | | XXX | | | 0 |
| 12. Disability | | | 0 | 0 | | | XXX | | | 0 |
| 13. Expiry | | | 0 | 0 | | | XXX | | | 0 |
| 14. Surrender | | | 557 | 365,004 | | | | | | 365,004 |
| 15. Lapse | | | 4,060 | 3,771,378 | | | | | | 3,771,378 |
| 16. Conversion | | | 308 | 242,975 | | | XXX | | XXX | 242,975 |
| 17. Decreased (net) | | | 0 | 281,156 | | | | | | 281,156 |
| 18. Reinsurance | | | 0 | 0 | | | XXX | | | 0 |
| 19. Aggregate write-ins for decreases | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 20. Totals (Lines 10 to 19) | | | 4,815 | 4,810,795 | | | XXX | | | 4,810,795 |
| 21. In force end of year (Line 9 minus Line 20) | | | 78,906 | 84,320,829 | | | XXX | | | 84,320,829 |
| 22. Reinsurance ceded end of year | XXX | | XXX | 64,400,218 | | | XXX | | | 64,400,218 |
| 23. Line 21 minus Line 22 | XXX | 0 | XXX | 19,920,611 | 0 | 0 | XXX | 0 | 0 | 19,920,611 |

**DETAILS OF WRITE-INS**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0801. | | | | | | | | | | |
| 0802. | | | | | | | | | | |
| 0803. | | | | | | | | | | |
| 0898. Summary of remaining write-ins for Line 8 from overflow page | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0899. Totals (Lines 0801 thru 0803 plus 0898) (Line 8 above) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1901. | | | | | | | | | | |
| 1902. | | | | | | | | | | |
| 1903. | | | | | | | | | | |
| 1998. Summary of remaining write-ins for Line 19 from overflow page | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1999. Totals (Lines 1901 thru 1903 plus 1998) (Line 19 above) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

(a) Amounts of life insurance in this exhibit shall be shown in thousands (item 000).
(b) Gross: $

USBANK3046-003062

ANNUAL STATEMENT FOR THE YEAR 2008 OF THE PHL VARIABLE INSURANCE COMPANY

## SCHEDULE F

Showing all claims for death losses and all other contract claims resisted or compromised during the year, and
all claims for death losses and all other contract claims resisted December 31 of current year

| 1 Contract Numbers | 2 Claim Numbers | 3 State of Residence of Claimant | 4 Year of Claim for Death or Disability | 5 Amount Claimed | 6 Amount Paid During the Year | 7 Amount Resisted Dec. 31 of Current Year | 8 Why Compromised or Resisted |
|---|---|---|---|---|---|---|---|
| 0199999 - Disposed of - Death Claims - Ordinary | | | | | | | |
| 0599999 - Death Claims - Disposed Of | | | | | | | |
| 2899999 - Claims Disposed of During Current Year | | | | | | | |
| 9999999 Totals | | | | | | | |

USBANK3046-003073

LIFE AND ACCIDENT AND HEALTH COMPANIES—ASSOCIATION EDITION

# ANNUAL STATEMENT
## FOR THE YEAR ENDED DECEMBER 31, 2009
OF THE CONDITION AND AFFAIRS OF THE

## PHL VARIABLE INSURANCE COMPANY

| NAIC Group Code | 0403 | , | 0403 | NAIC Company Code | 93548 | Employer's ID Number | 06-1045829 |
|---|---|---|---|---|---|---|---|
| | (Current Period) | | (Prior Period) | | | | |

Organized under the Laws of ___Connecticut___ , State of Domicile or Port of Entry ___Connecticut___

Country of Domicile ___United States___

Incorporated/Organized ___07/15/1981___ Commenced Business ___07/15/1981___

Statutory Home Office ___One American Row___ , ___Hartford, CT 06115___
(Street and Number) (City or Town, State and Zip Code)

Main Administrative Office ___One American Row___ ___Hartford, CT 06115___ ___860-403-5000___
(Street and Number) (City or Town, State and Zip Code) (Area Code) (Telephone Number)

Mail Address ___P. O. Box 5056___ ___Hartford, CT 06102-5056___
(Street and Number or P.O. Box) (City or Town, State and Zip Code)

Primary Location of Books and Records ___One American Row___ ___Hartford, CT 06115___ ___860-403-5000-5210___
(Street and Number) (City or Town, State and Zip Code) (Area Code) (Telephone Number)

Internet Website Address ___www.phoenixwm.com___

Statutory Statement Contact ___Donald Scott Aderholt___ ___860-403-5000-5210___
(Name) (Area Code) (Telephone Number) (Extension)

___Donald.Aderholt@phoenixwm.com___ ___860-403-5344___
(E-mail Address) (FAX Number)

## OFFICERS

| Name | Title | Name | Title |
|---|---|---|---|
| Philip Konrad Polkinghorn | President | John Henry Beers | VP, Secretary & Chief Compliance Officer |
| Peter Alexander Hofmann | Senior Executive VP, CFO & Treasurer | Robert Joseph Lombardi | VP & Appointed Actuary |

## OTHER OFFICERS

| | | | |
|---|---|---|---|
| Thomas Martin Buckingham | Senior Vice President | Benito Joseph Cuevo Jr. | Vice President |
| John Ruben Flores | Vice President | Byron Burdick Frank | VP & Illustration Actuary |
| Michael Edward Hanrahan | VP & Chief Accounting Officer | William Hayward | Vice President |
| John Vincent LaGrasse | Executive Vice President | Kathleen Ann McGah | VP & Assistant Secretary |
| John Thomas Mulrain | Senior VP & Assistant Secretary | Gina Collopy O'Connell | Senior Vice President |
| Zafar Rashid | Senior Vice President | Christopher Matthew Wilkos | Executive VP & Chief Investment Officer |

## DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Edward William Cassidy | Philip Konrad Polkinghorn | Christopher Matthew Wilkos |

State of _____CONNECTICUT_____

County of _____HARTFORD_____   ss

The officers of this reporting entity, being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures Manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

| ___Philip Konrad Polkinghorn___ | ___John Henry Beers___ | ___Peter Alexander Hofmann___ |
|---|---|---|
| President | VP, Secretary & Chief Compliance Officer | Senior Executive VP, CFO & Treasurer |

a. Is this an original filing? Yes [ X ] No [ ]

Subscribed and sworn to before me this

_____ day of ___FEBRUARY, 2010___

b. If no,
1. State the amendment number _____
2. Date filed _____
3. Number of pages attached _____

Jeannine Phillips, Statutory Accounting Assistant
April 30, 2011

USBANK3046-003265

**ANNUAL STATEMENT FOR THE YEAR 2009 OF THE PHL VARIABLE INSURANCE COMPANY**

DIRECT BUSINESS IN THE STATE OF  Consolidated                    DURING THE YEAR  2009

# LIFE INSURANCE

NAIC Group Code   0409                                             NAIC Company Code   93548

| DIRECT PREMIUMS AND ANNUITY CONSIDERATIONS | 1 Ordinary | 2 Credit Life (Group and Individual) | 3 Group | 4 Industrial | 5 Total |
|---|---|---|---|---|---|
| 1. Life insurance | 586,802,890 | 0 | 0 | 0 | 586,802,890 |
| 2. Annuity considerations | 135,129,993 | 0 | 0 | 0 | 135,129,993 |
| 3. Deposit-type contract funds | 1,482,277 | XXX | 0 | XXX | 1,482,277 |
| 4. Other considerations | 0 | 0 | 0 | 0 | 0 |
| 5. Totals (Sum of Lines 1 to 4) | 523,415,161 | 0 | 0 | 0 | 523,415,161 |
| **DIRECT DIVIDENDS TO POLICYHOLDERS** | | | | | |
| Life insurance: | | | | | |
| 6.1 Paid in cash or left on deposit | 0 | 0 | 0 | 0 | 0 |
| 6.2 Applied to pay renewal premiums | 0 | 0 | 0 | 0 | 0 |
| 6.3 Applied to provide paid-up additions or shorten the endowment or premium-paying period | 0 | 0 | 0 | 0 | 0 |
| 6.4 Other | 0 | 0 | 0 | 0 | 0 |
| 6.5 Totals (Sum of 6.1 to 6.4) | 0 | 0 | 0 | 0 | 0 |
| Annuities: | | | | | |
| 7.1 Paid in cash or left on deposit | 0 | 0 | 0 | 0 | 0 |
| 7.2 Applied to provide paid-up annuities | 0 | 0 | 0 | 0 | 0 |
| 7.3 Other | 0 | 0 | 0 | 0 | 0 |
| 7.4 Totals (Sum of Lines 7.1 to 7.3) | 0 | 0 | 0 | 0 | 0 |
| 8. Grand Totals (Lines 6.5 plus 7.4) | 0 | 0 | 0 | 0 | 0 |
| **DIRECT CLAIMS AND BENEFITS PAID** | | | | | |
| 9. Death benefits | 171,455,141 | 0 | 0 | 0 | 171,455,141 |
| 10. Matured endowments | 0 | 0 | 0 | 0 | 0 |
| 11. Annuity benefits | 48,454,975 | 0 | 0 | 0 | 48,454,975 |
| 12. Surrender values and withdrawals for life contracts | 536,109,670 | 0 | 0 | 0 | 536,109,670 |
| 13. Aggregate write-ins for miscellaneous direct claims and benefits paid | 0 | 0 | 0 | 0 | 0 |
| 14. All other benefits, except accident and health | 92,531 | 0 | 0 | 0 | 92,531 |
| 15. Totals | 758,092,317 | 0 | 0 | 0 | 758,092,317 |
| **DETAILS OF WRITE-INS** | | | | | |
| 1301. | | | | | |
| 1302. | | | | | |
| 1303. | | | | | |
| 1398. Summary of Line 13 from overflow page | 0 | 0 | 0 | 0 | 0 |
| 1399. Totals (Lines 1301 thru 1303 plus 1398) (Line 13 above) | 0 | 0 | 0 | 0 | 0 |

| DIRECT DEATH BENEFITS AND MATURED ENDOWMENTS INCURRED | Ordinary | | Credit Life (Group and Individual) | | Group | | Industrial | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1 No. | 2 Amount | 3 No. of Ind. Pols. & Gr. Certifs. | 4 Amount | 5 No. of Certifs. | 6 Amount | 7 No. | 8 Amount | 9 No. | 10 Amount |
| 16. Unpaid December 31, prior year | 75 | 50,405,596 | 0 | 0 | 0 | 0 | 0 | 0 | 75 | 50,405,596 |
| 17. Incurred during current year | 408 | 177,880,128 | 0 | 0 | 0 | 0 | 0 | 0 | 408 | 177,880,128 |
| Settled during current year: | | | | | | | | | | |
| 18.1 By payment in full | 452 | 171,527,672 | 0 | 0 | 0 | 0 | 0 | 0 | 452 | 171,527,672 |
| 18.2 By payment on compromised claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18.3 Totals paid | 452 | 171,527,672 | 0 | 0 | 0 | 0 | 0 | 0 | 452 | 171,527,672 |
| 18.4 Reduction by compromise | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18.5 Amount rejected | 1 | 200,000 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 200,000 |
| 18.6 Total settlements | 453 | 171,727,672 | 0 | 0 | 0 | 0 | 0 | 0 | 453 | 171,727,672 |
| 19. Unpaid Dec. 31, current year (16+17-18.6) | 30 | 56,558,053 | 0 | 0 | 0 | 0 | 0 | 0 | 30 | 56,558,053 |
| **POLICY EXHIBIT** | | | No. of Policies | | | | | | | |
| 20. In force December 31, prior year | 77,580 | 84,211,890,705 | (a) | 0 | 0 | 0 | 0 | 0 | 77,580 | 84,211,890,705 |
| 21. Issued during year | 4,059 | 3,646,417,545 | 0 | 0 | 0 | 0 | 0 | 0 | 4,059 | 3,646,417,545 |
| 22. Other changes to in force (Net) | (6,080) | (6,646,011,112) | 0 | 0 | 0 | 0 | 0 | 0 | (6,080) | (6,646,011,112) |
| 23. In force December 31 of current year | 75,559 | 81,212,297,138 | (a) | 0 | 0 | 0 | 0 | 0 | 75,559 | 81,212,297,138 |

(a) Includes Individual Credit Life Insurance: prior year $                0         current year $                0
Includes Group Credit Life Insurance: Loans less than or equal to 60 months at issue, prior year $                current year $                
Loans greater than 60 months at issue BUT NOT GREATER THAN 120 MONTHS, prior year $                current year $                0

# ACCIDENT AND HEALTH INSURANCE

| | 1 Direct Premiums | 2 Direct Premiums Earned | 3 Dividends Paid Or Credited On Direct Business | 4 Direct Losses Paid | 5 Direct Losses Incurred |
|---|---|---|---|---|---|
| 24. Group Policies (b) | 0 | 0 | 0 | 0 | 0 |
| 24.1 Federal Employees Health Benefits Program premium (b) | 0 | 0 | 0 | 0 | 0 |
| 24.2 Credit (Group and Individual) | 0 | 0 | 0 | 0 | 0 |
| 24.3 Collectively Renewable Policies (b) | 0 | 0 | 0 | 0 | 0 |
| 24.4 Medicare Title XVIII exempt from state taxes or fees | 0 | 0 | 0 | 0 | 0 |
| Other Individual Policies: | | | | | |
| 25.1 Non-cancellable (b) | 0 | 0 | 0 | 0 | 0 |
| 25.2 Guaranteed renewable (b) | 0 | 0 | 0 | 0 | 0 |
| 25.3 Non-renewable for stated reasons only (b) | 0 | 0 | 0 | 0 | 0 |
| 25.4 Other accident only | 0 | 0 | 0 | 0 | 0 |
| 25.5 All other (b) | 0 | 0 | 0 | 0 | 0 |
| 25.6 Totals (Sum of Lines 25.1 to 25.5) | 0 | 0 | 0 | 0 | 0 |
| 26. Totals (Lines 24 + 24.1 + 24.2 + 24.3 + 24.4 + 25.6) | 0 | 0 | 0 | 0 | 0 |

NONE

(b) For health business on indicated lines report: Number of persons insured under PPO managed care products                0         and number of persons insured under indemnity only products                0

24.GT

USBANK3046-003369

ANNUAL STATEMENT FOR THE YEAR 2009 OF THE PHL VARIABLE INSURANCE COMPANY

# EXHIBIT OF LIFE INSURANCE

| | Individual | | Ordinary | | | Credit Life (Group and Individual) | | Group | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 Number of Policies | 2 Amount of Insurance (a) | 2 Number of Policies | 3 Amount of Insurance (a) | | 5 Number of Individual Policies and Group Certificates | 6 Amount of Insurance (a) | 7 Policies | 8 Number of Certificates | 9 Amount of Insurance (a) | 10 Total Amount of Insurance (a) |
| 1. In force end of prior year | | | | | | | | | | | |
| 2. Issued during year | | | | | | | | | | | |
| 3. Reinsurance assumed | | | | | | | | | | | |
| 4. Revived during year | | | | | | | | | | | |
| 5. Increased during year (net) | | | | | | | | | | | |
| 6. Subtotals, Lines 2 to 5 | | | | | | | | | | | |
| 7. Additions by dividends during year | | | | | | | | | | | |
| 8. Aggregate write-ins for increases | | | | | | | | | | | |
| 9. Totals (Lines 1 and 6 to 8) | | | | | | | | | | | |
| 10. Death | | | | | | | | | | | |
| 11. Maturity | | | | | | | | | | | |
| 12. Disability | | | | | | | | | | | |
| 13. Expiry | | | | | | | | | | | |
| 14. Surrender | | | | | | | | | | | |
| 15. Lapse | | | | | | | | | | | |
| 16. Conversion | | | | | | | | | | | |
| 17. Decreased (net) | | | | | | | | | | | |
| 18. Reinsurance | | | | | | | | | | | |
| 19. Aggregate write-ins for decreases | | | | | | | | | | | |
| 20. Totals (Lines 10 to 19) | | | | | | | | | | | |
| 21. In force end of year (Line 9 minus Line 20) | | | | | | | | | | | |
| 22. Reinsurance ceded end of year | | | | | | | | | | | |
| 23. Line 21 minus Line 22 | | | | | | | | | | | |

## DETAILS OF WRITE-INS

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0801. | | | | | | | | | | | |
| 0802. | | | | | | | | | | | |
| 0803. | | | | | | | | | | | |
| 0898. Summary of remaining write-ins for Line 8 from overflow page | | | | | | | | | | | |
| 0899. Totals (Lines 0801 through 0803 plus 0898) (Line 8 above) | | | | | | | | | | | |
| 1901. | | | | | | | | | | | |
| 1902. | | | | | | | | | | | |
| 1903. | | | | | | | | | | | |
| 1998. Summary of remaining write-ins for Line 19 from overflow page | | | | | | | | | | | |
| 1999. Totals (Lines 1901 through 1903 plus 1998) (Line 19 above) | | | | | | | | | | | |

(a) Amounts of life insurance shown at this point to thousands omitted (000)
(b) Group § _____ Individual §

USBANK3046-003370

ANNUAL STATEMENT FOR THE YEAR 2009 OF THE PHL VARIABLE INSURANCE COMPANY

# SCHEDULE F

Showing all claims for death losses and all other contract claims resisted or compromised during the year, and
all claims for death losses and all other contract claims resisted December 31 of current year

| 1<br>Contract Numbers | 2<br>Claim Numbers | 3<br>State of Residence of Claimant | 4<br>Year of Claim for Death or Disability | 5<br>Amount Claimed | 6<br>Amount Paid During the Year | 7<br>Amount Resisted Dec. 31 of Current Year | 8<br>Why Compromised or Resisted |
|---|---|---|---|---|---|---|---|
| 97521157 | 97521157 | MN | 2009 | 10,000,000 | | 0 | Claim Denial, Misrepresentation |
| 97511900 | 97511900 | NC | 2009 | 5,000,000 | | 0 | Misrepresentation |
| 40079008 | 40079008 | CA | 2009 | 2,000,000 | | 200,000 | Claim Denial, Misrepresentation |
| 97510032 | 97510032 | FL | 2009 | 5,000,000 | | 0 | Claim Denial, Misrepresentation |
| 0199999 - Disposed of: Death Claims - Ordinary | | | | 22,000,000 | | 200,000 | XXX |
| 0699999 - Death Claims - Disposed Of | | | | 22,000,000 | | 200,000 | XXX |
| 2699999 - Claims Disposed of During Current Year | | | | 22,000,000 | | 200,000 | XXX |
| 5399999 Totals | | | | 22,000,000 | | 200,000 | XXX |

USBANK3046-003381

LIFE AND ACCIDENT AND HEALTH COMPANIES—ASSOCIATION EDITION

# ANNUAL STATEMENT

## FOR THE YEAR ENDED DECEMBER 31, 2010
### OF THE CONDITION AND AFFAIRS OF THE

## PHL VARIABLE INSURANCE COMPANY

| | | | | | |
|---|---|---|---|---|---|
| NAIC Group Code | 0403 (Current Period) | 0403 (Prior Period) | NAIC Company Code | 93548 | Employer's ID Number 06-1045829 |

Organized under the Laws of __Connecticut__, State of Domicile or Port of Entry __Connecticut__

Country of Domicile __United States__

Incorporated/Organized __07/15/1981__  Commenced Business __07/15/1981__

Statutory Home Office __One American Row__ , __Hartford, CT 06115__
(Street and Number) (City or Town, State and Zip Code)

Main Administrative Office __One American Row__  __Hartford, CT 06115__  __860-403-5000__
(Street and Number) (City or Town, State and Zip Code) (Area Code) (Telephone Number)

Mail Address __P. O. Box 5056__ , __Hartford, CT 06102-5056__
(Street and Number or P.O. Box) (City or Town, State and Zip Code)

Primary Location of Books and Records __One American Row__  __Hartford, CT 06115__  __860-403-5000-5210__
(Street and Number) (City or Town, State and Zip Code) (Area Code) (Telephone Number)

Internet Web Site Address __www.phoenixwm.com__

Statutory Statement Contact __Donald Scott Aderhold__  __860-403-5000-5210__
(Name) (Area Code) (Telephone Number) (Extension)

__donald.aderhold@phoenixwm.com__  __860-403-5344__
(E-Mail Address) (FAX Number)

## OFFICERS

| Name | Title | Name | Title |
|---|---|---|---|
| | | John Henry Beers | VP, Secretary & Chief Compliance Officer |
| James David Wehr | President | | |
| Peter Alexander Hofmann | Sr.Exec. VP, CFO & Treasurer | Andrew Simon Greenhalgh | 2nd VP & Appointed Actuary |

## OTHER OFFICERS

| | | | |
|---|---|---|---|
| Thomas Martin Buckingham | Senior VP | Benito Joseph Cuevo Jr. | Vice President |
| John Ruben Flores | Vice President | Byron Burdick Frank | VP & Illustration Actuary |
| Michael Edward Hanrahan | VP & Chief Accounting Officer | William Hayward | Vice President |
| John Vincent LaGrasse | Executive Vice President | Robert Joseph Lombardi | Vice President |
| Kathleen Ann McGah | VP & Assistant Secretary | John Thomas Mulrain | Senior VP & Assistant Secretary |
| Gina Collopy O'Connell | Senior Vice President | David Roger Pellerin | Senior Vice President |
| Zafar Rashid | Senior Vice President | Christopher Matthew Wilkos | Executive VP & Chief Investment Officer |

## DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Edward William Cassidy | Philip Konrad Polkinghorn | Christopher Matthew Wilkos |

State of __CONNECTICUT__

County of __HARTFORD__                                ss

The officers of this reporting entity, being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures Manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

| | | |
|---|---|---|
| James David Wehr | John Henry Beers | Peter Alexander Hofmann |
| President | VP, Secretary & Chief Compliance Officer | Sr.Exec. VP, CFO & Treasurer |

a. Is this an original filing? Yes [ X ] No [ ]

b. If no,
1. State the amendment number _____
2. Date filed _____
3. Number of pages attached _____

Subscribed and sworn to before me this

_____ day of __FEBRUARY, 2011__

Jeannine Phillips, Statutory Reporting Assistant & Notary Public
April 30, 2011

USBANK3046-003575

**ANNUAL STATEMENT FOR THE YEAR 2010 OF THE PHL VARIABLE INSURANCE COMPANY**

DIRECT BUSINESS IN THE STATE OF   Consolidated

# LIFE INSURANCE

DURING THE YEAR   2010

NAIC Group Code:   0403

NAIC Company Code:   93548

| DIRECT PREMIUMS AND ANNUITY CONSIDERATIONS | 1 Ordinary | 2 Credit Life (Group and Individual) | 3 Group | 4 Industrial | 5 Total |
|---|---|---|---|---|---|
| 1. Life insurance | 562,363,151 | 0 | 0 | 0 | 562,363,151 |
| 2. Annuity considerations | 251,503,050 | 0 | 0 | 0 | 251,503,050 |
| 3. Deposit type contract funds | 1,245,594 | XXX | 0 | XXX | 1,245,594 |
| 4. Other considerations | 0 | 0 | 0 | 0 | 0 |
| 5. Totals (Sum of Lines 1 to 4) | 815,111,595 | 0 | 0 | 0 | 815,111,595 |
| **DIRECT DIVIDENDS TO POLICYHOLDERS** | | | | | |
| Life insurance: | | | | | |
| 6.1 Paid in cash or left on deposit | 0 | 0 | 0 | 0 | 0 |
| 6.2 Applied to pay renewal premiums | 0 | 0 | 0 | 0 | 0 |
| 6.3 Applied to provide paid-up additions or shorten the endowment or premium-paying period | 0 | 0 | 0 | 0 | 0 |
| 6.4 Other | 0 | 0 | 0 | 0 | 0 |
| 6.5 Totals (Sum of Lines 6.1 to 6.4) | 0 | 0 | 0 | 0 | 0 |
| Annuities: | | | | | |
| 7.1 Paid in cash or left on deposit | 0 | 0 | 0 | 0 | 0 |
| 7.2 Applied to provide paid-up annuities | 0 | 0 | 0 | 0 | 0 |
| 7.3 Other | 0 | 0 | 0 | 0 | 0 |
| 7.4 Totals (Sum of Lines 7.1 to 7.3) | 0 | 0 | 0 | 0 | 0 |
| 8. Grand Totals (Lines 6.5 + 7.4) | 0 | 0 | 0 | 0 | 0 |
| **DIRECT CLAIMS AND BENEFITS PAID** | | | | | |
| 9. Death benefits | 249,923,246 | 0 | 0 | 0 | 249,923,246 |
| 10. Matured endowments | 0 | 0 | 0 | 0 | 0 |
| 11. Annuity benefits | 49,556,310 | 0 | 0 | 0 | 49,556,310 |
| 12. Surrender values and withdrawals for life contracts | 425,393,536 | 0 | 0 | 0 | 425,393,536 |
| 13. Aggregate write-ins for miscellaneous direct claims and benefits paid | 0 | 0 | 0 | 0 | 0 |
| 14. All other benefits, except accident and health | 72,327 | 0 | 0 | 0 | 72,327 |
| 15. Totals | 724,945,419 | 0 | 0 | 0 | 724,945,419 |
| **DETAILS OF WRITE-INS** | | | | | |
| 1301. | | | | | |
| 1302. | | | | | |
| 1303. | | | | | |
| 1398. Summary of remaining write-ins for Line 13 from overflow page | 0 | 0 | 0 | 0 | 0 |
| 1399. Total (Lines 1301 through 1303 + 1398) (Line 13 above) | 0 | 0 | 0 | 0 | 0 |

| DIRECT DEATH BENEFITS AND MATURED ENDOWMENTS INCURRED | Ordinary 1 No. | 2 Amount | Credit Life (Group and Individual) 3 No. of Ind. Pols. & Gr. Certifs. | 4 Amount | Group 5 No. of Certifs. | 6 Amount | Industrial 7 No. | 8 Amount | Total 9 No. | 10 Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 16. Unpaid December 31, prior year | 30 | 56,558,054 | 0 | 0 | 0 | 0 | 0 | 0 | 30 | 56,558,054 |
| 17. Incurred during current year | 142 | 222,196,553 | 0 | 0 | 0 | 0 | 0 | 0 | 142 | 222,196,553 |
| Settled during current year: | | | | | | | | | | |
| 18.1 By payment in full | 160 | 249,700,823 | 0 | 0 | 0 | 0 | 0 | 0 | 160 | 249,700,823 |
| 18.2 By payment on compromised claims | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18.3 Totals paid | 160 | 249,700,823 | 0 | 0 | 0 | 0 | 0 | 0 | 160 | 249,700,823 |
| 18.4 Reduction by compromise | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 18.5 Amount rejected | 1 | 1,750,000 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1,750,000 |
| 18.6 Total settlements | 161 | 251,450,823 | 0 | 0 | 0 | 0 | 0 | 0 | 161 | 251,450,823 |
| 19. Unpaid Dec. 31, current year (16 + 17 – 18.6) | 11 | 27,303,784 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 27,303,784 |
| **POLICY EXHIBIT** | | | | | No. of Policies | | | | | |
| 20. In force December 31, prior year | 75,560 | 81,212,297,137 | (a) | | 0 | 0 | 0 | 0 | 75,560 | 81,212,297,137 |
| 21. Issued during year | 228 | 151,638,830 | | | 0 | 0 | 0 | 0 | 228 | 151,638,830 |
| 22. Other changes to in force (Net) | (6,290) | (7,624,780,043) | | | 0 | 0 | 0 | 0 | (6,290) | (7,624,780,043) |
| 23. In force December 31 of current year | 69,498 | 73,739,155,924 | (a) | | 0 | 0 | 0 | 0 | 69,498 | 73,739,155,924 |

(a) Includes Individual Credit Life Insurance: prior year $ ___0 current year $ ___0
Includes Group Credit Life Insurance: Loans less than or equal to 60 months at issue, prior year $ _____ current year $ _____
Loans greater than 60 months at issue BUT NOT GREATER THAN 120 MONTHS, prior year $ ___0 current year $ ___0

# ACCIDENT AND HEALTH INSURANCE

| | 1 Direct Premiums | 2 Direct Premiums Earned | 3 Dividends Paid Or Credited On Direct Business | 4 Direct Losses Paid | 5 Direct Losses Incurred |
|---|---|---|---|---|---|
| 24. Group policies (b) | 0 | 0 | 0 | 0 | 0 |
| 24.1 Federal Employees Health Benefits Program premium (b) | 0 | 0 | 0 | 0 | 0 |
| 24.2 Credit (Group and Individual) | 0 | 0 | 0 | 0 | 0 |
| 24.3 Collectively renewable policies (b) | 0 | 0 | 0 | 0 | 0 |
| 24.4 Medicare Title XVIII exempt from state taxes or fees | 0 | 0 | 0 | 0 | 0 |
| Other Individual Policies: | | | | | |
| 25.1 Non-cancelable (b) | 0 | 0 | 0 | 0 | 0 |
| 25.2 Guaranteed renewable (b) | 0 | 0 | 0 | 0 | 0 |
| 25.3 Non-renewable for stated reasons only (b) | 0 | 0 | 0 | 0 | 0 |
| 25.4 Other accident only | 0 | 0 | 0 | 0 | 0 |
| 25.5 All other (b) | 0 | 0 | 0 | 0 | 0 |
| 25.6 Totals (sum of Lines 25.1 to 25.5) | 0 | 0 | 0 | 0 | 0 |
| 26. Totals (Lines 24 + 24.1 + 24.2 + 24.3 + 24.4 + 25.6) | 0 | 0 | 0 | 0 | 0 |

NONE

(b) For health business on indicated lines report: Number of persons insured under PPO managed care products ___0 and number of persons insured under indemnity only products ___0

24.GT

USBANK3046-003682

ANNUAL STATEMENT FOR THE YEAR 2010 OF THE PHL VARIABLE INSURANCE COMPANY

# EXHIBIT OF LIFE INSURANCE

| | Industrial | | Ordinary | | | Credit Life (Group and Individual) | | Group | | | Total |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| | Number of Policies | Amount of Insurance (b) | Number of Policies | Amount of Insurance | Number of Policies and Group Certificates | Amount of Insurance | Policies | Certificates | Amount of Insurance (a) | Total Amount of Insurance |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. In force end of prior year | | | | | | | | | | |
| 2. Issued during year | | | | | | | | | | |
| 3. Reinsurance assumed | | | | | | | | | | |
| 4. Revived during year | | | | | | | | | | |
| 5. Increased during year (net) | | | | | | | | | | |
| 6. Subtotals, Lines 2 to 5 | | | | | | | | | | |
| 7. Additions by dividends during year | | | | | | | | | | |
| 8. Aggregate write-ins for increases | | | | | | | | | | |
| 9. Totals (Lines 1 and 6 to 8) | | | | | | | | | | |
| 10. Death | | | | | | | | | | |
| 11. Maturity | | | | | | | | | | |
| 12. Disability | | | | | | | | | | |
| 13. Expiry | | | | | | | | | | |
| 14. Surrender | | | | | | | | | | |
| 15. Lapse | | | | | | | | | | |
| 16. Conversion | | | | | | | | | | |
| 17. Decreased (net) | | | | | | | | | | |
| 18. Reinsurance | | | | | | | | | | |
| 19. Aggregate write-ins for decreases | | | | | | | | | | |
| 20. Totals (Lines 10 to 19) | | | | | | | | | | |
| 21. In force end of year (Line 9 minus Line 20) | | | | | | | | | | |
| 22. Reinsurance ceded end of year | | | | | | | | | | |
| 23. Line 21 minus Line 22 | | | | | | | | | | |

## DETAILS OF WRITE-INS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 0801. | | | | | | | | | | |
| 0802. | | | | | | | | | | |
| 0803. | | | | | | | | | | |
| 0898. Summary of remaining write-ins for Line 8 from overflow page | | | | | | | | | | |
| 0899. Totals (Lines 0801 through 0803 plus 0898) (Line 8 above) | | | | | | | | | | |
| 1901. | | | | | | | | | | |
| 1902. | | | | | | | | | | |
| 1903. | | | | | | | | | | |
| 1998. Summary of remaining write-ins for Line 19 from overflow page | | | | | | | | | | |
| 1999. Totals (Lines 1901 through 1903 plus 1998) (Line 19 above) | | | | | | | | | | |

(a) Amount of life insurance in Column 9 will not add across to Column 10 because certificates count in Column 8.
(b) Intentionally left blank

USBANK3046-003683

ANNUAL STATEMENT FOR THE YEAR 2010 OF THE PHL VARIABLE INSURANCE COMPANY

# SCHEDULE F

Showing all claims for death losses and all other contract claims resisted or compromised during the year, and
all claims for death losses and all other contract claims resisted December 31 of current year

| 1 Contract Numbers | 2 Claim Numbers | 3 State of Residence of Claimant | 4 Year of Claim for Death or Disability | 5 Amount Claimed | 6 Amount Paid During the Year | 7 Amount Resisted Dec. 31 of Current Year | 8 Why Compromised or Resisted |
|---|---|---|---|---|---|---|---|
| 97511900 | 97511900 | NE | 2008 | 5,000,000 | 1,800,000 | | Claim denial |
| 40079400 | 40079400 | CA | 2008 | 2,000,000 | 2,200,000 | | Claim denial |
| 97510032 | 97510032 | FL | 2009 | 5,000,000 | 1,230,000 | | Claim denial |
| 0199999 - Disposed of: Death Claims - Ordinary | | | | 12,000,000 | 5,230,000 | | XXX |
| 0599999 - Death Claims - Disposed Of | | | | 12,000,000 | 5,230,000 | | XXX |
| 2699999 - Claims Disposed of During Current Year | | | | 12,000,000 | 5,230,000 | | XXX |
| 97520148 | 97520148 | DE | 2010 | 9,000,000 | | | Claim denial |
| 97527100 | 97527100 | CT | 2010 | 5,000,000 | | 1,750,000 | Claim denial |
| 97521157 | 97521157 | MN | 2008 | 10,000,000 | | | Claim denial |
| 2799999 - Resisted: Death Claims - Ordinary | | | | 24,000,000 | | 1,750,000 | XXX |
| 3199999 - Death Claims - Resisted | | | | 24,000,000 | | 1,750,000 | XXX |
| 5299999 - Claims Resisted During Current Year | | | | 24,000,000 | | 1,750,000 | XXX |
| 5399999 Totals | | | | 36,000,000 | 5,230,000 | 1,750,000 | XXX |

USBANK3046-003694

LIFE AND ACCIDENT AND HEALTH COMPANIES—ASSOCIATION EDITION

# ANNUAL STATEMENT
## FOR THE YEAR ENDED DECEMBER 31, 2011
OF THE CONDITION AND AFFAIRS OF THE

## PHL VARIABLE INSURANCE COMPANY

| | | | | | |
|---|---|---|---|---|---|
| NAIC Group Code | 0403 (Current Period) | 0403 (Prior Period) | NAIC Company Code | 93548 | Employer's ID Number 06-1045829 |

Organized under the Laws of **Connecticut**, State of Domicile or Port of Entry **Connecticut**

Country of Domicile **United States**

Incorporated/Organized **07/15/1981** Commenced Business **07/15/1981**

Statutory Home Office **One American Row** (Street and Number), **Hartford, CT 06115** (City or Town, State and Zip Code)

Main Administrative Office **One American Row** (Street and Number) **Hartford, CT 06115** (City or Town, State and Zip Code) **860-403-5000** (Area Code) (Telephone Number)

Mail Address **P. O. Box 5056** (Street and Number or P.O. Box) **Hartford, CT 06102-5056** (City or Town, State and Zip Code)

Primary Location of Books and Records **One American Row** (Street and Number) **Hartford, CT 06115** (City or Town, State and Zip Code) **860-403-5210** (Area Code) (Telephone Number)

Internet Web Site Address **www.phoenixwm.com**

Statutory Statement Contact **Donald Scott Aderhold** (Name) **860-403-5210** (Area Code) (Telephone Number) (Extension)

**donald.aderhold@phoenixwm.com** (E-Mail Address) **860-403-5344** (FAX Number)

## OFFICERS

| Name | Title | Name | Title |
|---|---|---|---|
| | | | VP, Secretary & Chief Compliance Officer |
| James David Wehr | President | John Henry Beers | |
| Peter Alexander Hofmann | Sr.Exec. VP, CFO & Treasurer | Andrew Simon Greenhalgh | 2nd VP & Appointed Actuary |

## OTHER OFFICERS

| Name | Title | Name | Title |
|---|---|---|---|
| Thomas Martin Buckingham | Senior Vice President | Benito Joseph Cuevo Jr. | Vice President |
| John Ruben Flores | Vice President | Byron Burdick Frank | VP & Illustration Actuary |
| Michael Edward Hanrahan | VP & Chief Accounting Officer | William Hayward | Vice President |
| John Vincent LaGrasse | Executive VP | Robert Joseph Lombardi | Vice President |
| Kathleen Ann McGah | VP & Assistant Secretary | John Thomas Mulrain | Executive VP & Assistant Secretary |
| Gina Collopy O'Connell | Senior VP | David Roger Pellerin | Senior VP |
| Philip Konrad Polkinghorn | Senior Executive VP | Zafar Rashid | Senior VP |
| Christopher Matthew Wilkes | Executive VP & Chief Investment Officer | | |

## DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Christopher Matthew Wilkes | Philip Konrad Polkinghorn | Edward William Cassidy |

State of ..................CONNECTICUT..................

County of ..................HARTFORD.................. ss

The officers of this reporting entity, being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures Manual except to the extent that (1) state law may differ, or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively. Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

| | | |
|---|---|---|
| James David Wehr | John Henry Beers | Peter Alexander Hofmann |
| President | VP, Secretary & Chief Compliance Officer | Sr.Exec. VP, CFO & Treasurer |

a. Is this an original filing?    Yes [ X ] No [  ]

Subscribed and sworn to before me this

................day of ........FEBRUARY, 2012........

b. If no,
1. State the amendment number _____
2. Date filed _____
3. Number of pages attached _____

Jeannine Phillips, Statutory Reporting & Notary Public
April 30, 2016

USBANK3046-003902

**ANNUAL STATEMENT FOR THE YEAR 2011 OF THE PHL VARIABLE INSURANCE COMPANY**

DIRECT BUSINESS IN THE STATE OF  Consolidated                                          DURING THE YEAR  2011

## LIFE INSURANCE

NAIC Group Code:  0400                                                                NAIC Company Code:  93548

| DIRECT PREMIUMS AND ANNUITY CONSIDERATIONS | 1 Ordinary | 2 Credit Life (Group and Individual) | 3 Group | 4 Industrial | 5 Total |
|---|---|---|---|---|---|
| 1.  Life insurance | 397,474,445 | 0 | 0 | | 397,474,445 |
| 2.  Annuity considerations | 917,857,739 | 0 | 0 | | 917,857,739 |
| 3.  Deposit-type contract funds | 31,821,561 | XXX | 0 | XXX | 31,821,561 |
| 4.  Other considerations | 0 | 0 | 0 | | 0 |
| 5.  Totals (Sum of Lines 1 to 4) | 1,347,093,744 | 0 | 0 | | 1,347,093,744 |
| **DIRECT DIVIDENDS TO POLICYHOLDERS** | | | | | |
| Life insurance: | | | | | |
| 6.1 Paid in cash or left on deposit | 0 | 0 | 0 | | 0 |
| 6.2 Applied to pay renewal premiums | 0 | 0 | 0 | | 0 |
| 6.3 Applied to provide paid-up additions or shorten the endowment or premium-paying period | 0 | 0 | 0 | | 0 |
| 6.4 Other | 0 | 0 | 0 | | 0 |
| 6.5 Totals (Sum of Lines 6.1 to 6.4) | 0 | 0 | 0 | | 0 |
| Annuities: | | | | | |
| 7.1 Paid in cash or left on deposit | 0 | 0 | 0 | | 0 |
| 7.2 Applied to provide paid-up annuities | 0 | 0 | 0 | | 0 |
| 7.3 Other | 0 | 0 | 0 | | 0 |
| 7.4 Totals (Sum of Lines 7.1 to 7.3) | 0 | 0 | 0 | | 0 |
| 8.  Grand Totals (Lines 6.5 + 7.4) | 0 | 0 | 0 | | 0 |
| **DIRECT CLAIMS AND BENEFITS PAID** | | | | | |
| 9.  Death benefits | 153,463,823 | 0 | 0 | | 153,463,823 |
| 10.  Matured endowments | 0 | 0 | 0 | | 0 |
| 11.  Annuity benefits | 59,430,900 | 0 | 0 | | 59,430,900 |
| 12.  Surrender values and withdrawals for life contracts | 441,125,005 | 0 | 0 | | 441,125,005 |
| 13.  Aggregate write-ins for miscellaneous direct claims and benefits paid | 0 | 0 | 0 | | 0 |
| 14.  All other benefits, except accident and health | 87,771 | 0 | 0 | | 87,771 |
| 15.  Totals | 654,107,498 | 0 | 0 | | 654,107,498 |
| **DETAILS OF WRITE-INS** | | | | | |
| 1301. | | | | | |
| 1302. | | | | | |
| 1303. | | | | | |
| 1398.  Summary of remaining write-ins for Line 13 from overflow page | 0 | 0 | 0 | | 0 |
| 1399.  Total (Lines 1301 through 1303 + 1398) (Line 13 above) | 0 | 0 | 0 | | 0 |

| DIRECT DEATH BENEFITS AND MATURED ENDOWMENTS INCURRED | Ordinary 1 No. | 2 Amount | Credit Life (Group and Individual) 3 No. of Ind. Pols. & Gr. Certifs. | 4 Amount | Group 5 No. of Certifs. | 6 Amount | Industrial 7 No. | 8 Amount | Total 9 No. | 10 Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 16.  Unpaid December 31, prior year | 11 | 27,303,784 | | 0 | | 0 | | 0 | 11 | 27,303,784 |
| 17.  Incurred during current year | 246 | 162,922,467 | | 0 | | 0 | | 0 | 246 | 162,922,467 |
| Settled during current year: | | | | | | | | | | |
| 18.1 By payment in full | 174 | 153,551,593 | | 0 | | 0 | | 0 | 174 | 153,551,593 |
| 18.2 By payment on compromised claims | 0 | 0 | | 0 | | 0 | | 0 | 0 | 0 |
| 18.3 Totals paid | 174 | 153,551,593 | | 0 | | 0 | | 0 | 174 | 153,551,593 |
| 18.4 Reduction by compromise | 0 | 0 | | 0 | | 0 | | 0 | 0 | 0 |
| 18.5 Amount rejected | 0 | 0 | | 0 | | 0 | | 0 | 0 | 0 |
| 18.6 Total settlements | 174 | 153,551,593 | | 0 | | 0 | | 0 | 174 | 153,551,593 |
| 19.  Unpaid Dec. 31, current year (18 + 17 - 18.6) | 83 | 36,674,658 | | 0 | | 0 | | 0 | 83 | 36,674,658 |
| **POLICY EXHIBIT** | | | | | No. of Policies | | | | | |
| 20.  In force December 31, prior year | 69,498 | 73,739,155,924 | (a) | 0 | | 0 | | 0 | 69,498 | 73,739,155,924 |
| 21.  Issued during year | 214 | 96,243,553 | | 0 | | 0 | | 0 | 214 | 96,243,553 |
| 22.  Other changes to in force (Net) | (4,577) | (5,630,307,739) | | 0 | | 0 | | 0 | (4,577) | (5,630,307,739) |
| 23.  In force December 31 of current year | 65,135 | 68,205,091,738 | (a) | 0 | | 0 | | 0 | 65,135 | 68,205,091,738 |

(a) Includes Individual Credit Life Insurance: prior year $ _____ 0  current year $ _____ 0
Includes Group Credit Life Insurance:  Loans less than or equal to 60 months at issue, prior year $ _____  current year $ _____ 0
Loans greater than 60 months at issue BUT NOT GREATER THAN 120 MONTHS, prior year $ _____ 0  current year $ _____ 0

## ACCIDENT AND HEALTH INSURANCE

| | 1 Direct Premiums | 2 Direct Premiums Earned | 3 Dividends Paid Or Credited On Direct Business | 4 Direct Losses Paid | 5 Direct Losses Incurred |
|---|---|---|---|---|---|
| 24.  Group policies (b) | | | | | |
| 24.1 Federal Employees Health Benefits Program premium (b) | | | | | |
| 24.2 Credit (Group and Individual) | | | | | |
| 24.3 Collectively renewable policies (b) | | | | | |
| 24.4 Medicare Title XVIII exempt from state taxes or fees | | | | | |
| Other Individual Policies: | | | | | |
| 25.1 Non-cancellable (b) | | | | | |
| 25.2 Guaranteed renewable (b) | | | | | |
| 25.3 Non-renewable for stated reasons only (b) | | | | | |
| 25.4 Other accident only | | | | | |
| 25.5 All other (b) | | | | | |
| 25.6 Totals (sum of Lines 25.1 to 25.5) | | | | | |
| 26.  Totals (Lines 24 + 24.1 + 24.2 + 24.3 + 24.4 + 25.6) | | | | | |

NONE

(b) For health business on indicated lines report: Number of persons insured under PPO managed care products _____ and number of persons insured under indemnity only products _____

24.GT

USBANK3046-004008

ANNUAL STATEMENT FOR THE YEAR 2011 OF THE PHL VARIABLE INSURANCE COMPANY

# EXHIBIT OF LIFE INSURANCE

| | Individual | | Ordinary | | Credit Life (Group and Individual) | | Group | | | Total |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number of Policies | Amount of Insurance (a) | Number of Policies | Amount of Insurance (a) | Number of Individual Policies and Group Certificates | Amount of Insurance (a) | Number of Policies | Number of Certificates | Amount of Insurance (a) | Total Amount of Insurance (a) |
| 1. In force end of prior year | 0 | 0 | 70,363 | 73,688,437 | 0 | 0 | | 0 | 0 | 73,988,407 |
| 2. Iss. ed during year | | | 214 | 96,244 | | | | | | 96,244 |
| 3. Reins. ance assumed | | | (59) | (5,504) | | | | | | (5,504) |
| 4. Revived during year | | | 59 | 34,319 | | | | | | 34,319 |
| 5. Increased during year (net) | | 0 | | | | 0 | | | | |
| 6. Subtotals, Lines 2 to 5 | 0 | 0 | 198 | 125,029 | 0 | 0 | | 0 | 0 | 125,029 |
| 7. Additions by dividends during year | X0 | | X0 | | XX | | | | | |
| 8. Aggregate write-ins for increases | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| 9. Totals (Lines 1 and 6 to 8) | 0 | 0 | 70,561 | 73,813,436 | 0 | 0 | | 0 | 0 | 73,813,436 |
| 10. Death | | | 145 | 169,806 | | | | | | 169,806 |
| 11. Maturity | | | | | | | XX | | | |
| 12. Disability | | | | | | | XX | | | |
| 13. Expiry | | | | | | | XX | | | |
| 14. Surrender | | | 577 | 593,591 | | | | | | 593,591 |
| 15. Lapse | | | 3,739 | 4,618,974 | | | | | | 4,618,974 |
| 16. Conversion | | | 25 | 27,775 | | | XX | XX | XX | 27,775 |
| 17. Decreased (net) | | | | 162,740 | | | | | | 162,740 |
| 18. Reins. ance | | | | | | | | | | |
| 19. Aggregate write-ins for decreases | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| 20. Totals (Lines 10 to 19) | 0 | 0 | 4,484 | 5,542,286 | 0 | 0 | | 0 | 0 | 5,542,286 |
| 21. In force end of year (Line 9 mins. Line 20) | 0 | 0 | 66,077 | 68,271,150 | 0 | 0 | | 0 | 0 | 68,271,150 |
| 22. Reins. ance ceded end of year | XX | | XX | 52,320,761 | XX | | XX | XX | XX | 52,320,761 |
| 23. Line 21 minus Line 22 | XX | | XX | 15,950,398 | 0 | 0 | | 0 | 0 | 15,950,398 |

## DETAILS OF WRITE-INS

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 0801. | | | | | | | | | | |
| 0802. | | | | | | | | | | |
| 0803. | | | | | | | | | | |
| 0898. Summary of remaining write-ins for Line 8 from overflow page | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| 0899. Totals (Lines 0801 through 0803 plus 0898) (Line 8 above) | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| 1901. | | | | | | | | | | |
| 1902. | | | | | | | | | | |
| 1903. | | | | | | | | | | |
| 1998. Summary of remaining write-ins for Line 19 from overflow page | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |
| 1999. Totals (Lines 1901 through 1903 plus 1998) (Line 19 above) | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | 0 |

(a) Amounts of life insurance in this exhibit shall be shown in thousands (omit 000)
(b) Group $

25

USBANK3046-004009

ANNUAL STATEMENT FOR THE YEAR 2011 OF THE PHL VARIABLE INSURANCE COMPANY

# SCHEDULE F

Showing all claims for death losses and all other contract claims resisted or compromised during the year, and
all claims for death losses and all other contract claims resisted December 31 of current year

| 1<br>Contract Numbers | 2<br>Claim Numbers | 3<br>State of Residence of Claimant | 4<br>Year of Claim for Death or Disability | 5<br>Amount Claimed | 6<br>Amount Paid During the Year | 7<br>Amount Resisted Dec. 31 of Current Year | 8<br>Why Compromised or Resisted |
|---|---|---|---|---|---|---|---|
| 97527106 | 97527106 | CT | 2010 | 5,000,000 | 1,750,000 | | Claim denial |
| 0199999 - Disposed of Death Claims - Ordinary | | | | 5,000,000 | 1,750,000 | | XXX |
| 0599999 - Death Claims - Disposed Of | | | | 5,000,000 | 1,750,000 | | XXX |
| 2699999 - Claims Disposed of During Current Year | | | | 5,000,000 | 1,750,000 | | XXX |
| 97520148 | 97520148 | DE | 2010 | 9,000,000 | | | Claim denial |
| 97529709 | 97529709 | MN | 2010 | 10,000,000 | | 318,000 | Misrepresentation |
| 97521157 - SCI | 97521157 - SCI | MN | 2008 | 10,000,000 | | | Claim denial |
| 2799999 - Resisted: Death Claims - Ordinary | | | | 29,000,000 | | 318,000 | XXX |
| 3199999 - Death Claims - Resisted | | | | 29,000,000 | | 318,000 | XXX |
| 5299999 - Claims Resisted During Current Year | | | | 29,000,000 | | 318,000 | XXX |
| 5399999 Totals | | | | 34,000,000 | 1,750,000 | 318,000 | XXX |

USBANK3046-004020

# EXHIBIT  A2

U.S. Bank National Association, et al.

Plaintiff,


vs.


PHL Variable Insurance Company,

Defendants.




In the United States District Court
Central District of California
Western Division




Case No.: CV12-03046 RGK (MRW)




Expert Report
Submitted by
William D. Hager




On Behalf of
The Plaintiff


1

**TABLE OF CONTENTS**

I.     Introduction...............................................................................................3

II.    Summary of Most Pertinent Expertise................................................4

III.   Documents Reviewed ...........................................................................10

IV.    Assignment and Expert Opinions ......................................................12

V.     Preliminary Matters to the Expert Opinions .........................................13

VI.    Expert Opinions and Further Discussion ..............................................14

VII.   Additional Expertise to Render These Opinions ..................................39

**APPENDICES**

Appendix A ............................................................................. Curriculum Vitae

Appendix B ......................................................................................Publications

Appendix C ................................................................................ Prior Testimony

# I.      INTRODUCTION

**Introduction.**  I have been retained by the law firm of Orrick, Herrington & Sutcliffe LLP, on behalf of U.S. Bank National Association, a national association, as securities intermediary for Lima Acquisition LP (collectively, "US Bank"), in the matter of *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, United States District Court, Central District of California, Case No. CV12-03046 RGK (MRW).

**Ongoing Considerations.**  I am submitting this Report on the specific issues stated herein.  I reserve the right to amend or otherwise modify this Report, including its summaries, opinions, and all other elements.  It is possible that additional information and documents will require the reconsideration of (i) the opinions expressed in this report and (ii) possible additional expert opinions.  To the extent that Defendant or its expert witness(es) provide additional materials or testimony, I reserve the right to provide a rebuttal.  Lastly, I have reached the opinions expressed in this Report based upon a reasonable degree of professional certainty.

**Compensation.**  I am being compensated at the rate of $495 per hour, plus costs, for my work on this case.  These rates are my usual and customary rates.

**Qualifications to Render These Expert Opinions**.  My opinions are based on my skill, knowledge, training, education, expertise, and experience, which are detailed in the attached Curriculum Vitae (see Appendix A), as well as my specific expertise set forth in Sections II and V of this Report.

**Sources of Information.**  I obtained documents and used resources from: (i) Orrick, Herrington & Sutcliffe LLP  ("Orrick Law Firm"), as more fully detailed below; (ii) standard life insurance reference materials; and (iii) certain regulatory materials including, among other things, materials from State of California (including rules and regulations) and from the National Association of Insurance Commissioners ("NAIC") as utilized by California's Department of Insurance ("CDOI").  See the discussion below for more details.

**Documents Reviewed in Reaching All of These Expert Opinions and Conclusions.**  In reaching each of the expert opinions and conclusions in this Report, I relied on all of the documents referenced herein.

**Author's Expertise Is a Component Part of All of These Expert Opinions.**  Each of the expert opinions and conclusions in this Report is based on a combination of the facts, documents, and this author's skill, knowledge, training, education, expertise, experience, and working knowledge of the specific areas and matters at issue herein.

**Limitations of All of These Expert Opinions.**  The expert opinions and conclusions set forth in this Report relate to, and are specifically limited to, the unique facts of this case; as such, they do not have applicability beyond the facts of this case.

## II.  SUMMARY OF MOST PERTINENT EXPERTISE

A.  *Expertise as to Life Insurance Policies*

    *1.  Expertise as an Insurance Regulator.*  I have extensive and substantive experience relating directly to life insurance policies (like those at issue here), including interpreting policy language and determining the insurer's obligations under such policies.  As a regulator for eight years in three positions ((i) Assistant Attorney General assigned to the Department of Insurance (Iowa), (ii) First Deputy Commissioner of Insurance (Iowa) and (iii) Commissioner of Insurance (Iowa)), I approved (or disapproved) of language in form life insurance policies used by each of the 500 life insurance companies doing business in the State of Iowa, including the type of form life insurance policies at issue in this case.  I also approved (or disapproved) of language in form policy applications, like those at issue in this case.  In addition, I regularly served as an Administrative Law Judge[1] in matters relating directly to life insurance policies.

    *2.  Expertise as a Member of NAIC.*  While Commissioner of Insurance for the State of Iowa, I served as a member of the National Association of Insurance Commissioners ("NAIC"), including as a member of its Executive Committee.  NAIC is the nationwide organization of all state insurance commissioners.  That organization has responsibilities for establishing model statutes and model administrative regulations for consideration by all states.  While with the NAIC, I served, among other things, as:

- *Chair of the Life Insurance Committee*.  This Committee oversaw all issues relating to life insurance, including life insurance policies and policy applications;

- *Chair of the Universal Life Insurance Task Force*.  This Committee oversaw universal life insurance and other similar products; and

- *Chair of the Life Insurance Product Development Task Force*.  While Chair of this Task Force, I led the development of model disclosure statements for providers of universal life insurance and other similar products to enable consumers to better compare different types of life insurance products.

    *3.  Expertise as General Counsel and Chief Lobbyist of the American Academy of Actuaries.*  I served as General Counsel and Chief Lobbyist of the American Academy of Actuaries, in Washington D.C.  The Academy is the national professional association for actuaries.  These professionals calculate premium pricing for policies such as those at issue in

---

[1]   Then known as a "Hearing Officer."

this case.  Because policy language dictates premium pricing, actuaries are involved in determining policy language.

4. *Expertise as Chief Executive Officer of a Major Insurance Entity.*  After serving as a regulator, I served as President and Chief Executive Officer of the National Council on Compensation Insurance ("NCCI"), in New York City.  NCCI, which does business in about 40 states, is a nationwide industry-owned organization with about 1,500 employees and annual revenues of about $150 million.  NCCI was domiciled in Florida and did business in Connecticut and California.  NCCI, therefore, was subject to the full authority of California's and Connecticut's Departments of Insurance and to the laws and jurisdictions of those states.  Among my responsibilities at NCCI (along with my staff) was to draft the workers compensation insurance policy forms used in NCCI's 40 states of operation.  The life insurance benefit is a key feature of workers compensation.  I drafted form policy language (tailored to each specific state's insurance code) as well as form endorsements and other form policy documents.  In addition, I worked to obtain the approval of all such policy forms, endorsements, and documents from each state's department of insurance for use by insurance companies.  I am very familiar with the meaning and relevance of state-approved form policies, endorsements, applications, and other related documents.

5. *Expertise as a Reinsurance Arbitrator.*  I am one of about 400 certified reinsurance arbitrators (by ARIAS-US), and, in that capacity, I have presided over disputes between insurers (like Penn Mutual[2]) and their reinsurers over language in life insurance policies.

B. *Expertise as to the Duties of Life Insurance Companies Regarding Claims Handling*

1. *Expertise as Commissioner of Insurance.*  I also have had significant experience and responsibility in connection with passing judgment on insurers' responsibilities *as to insurance agents, applicants, insureds, owners, and beneficiaries,* such as those involved here.  In particular, in my positions as Assistant Attorney General, First Deputy Commissioner of Insurance, and Commissioner of Insurance in the State of Iowa, I had daily responsibility for holding all of the state's 500 life insurers accountable to their legal and regulatory obligations.  I did so through a series of action steps and tools.  The action steps and tools included the following:

a *NAIC Market Regulation Handbook.*  As Commissioner of Insurance, I had as an available tool the NAIC Market Regulation Handbook ("Examiners Handbook").  The Examiners Handbook, among other things, sets forth standards by which to assess life insurers' (i) policy applications, (ii) policy issuance, and (iii) responsibilities to their agents.  The Handbook also sets forth standards by which to assess agent contracts and appointments of agents.  The Examiners Handbook is used by every department of insurance in the United States.  The standards have been universally promulgated and adopted by all 50 Commissioners of Insurance.  The standards of the Examiners Handbook are universally recognized as appropriate standards against which to judge life insurer behavior.

---

[2]   I have never sat as an arbitrator on a case involving PHL Variable Insurance Company.

   *b. Market Conduct Examinations.*  On a regular basis, my Department utilized the Examiners Handbook to conduct Market Conduct Examinations on life insurers to determine whether they were meeting their obligations to insureds and others.  The examinations entailed the physical inspection of insurers' policy applications and policy issuance files to identify any errant action or inappropriate behavior.  As further discussed below, errant insurers were warned, disciplined, and prosecuted as required.

   *c. NAIC Financial Examiners Handbook.*  As Commissioner of Insurance, I had another tool available to me—namely, the NAIC's Financial Examiners Handbook ("Financial Examiners Handbook").  The Financial Examiners Handbook sets forth standards by which to assess life insurer solvency on a triennial basis. As with the Examiners Handbook, the Financial Examiners Handbook is used by every department of insurance in the United States.  Similarly, these standards have been universally promulgated and adopted by all 50 Commissioners of Insurance.  The standards of the Financial Examiners Handbook are universally recognized as appropriate standards against which to judge life insurer behavior.

   *d. Financial Examinations.*  On a regular basis, my Department utilized the Financial Examiners Handbook on life insurers to determine whether they were likely to remain solvent.  Financial examinations entailed the physical inspection of insurers' operations and files to ensure, among other things, proper financial reporting as to agent and policyholder matters.  As further discussed below, errant insurers were warned, disciplined, and prosecuted as required.

   *e. Complaints from the Public.*  On a daily basis, my Department received consumer complaints regarding the practices of life insurance companies.  The Department's Consumer Protection Division was staffed by Department lawyers who resolved the individual consumer complaints.  The lawyers would determine whether incoming consumer complaints regarding an insurance company evidenced unacceptable practices.

   *f. Prosecution.*  When insurer behavior required formal action (whether as a result of complaints from the public or Department investigations), my Department prosecuted such insurers under Iowa's civil Administrative Procedures Act.  During my eight years as a regulator, I served in various capacities with respect to such prosecutions, including (i) as a line prosecutor (as Assistant Attorney General), (ii) as a prosecutor making charging decisions (as First Deputy and Commissioner of Insurance) and (iii) as an Administrative Law Judge ("ALJ") presiding over prosecutions.  I have served as an ALJ in scores of cases where a life insurer's (i) agent, (ii) policy form, (iii) policy application and (iv) overall conduct were at issue.

  *2. Expertise as Chief Executive Officer of a Major Insurance Entity.*  While I was President and CEO of NCCI, it was subject to the full range of authority of Connecticut's and California's Departments of Insurance as discussed above.  During that time, I visited and physically toured and reviewed in excess of 400 insurance companies.  Through that experience, I gained direct exposure to standard practices in the insurance industry.

  *3. Expertise as General Counsel and Chief Lobbyist of the American Academy of Actuaries.*  As stated above, I served as General Counsel and Chief Lobbyist of the American Academy of Actuaries, in Washington D.C.  Collectively, Academy members were affiliated

with virtually every life insurance company in the United States.  The Academy's Board of Directors likewise was comprised of leading insurance company executives from such life insurance companies.

      *4.*    *Expertise as an Attorney in Private Practice.*  As an attorney in private practice, I became familiar with standards of practice in the life insurance industry by representing insurer interests as counsel to (i) the Professional Insurance Agents of Iowa and (ii) the Iowa Association of Life Underwriters (life, health, and annuity insurance agents).  Through those representations, I became intimately familiar with insurance forms such as those at issue here.

C.    *Expertise as to Life Insurance Underwriting*

      *1.*    *Expertise as Commissioner of Insurance.*  Consistent with the discussion above, I also have had significant experience and responsibility in connection with passing judgment on insurers' *underwriting duties and responsibilities*.  In particular, in my positions as Assistant Attorney General, First Deputy Commissioner of Insurance, and Commissioner of Insurance in the State of Iowa, I had daily responsibility for holding all of the state's 500 life insurers accountable to their *underwriting obligations*.  I did so through a series of action steps and tools. The action steps and tools included the following:

      *a*    *NAIC Market Regulation Handbook.*  As Commissioner of Insurance, I had as an available tool the NAIC's Examiners Handbook.  The Examiners Handbook, among other things, sets forth standards by which to assess life insurers' underwriting behavior (i) during the policy application process, (ii) during the time of policy issuance, (iii) as to insurers' agents, and (iv) subsequent to policy issuance.  The standards set forth in the Examiners Handbook are used by every state department of insurance and have been universally promulgated and adopted by all 50 Commissioners of Insurance.  They are universally recognized as appropriate standards against which to judge life insurer behavior.

      *b.*    *Market Conduct Examinations.*  On a regular basis, my Department utilized the Examiners Handbook to conduct Market Conduct Examinations on life insurers to determine whether they were meeting their obligations to insureds and others as to underwriting issues.  The examinations entailed the physical inspection of insurers' policy applications and policy issuance files to identify any errant action or inappropriate behavior.  As further discussed below, errant insurers were warned, disciplined, and prosecuted as required.

      *c.*    *NAIC Financial Examiners Handbook.*  As Commissioner of Insurance, I had another tool available to me—namely, the NAIC's Financial Examiners Handbook.  The Financial Examiners Handbook sets forth standards by which to assess life insurer solvency on a triennial basis. As with the Examiners Handbook, the Financial Examiners Handbook is used by every department of insurance in the United States.  Similarly, these standards have been universally promulgated and adopted by all 50 Commissioners of Insurance.  The standards of the Financial Examiners Handbook are universally recognized as appropriate standards against which to judge life insurer behavior.

        *d.*     *Financial Examinations.*  On a regular basis, my Department utilized the Financial Examiners Handbook on life insurers to determine whether they were likely to remain solvent. Financial examinations entailed the physical inspection of insurers' operations and files to ensure, among other things, (i) compliance with underwriting duties and (ii) proper financial reporting. As further discussed below, errant insurers were warned, disciplined, and prosecuted as required.

        *e.*     *Complaints from the Public.*  On a daily basis, my Department received consumer complaints regarding the underwriting practices of life insurance companies. The Department's Consumer Protection Division was staffed by Department lawyers who resolved the individual consumer complaints. The lawyers would determine whether incoming consumer complaints regarding an insurance company evidenced unacceptable underwriting practices.

        *f.*     *Prosecution.*  When insurer behavior required formal action (whether as a result of complaints from the public or Department investigations), my Department prosecuted such insurers under Iowa's civil Administrative Procedures Act consistent with the discussion in the prior section.

    2.     *Expertise as Chief Executive Officer of a Major Insurance Entity*. My executive experience at NCCI also resulted in expertise as to insurer responsibilities as to life insurers' underwriting behavior (i) during the policy application process, (ii) during the time of policy issuance, (iii) as to insurers' agents, and (iv) subsequent to policy issuance.

    *The Gold Standard of Underwriting*. While I was President and CEO of NCCI, it was responsible for formulating the underwriting standards used for most all workers compensation policies in the nation. Underwriting for workers compensation is routinely recognized as the most intense underwriting of all lines of insurance. This is because there are over 600 officially-designated workers compensation classification codes under which an employee may be classified based upon his or her principal job duties. NCCI authored and maintained a detailed, word-by-word, phrase-by-phrase description of each of these 600 classification codes, to which insurers were required to adhere. That document is contained within a text known as the Scopes Manual, which is recognized industry-wide as the Gold Standard for underwriting workers compensation insurance.

    Furthermore, the underwriting process, regardless of the specific line of insurance at issue is fundamentally the same. This is because almost all insurers (including life insurers), regardless of the specific line of insurance at issue, seek to select the most favorable risks and reject the least favorable risks.

    3.     *Expertise as General Counsel and Chief Lobbyist of the American Academy of Actuaries.* As stated above, I served as General Counsel and Chief Lobbyist of the American Academy of Actuaries, in Washington D.C. Collectively, Academy members were affiliated with virtually every life insurance company in the United States. The Academy's Board of Directors likewise was comprised of leading insurance company executives from such life insurance companies.

     *4.*      *Expertise as an Attorney in Private Practice.*  As an attorney in private practice, I became familiar with underwriting standards and practices in the life insurance industry by representing insurer interests as counsel to (i) the Professional Insurance Agents of Iowa and (ii) the Iowa Association of Life Underwriters (whose duties included the first line of life underwriting).

D.   *Expertise as to Life Insurance Agents*

     *1.*      *Expertise as a Regulator:  Licensure.*  I have extensive and substantive experience relating to the duty of care that comes to bear on insurance agents and agencies in their relationships with life insurance companies.  As an Assistant Attorney General (see above), I prosecuted life insurance agents for violating their duties of care.  As an insurance regulator (see above), I, along with my staff, screened hundreds of thousands of agents for character and background.  As to subject matter testing, I formulated agent-licensing exams.  Upon passage of the exams, I have licensed hundreds of thousands of insurance agents.  In addition, I had direct responsibility over the appointment processes of some 500 life insurance companies of all of their life agents.  I also supervised the ongoing relationships between all life insurance companies in Iowa and their appointed agents.

     *2.*      *Expertise as a Regulator: Prosecution and Continuing Education.*  I have initiated license revocation actions against life insurance agents and prosecuted them to completion.  I also have had full responsibility for the continuing education of licensed life insurance agents.  Among other things, I approved continuing education courses for acceptable content, oversaw the administration of such courses, and granted or denied credit for such courses.

     *3.*      *Expertise as a Regulator: ALJ.*  As an Administrative Law Judge, I presided over and entered findings of facts and conclusions of law in scores of cases in which life insurance agents were prosecuted for violating standards of care.

     *4.*      *Expertise as an Attorney in Private Practice.*  As an attorney in private practice, I defended life insurance agents and brokers (in administrative law forums) against alleged violations of their duties of care.

     *5.*      *Expertise as Chief Executive Officer of a Major Insurance Entity*.  As President and CEO of NCCI, I developed substantial working relationships with the  insurance agent and agency community.

E.    *Expertise as to Actuarial Issues*

     *1.*      *Expertise as Commissioner of Insurance*.  As Commissioner of Insurance, my Department was responsible for overseeing insurer solvency (including insurer finances and accounting) and conducting insurer examinations.  As part of that responsibility, my Department oversaw the practices of insurers, agents, and actuaries in formulating premium rates.  In addition, I oversaw Iowa's regulation of the securities industry, and Iowa's Superintendent of Securities reported directly to me.  As a member of the NAIC, I served as both Vice Chairman and Chairman of NAIC's Life Insurance Committee.  The charge of this Committee was to oversee life insurers and all issues relating to life insurance products, including  underwriting

practices.  This Committee's work included considerations relating to underlying actuarial issues as to pricing.

   2.   *Expertise as Chief Executive Officer of a Major Insurance Entity.*  As President and CEO of NCCI, I had responsibility to accurately price some $12 - $15 billion of workers compensation insurance in 39 states.  NCCI prepared proposed premium filings for regulators to approve by extracting key data from its member insurance companies and then using that data to project necessary premium changes.  NCCI carried out its intensive pricing work though the professional efforts of an actuarial division of about 150 personnel.

   3.   *Expertise as General Counsel and Chief Lobbyist of the American Academy of Actuaries.*  I served as General Counsel and Chief Lobbyist of the American Academy of Actuaries.  In that capacity, I advised on admissions, discipline, federal antitrust law, and general corporate law.  I represented the 10,000-member professional organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance, and Labor, and House Committees on Education, Labor, Energy, and Ways and Means) and before various federal regulatory agencies.  The Academy is the professional organization of actuaries and includes qualified actuaries from all disciplines and all forms of insurers.  Collectively, Academy members were affiliated with virtually every life insurance company in the United States.  The Academy's Board of Directors likewise was comprised of leading insurance company executives from such life insurance companies.

   4.   *Expertise as an Author on Actuarial Issues.*  I have served in a number of cases as an expert on actuarial issues, including in Arizona, Florida, and California.  I also am the author of a number of articles on the actuarial profession.

   5.   *Expertise as a Reinsurance Arbitrator.*  I am certified by ARIAS-US as one of about 400 U.S. certified reinsurance arbitrators.  I sit as an arbitrator of disputes between insurers and their reinsurers.  Actuarial issues routinely arise in such cases in the form of pricing disputes.  Oftentimes, there are disputes regarding the information supplied by the ceding company and that information's positive or negative effect on the pricing that was agreed upon at the time of the initial reinsurance agreement.

### III.   DOCUMENTS REVIEWED

   In connection with preparing this report, I reviewed, among others, the following documents (and, as applicable, exhibits and attachments thereto):

•   All documents produced by PHL and US Bank in *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, United States District Court, Central District of California, Case No. CV12-03046 ("Doe I Case").

•   U.S. Bank's Second Amended Complaint from the Doe I Case.

•   PHL's First Amended Counterclaim and Third-Party Complaint in Interpleader from the Doe I Case.

10

- U.S. Bank's Responses to PHL's Second Set of Interrogatories from the Doe I Case.

- PHL's Responses to U.S. Bank's First Set of Interrogatories from the Doe I Case.

- PHL's Responses to U.S. Bank's First Set of Requests for Admission from the Doe I Case.

- U.S. Bank's Responses to PHL's First Set of Interrogatories from the Doe I Case.

- PHL's Responses to U.S. Bank's Second Set of Interrogatories from the Doe I Case.

- U.S. Bank's Complaint from *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, United States District Court, Central District of California, Case No. CV12-03047 ("Doe II Case").

- PHL's Answer to Complaint from the Doe II Case.

- U.S. Bank's First Amended Complaint from the Doe II Case.

- U.S. Bank's Second Amended Complaint from the Doe II Case.

- PHL's Answer to Second Amended Complaint from the Doe II Case.

- PHL's Counterclaim and Third Party Complaint for Interpleader from the Doe II Case.

- PHL's First Amended Counterclaim and Third-Party Complaint in Interpleader from the Doe II Case.

- U.S. Bank's Complaint from *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, United States District Court, District of Minnesota, Case No. 12-CV-00877 ("Doe III Case").

- PHL's Answer to Complaint from the Doe III Case.

- U.S. Bank's First Amended Complaint from the Doe III Case.

- U.S. Bank's Second Amended Complaint from the Doe III Case.

- PHL's Counterclaim from the Doe III Case.

- All documents produced by PFG in the Doe III Case.

- Complaint from *Karen Benjamin, as Trustee of the Jackson Family 2007 Irrevocable Trust v. PHL Variable Ins. Co.*, United States District Court, Central District of California, Case No. CV12-4556 ("Jackson Case").

11

- PHL's Complaint from *PHL Variable Ins. Co. v. Bank of Utah*, United States District Court, District of Minnesota, Case No. 12-cv-01256-ADM-JJK ("Close Case").

- Bank of Utah's Answer and Counterclaim from the Close Case.

- PHL's Answer to Bank of Utah's Counterclaim from the Close Case.

- Bank of Utah's Proposed Amended Counterclaim (attached to Declaration of Stephen G. Foresta in Support of Defendant's Motion for Leave to Amend Its Counterclaim) from Close Case.

- Docket from *PHL Variable Ins. Co. v. ESF QIF Trust*, United States District Court, District of Delaware, Case No. 12-cv-319-LPS ("Griggs Case").

- PHL's Complaint from Griggs Case.

- ESF QIF Trust's Answer/Counterclaim from Griggs Case.

- Docket from *Wells Fargo Bank, N.A., Trustee of the Milton Levy 2006-1 Insurance Trust v. PHL Variable Ins. Co.,* United States District Court, Northern District of Texas, Case No. 3:12-CV-3760 ("Levy Case").

- Wells Fargo Bank, N.A.'s Complaint from Levy Case.

- PHL's Answer from Levy Case.

- NAIC Market Regulation Handbook;

- PHL's SEC Form 10-K Filings for 2008-2011.

- Various statutory and regulatory provisions as noted in this Report and as available online.

- Various on-line websites.

## IV.    ASSIGNMENT AND EXPERT OPINIONS

My assignment was to read and review various records and documents in this case and other cases in order to determine whether PHL's conduct breached the custom and practice in the life insurance industry for handling claims.  In addition, I have been asked to opine whether, on the whole, PHL's conduct can be regarded as being more than just isolated incidents, systemic, and beyond the norms of the life insurance industry.  I also have been asked to provide some background on the secondary market for life insurance.

12

# V.   PRELIMINARY MATTERS TO THE EXPERT OPINIONS

Prior to entering my expert opinions, some preliminary matters merit discussion as follows:

*The Policies.*  There are two policies at issue in this matter,[3] both with a face value of $10 million and both with an issue date of December 28, 2005.  The insured, Jane Doe I died on January 28, 2012.  Both policies had the usual two year incontestability provision, which had run by the time of the claim.  US Bank acquired the two policies after the running of the contestability period.  US Bank dutifully and timely submitted a proof of claim to PHL on both policies on February 23, 2012.  PHL failed to respond at all to the claims pre-litigation.  Indeed, the record shows that PHL did not even contact US Bank until US Bank commenced this litigation.  Only after litigation ensued did PHL raise certain defenses to the claim.

*Connecticut Provisions.*  Further, before setting forth my opinions, I believe some additional preliminary matters merit discussion.  Because PHL's actions here are in part, governed by Connecticut's Unfair Trade Practices Act ("CUTPA" or the Act), I have set below, the pertinent provisions of the Act as they relate to this matter:

"(6) Unfair claim settlement practices. Committing or performing with such frequency as to indicate a general business practice any of the following: (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (b) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (c) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (d) refusing to pay claims without conducting a reasonable investigation based upon all available information; (e) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (f) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (g) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; (h) attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application; (i) attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured; (j) making claims payments to insureds or beneficiaries not accompanied by statements setting forth the coverage under which the payments are being made; (k) making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration; (l) delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information; (m) failing to promptly settle claims, where liability has become reasonably clear, under one portion of the

---

[3] Under Section VI.B., *infra*, additional policies are discussed.

insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; (n) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; (o) using as a basis for cash settlement with a first party automobile insurance claimant an amount which is less than the amount which the insurer would pay if repairs were made unless such amount is agreed to by the insured or provided for by the insurance policy."

Conn. Gen. Stat. § 38a-816(6)(6).

*California Provisions: 40 Days to Accept or Reject, with Explanation.*  In addition, California's requirements as to prompt claim actions by insurers are also relevant.  In particular, see California Code of Regulations, Title 10, section 2695.7(b), providing for claim decisions (" . . . accept or deny . . . ") to be made by the insurer within forty days of the receipt of a claim by the insurer.  In addition, subsection (1) of that regulation provides that the insurer who denies a claim must do so in writing with a statement of all bases for the denial and the factual and legal bases for the denial, with reference to statute, law or policy provision as applicable.[4] Furthermore, section 10172.5(a) of California's Insurance Code states that life insurers who do not pay death benefits within 30 days after the date of death must pay interest to beneficiaries at a rate of not less than the then-current rate of interest earned on death benefits left on deposit with the insurers.

*The Claimants.*  In all of this, it is important to respect the fact that US Bank is a legitimate and genuine claimant under the policies at issue—with exactly the same standing as any other individual or entity would have as a claimant under a life insurance policy.  PHL has tried mightily to attack US Bank because of its status as a corporate claimant.  The problem with PHL's position is that it is inconsistent with (i) the very policies it  issued in this matter, (ii) the rights PHL created in the policy owner under the policy, (iii) the rules and regulations of insurance regulators, and (iv) applicable contract rules and regulations.

## VI.   EXPERT OPINIONS AND FURTHER DISCUSSION

### A.   PHL Breached Its Obligations and Responsibilities as an Insurer and Engaged in Unfair Clams Handling with Respect to the Jane Doe I Policies

**Background:**

On December 28, 2005, PHL issued Policy Nos. 97514670 and 97514671 (each with $10 million face values) on the life of Jane Doe I ("Jane Doe I Policies").  The original owner and beneficiary of the Policies was the Jane Doe I Life Insurance Trust #2006.  The original beneficiary of the Jane Doe Life Insurance Trust #2006 was the Doe Family Irrevocable Trust.  Ownership of the Policies was subsequently transferred to US Bank National Association ("US Bank"), as securities intermediary for Lima Acquisition LP.

---

[4] *See*, *e.g.*, 10 Cal. Code Regs. § 2695.7(b)(1).

On January 28, 2012, Jane Doe I passed away, while the Jane Doe I Policies were in force. While Jane Doe I was alive, PHL received $2,515,400 in premiums under the Jane Doe I Policies. On February 23, 2012, US Bank timely submitted a proof of claim to PHL, seeking payment of death benefits under the Jane Doe I Policies. The Jane Doe I Policies state: "Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy." PHL never responded to US Bank's claim.

On April 6, 2012, US Bank, as securities intermediary for Lima Acquisition LP, filed this action, seeking payment of the death benefits. After the lawsuit was filed, PHL contacted US Bank and said for the first time that PHL had not paid the death benefits on the Jane Doe I Policies because it was concerned that two prior lienholders, J.P. Morgan Chase Bank, NA ("JPM") and The Bank of New York Trust Company, NA ("BoNY"), might assert claims on the Jane Doe I Policies. On April 25, 2012, at PHL's request, US Bank granted PHL an extension until May 15, 2012 to respond to its original Complaint.

On May 15, 2012, PHL filed an interpleader against US Bank, JPM, and BoNY. Although JPM and BoNY had relinquished their interests in the Policies nearly two years earlier, which PHL knew, PHL alleged that they might assert claims against the Doe Policies. PHL did *not* serve the interpleader on JPM or BoNY at this time. Further, PHL never deposited the funds it contended were at issue in the interpleader with the Court.

On May 16, 2012, PHL sent a letter to JPM and BoNY raising the same concerns that it raised in its interpleader. At that time, PHL made no mention of its interpleader, which it had filed against JPM on BoNY one day earlier. On June 18, 2012, PHL served the interpleader on JPM and BoNY.

On July 17 and 18, 2012, through US Bank's efforts, BoNY and JPM, respectively, provided signed documents confirming their release of any interest in the Policies, which was consistent with PHL's records all along. On July 18, 2012, US Bank provided copies of these documents to PHL. On July 25, 2012, PHL transmitted a check to US Bank in the amount of $20,305,566.02, which represents the face values of the Jane Doe I Policies plus a nominal amount of interest.

**Expert Opinions as to the Jane Doe I matter:**

1. **Failure to Respond.** PHL's failure to respond to US Bank's communications regarding its claim on the Jane Doe I Policies failed to meet acceptable standards of claims-handling practices within the life insurance industry.

 • PHL failed to respond at all to US Bank's timely proof of claim, which was submitted on February 23, 2012, until after US Bank filed suit against PHL. This was an unreasonable delay. Additionally, an insurer should not wait until a policyholder has sued the insurer before responding to the policyholder and providing its reasons for not paying the claims.

15

- I understand PHL has taken the position in litigation that PHL's communications regarding a different claim brought under a different policy (i.e., the John Doe II Policy referred to below) constituted a response to US Bank's claim under the Jane Doe I Policies. An insurer has an obligation to handle each claim independently. It is unreasonable for the insurer to expect a policyholder to know, without any communication from the insurer, that the insurer's communications as to one claim also applies to another claim.

- *Breach of Custom and Practice.* Further, and in all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require prompt and timely communications of an insurer to its insured once a claim has been filed in the claim settlement process.

2. **Absence of a Reasonable Investigation.** PHL failed to pay the claim on the Jane Doe I Policies without conducting a reasonable investigation based on all of the available information. PHL's investigation of the claim on the Jane Doe I Policies failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- If an insurance company believes that third parties might assert an interest in the proceeds of a policy, the insurance company should, if possible, contact those third parties immediately upon the filing of the claim. Here, PHL waited over three months to contact JPM and BoNY. At that point, US Bank had already sued PHL.

- An insurer's investigation should begin with a review of its own records. Here, a review of the Jane Doe I Policies' files would have revealed that JPM and BoNY released their interests in the Jane Doe I Policies in May 2010.

- PHL recorded the releases and notified US Bank in writing on August 2, 2010 that it had done so. Having notified US Bank that it had recorded the releases of the collateral assignments, it was unreasonable for PHL to contend later, after receiving a claim for the death benefits, that the releases it had recorded were unclear or may have been released in error. If PHL had any concerns about these releases, it should have raised and investigated those issues at the time it received and recorded the releases, not wait until after receiving a claim for the death benefits.

- *Breach of Custom and Practice.* Further, and in all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require a reasonable investigation of an insurer once a claim has been filed in the claim settlement process.

3. **Failure to Timely Affirm or Deny Coverage.** PHL failed to timely affirm or deny coverage of US Bank's claim on the Jane Doe I Policies. In particular, PHL did not affirm or deny coverage until PHL paid the claim. This failed to meet acceptable standards of claims-handling practices within the life insurance industry. See above.

- *California.*  PHL also failed to comply with California regulations with respect to its duty to affirm or deny coverage.  California regulations provide that, upon receiving a proof of claim, an insurer must accept or deny a claim immediately, but in no event more than 40 days after receiving the proof of claim.  If an insurer rejects all or part of a claim, it must do so in writing and list all factual and legal bases for such rejection or denial.  If an insurer requires additional time, it must, within 40 days of receipt of the claim, notify the claimant of its need and set forth reasons in writing.  Thereafter, the insurer is required to provide similar notice to the claimant every 30 days.  PHL did not comply with any of these requirements.

- *Breach of Custom and Practice.*  Further, PHL's actions here are inconsistent with their obligations and responsibilities under custom and practice in the industry, which require prompt decisions of an insurer in the claim settlement process.

4.    **Failure to Provide an Explanation or Excuse.**  PHL failed to provide a legitimate excuse for not promptly paying death benefits under the Jane Doe I Policies.  The record shows that during the claim settlement process, PHL provided no reason for not promptly paying this claim. See my discussion above on this point.

     *Breach of Custom and Practice.*  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require prompt payment of claims when liability is reasonably clear or clear justification as to why payment is delayed.

5.    **No Standards.**  In light of the above, it is my opinion that PHL did not have in place and did not implement adequate standards and procedures for ensuring that claims for death benefits, including a claim on the Jane Doe I Policies, would be promptly processed and investigated.  PHL's claims handling standards, and its implementation of those standards, failed to meet acceptable standards of claims-handling practices within the life insurance industry.

     *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to have in place and implement adequate standards to ensure that claims are promptly processed and investigated in the claim settlement process.

**B.    <u>PHL Has Engaged in a Pattern of Mishandling Claims</u>**

     As discussed above, Connecticut's Unfair Trade Practices Act ("CUTPA") requires US Bank to show that PHL's breaches were that of a general business practice.  I will leave it to others to legally define a "general business practice."

     For me, as a former Commissioner of Insurance and insurance company executive, the issue is whether, based upon my experience, PHL's pattern of resisting, denying, or delaying claims in circumstances similar to the Jane Doe I Policies reflects more than just isolated incidents, is suspiciously systemic, and is beyond the norms of the insurance industry.  Because it is not practical to analyze all of PHL's claims during the pertinent timeframe, I set out below a handful of cases known to US Bank (and, in turn, known to me), which reveals a pattern of

17

wrongful conduct by PHL.  I also discuss PHL's claim resistance/denial rates measured by death benefits, which, during the relevant timeframe, was more than *12 times* the industry average, and other factors that likely motivated PHL.   In light of this, it is clear that PHL's wrongful conduct occurred with a frequency and regularity to suggest that PHL engaged in systemic behavior to resist, deny, and delay valid death benefit claims, such as the one submitted by US Bank under the Jane Doe I Policies.

      1.     **U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co., United States District Court, Central District of California, Case No. CV12-03047 ("John Doe II Case")**

**Background:**[5]

On November 4, 2005, PHL issued Policy No. 97516307 (with a $10 million face value) on John Doe II's life ("John Doe II Policy").  The original owner and beneficiary of the John Doe II Policy was the John Doe II Irrevocable Insurance Trust.  The original beneficiary of the John Doe II Irrevocable Insurance Trust was John Doe II's wife.  Ownership of the John Doe II Policy was subsequently transferred to US Bank, as securities intermediary for Lima Acquisition LP.

On January 7, 2012, John Doe II passed away, while the John Doe II Policy was in force and after the running of the incontestability clause of the policy.  While John Doe II was alive, PHL received $1,484,500 in premiums on the John Doe II Policy.

On January 30, 2012, US Bank submitted a beneficiary statement to PHL, seeking payment of death benefits under the John Doe II Policy.  The Policy states:  "Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy."

On January 31, 2012, PHL sent a letter to Torrey Pines, the company servicing the John Doe II Policy on behalf of US Bank, requesting that US Bank produce "Schedule 2.1(a)(3) to a Purchase Agreement," which was referenced in an "Assignment and Assumption Agreement" that PHL had on file.  PHL said the schedule was necessary to confirm that BoNY had authority to release a collateral assignment to JPM on the John Doe II Policy.  In making this request, PHL did not provide a copy of the agreement to US Bank, but enclosed only one page of it.  US Bank was not a party to these agreements.

On February 8, 2012, US Bank responded to PHL by enclosing a Release of Assignment, dated August 15, 2010, which was signed by BoNY as attorney-in-fact for JPM, confirming that "all right, title and interest" in the John Doe II Policy is "relinquished and released."  On August 19, 2010, PHL also had sent a letter to US Bank confirming that it had recorded the release.  During a later telephone call, PHL advised Torrey Pines that it released JPM's interest in the John Doe II Policy but that PHL was investigating whether PHL made an error in doing so.  PHL again said it would not pay US Bank's claim unless US Bank provided PHL with the requested schedule.  PHL promised to send a confirming letter, but never did.

---

[5] Documents reviewed in connection with this case are reflected in, *supra*, Section III ("Documents Reviewed").

On February 13, 2012, US Bank submitted the original John Doe II Policy and a certified copy of John Doe II's death certificate to Phoenix.

On February 14, 2012, PHL sent another letter to US Bank requesting a copy of the above-referenced schedule.  On February 24, 2012, US Bank sent a letter reiterating that US Bank did not have the schedule that PHL asked for.  Because PHL still refused to pay the claim, US Bank tried to obtain the schedule directly from BoNY, but BoNY would not provide the schedule because it was confidential.  However, BoNY provided US Bank with a certificate confirming that BoNY had purchased JPM's interest in the John Doe II Policy and therefore had authority to release the collateral assignment on the John Doe II Policy, as stated in the Release in PHL's files.  US Bank then provided a copy of that certificate to PHL on March 21, 2012 and made a final demand for payment.  PHL still did not pay the claim.

On April 6, 2012, US Bank, as securities intermediary for Lima Acquisition LP, filed the original John Doe II Case, seeking payment of the death benefit on the John Doe II Policy.  On April 25, 2012, at PHL's request, US Bank granted PHL an extension until May 15, 2012 to respond to the complaint.

On May 16, 2012, PHL sent a letter to JPM and BoNY raising the concerns described above.  This was the first time PHL contacted JPM and BoNY about the John Doe II Policy after receiving a claim for the death benefit.

On May 22, 2012, PHL filed an interpleader against US Bank, JPM and BoNY.  PHL did *not* serve the interpleader on JPM or BoNY at this time.  Although PHL was required to deposit with the Court the $20 million in death benefits under the Policies, PHL never deposited the funds with the Court.

On July 17 and 18, 2012, BoNY and JPM, respectively, provided signed documents confirming their release of any interest in the John Doe II Policy's death benefits.  On July 18, 2012, US Bank provided copies of these documents to PHL.  On July 25, 2012, PHL transmitted a check to US Bank in the amount of $10,171,094.41, which represents the face values of the John Doe II Policy plus a nominal amount of interest.

**Expert Opinions as to the John Doe II Case:**

Based on the records I reviewed in this matter, the following constitute my expert opinions as to the John Doe II case.  In this regard, I have identified below matters that parallel the wrongful actions and behavior of PHL I set forth above in the Jane Doe I case.

1.     **Failure to timely Respond.**  PHL's failure to respond timely to US Bank's communications regarding its claim on the John Doe II Policy failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- After telling US Bank that it must provide a copy of the schedule on February 14, 2012, PHL never responded to any of US Bank's other communications, including after US Bank told PHL it could not obtain the schedule and provided PHL with the

certificate from BoNY.  A reasonable insurer should have responded to these communications and done so in writing promptly after receiving the communications.

- Even after US Bank provided the certificate from BoNY and made a final demand for PHL to pay the claim, PHL did not even respond, forcing US Bank to file a lawsuit. A reasonable insurer should respond to the demand.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to communicate timely with the claimant in the claim settlement process.

2.      **Lack of a Reasonable Investigation.**  PHL refused to pay the claim on the John Doe II Policy without conducting a reasonable investigation based on all of the available information. PHL's investigation of US Bank's claim on the John Doe II Policy failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- If an insurance company believes that third parties might assert an interest in the proceeds of a policy, the insurance company should, if possible, contact those third parties immediately.  Here, PHL waited over three months to contact JPM and BoNY. At that point, US Bank had already sued PHL.

- An insurer's investigation should begin with a review of its own records.  Here, a review of the Policies' files would have revealed that JPM and BoNY released their interests in the Policies in May 2010.  PHL recorded the releases and notified US Bank in writing on August 2, 2010 that it had done so.  Having notified US Bank that it had recorded the releases of the collateral assignments, it was unreasonable for PHL to contend later, after receiving a claim for the death benefits, that the releases it had recorded were unclear or may have been released in error.  If PHL had any concerns about these releases, it should have raised and investigated those issues at the time it received and recorded the releases, not wait until after receiving a claim for the death benefits.

- PHL also failed to reasonably consider the certificate that BoNY provided.  Taken together with PHL's records on file, PHL did not have a reasonable basis for continuing to claim that the release of the collateral assignment signed by BoNY was improper, especially when PHL had not even contacted BoNY or JPM at the time US Bank provided the certificate to PHL.

- It was also improper and unreasonable for PHL to demand that US Bank provide a copy of a schedule to an agreement that US Bank did not have and was not a party to. A reasonable insurer that genuinely believed there was an issue with the release and was conducting a proper investigation would have contacted JPM and BoNY first immediately, not demanded that the policyholder provide this information to PHL.

- *Breach of Custom and Practice.*  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to conduct a reasonable and timely investigation in the claim settlement process.

3.   **Failure to Affirm or Deny Coverage.**  PHL failed to timely affirm or deny coverage of US Bank's claim on the John Doe II Policy after receiving proof of death.  In fact, PHL does not appear ever to have affirmed or denied coverage until PHL actually paid the claim.

- PHL also failed to comply with California regulations with respect to its duty to affirm or deny coverage.  California regulations provide that, upon receiving a proof of claim, an insurer must accept or deny a claim immediately, but in no event more than 40 days after receiving the proof of claim.  If an insurer rejects all or part of a claim, it must do so in writing and list all factual and legal bases for such rejection or denial.  If an insurer requires additional time, it must, within 40 days of receipt of the claim, notify the claimant of its need and set forth reasons in writing.   Thereafter, the insurer is required to provide similar notice to the claimant every 30 days.  PHL did not comply with any of these requirements.

- *Breach of Custom and Practice.*  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to promptly affirm or deny coverage in the claim settlement process.

4.   **No Justification for Delay.**  PHL failed to provide a legitimate excuse for not promptly paying death benefits under the Doe Policies.  See above.

*Breach of Custom and Practice.*  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to provide a legitimate excuse in the event of not promptly paying claims when liability is reasonably clear in the claim settlement process.

5.   **No Standards.**  In light of the above, I believe PHL did not have in place and did not implement adequate standards and procedures for ensuring that claims for death benefits, including the claims on the Doe Policies, would be promptly processed and investigated.  PHL's claims handling standards, and its implementation of those standards, failed to meet acceptable standards of claims-handling practices within the life insurance industry.

*Breach of Custom and Practice.*  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to have in place adequate standards for assuring prompt investigation and settlement of claims in the claim settlement process.

2.      **U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co., United States District Court,
District of Minnesota, Case No. 12-CV-00877 ("John Doe III Case")**

**Background:** [6]

On January 21, 2008, PHL issued Policy No. 97528505 (with a $3 million face value) on
John Doe III's life ("John Doe III Policy"). The original owner and beneficiary of the John Doe
III Policy was the John Doe III 2008 Irrevocable Trust. The original beneficiary of the John Doe
III 2008 Irrevocable Trust was John Doe III's wife. Ownership of the John Doe III Policy was
subsequently transferred to US Bank, as securities intermediary for Lima Acquisition LP.

On November 4, 2011, John Doe III passed away, while the John Doe III Policy was in
force. While John Doe III was alive, PHL received $389,000 in premiums under the Policy.

On November 14, 2011, PHL sent a letter to John Doe III's widow (who was not the
owner or beneficiary) requesting:  (a) a certified copy of John Doe III's death certificate; (b) the
completion and return of an enclosed Beneficiary Statement; (c) completion of an enclosed
affidavit; and (d) return of the policy. On December 22, 2011, US Bank submitted a proof of
claim to PHL, seeking payment of death benefits. The Policy states:  "If the Insured dies while
the policy is in force, we will pay the Death Proceeds . . . upon receipt of due proof of death of
the Insured no later than two months after receipt of such proof, subject to any applicable
provisions of the policy."

On January 6, 2012, PHL sent a letter to US Bank stating that there were "issues"
regarding John Doe III's consent to the John Doe III Policy and the existence of an insurable
interest at the time the John Doe III Policy was issued. In that letter, PHL stated that to process
the claim, it would "require" various documents, including documents about John Doe III's
estate plan and his net worth and income.

On January 20, 2012, US Bank sent a letter to PHL stating that it already provided PHL
with all of the documents necessary for PHL to process the claim. On January 27, 2012, PHL
sent another letter stating its concern about John Doe III's alleged lack of consent to the policy.
On February 16, 2012, US Bank sent PHL an acknowledgement and consent form that was
signed by John Doe III and his spouse and notarized. The consent showed that John Doe III and
his spouse were consenting to the transfer of the policy over a year after the policy was issued.
On March 1, 2012, PHL sent US Bank a letter requesting the same documents it originally
requested. On March 9, 2012, US Bank sent a letter to PHL making a final demand for death
benefits. PHL never responded.

On April 6, 2012, US Bank filed the John Doe III Case, seeking payment of death
benefits. PHL still has not paid the claim.

---

[6] Documents reviewed in connection with this case are reflected in, *supra*, Section III ("Documents Reviewed").

**Expert Opinions as to the John Doe III Case:**

Based on the record I reviewed in this matter, the following constitute my expert opinions as to the John Doe III case. In this regard, I have identified below matters that parallel the wrongful actions and behavior of PHL I set forth above in the Jane Doe I case.

1.      **Failure to Timely Communicate.** PHL failed to respond to US Bank's communications within a reasonable time. PHL's failure to respond to US Bank's communications regarding its claim on the John Doe III Policy failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- •  US Bank filed its proof of claim on December 22, 2011. PHL waited over two weeks to acknowledge and respond to US Bank.

- •  Furthermore, rather than promptly contact US Bank after receipt of the claim, and without notifying US Bank, PHL communicated about the policy with John Doe III's widow, even though she was not the owner or beneficiary of the policy.

- •  When US Bank provided PHL with the acknowledgment and consent showing that John Doe III and his wife had consented to the transfer of the policy, PHL never directly responded to this point, but simply restated its demands for other documents that were less relevant to showing John Doe III's consent.

- •  *Breach of Custom and Practice.* In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to communicate timely with the claimant in the claim settlement process.

2.      **Lack of a Reasonable Investigation.** PHL refused to pay the claim on the John Doe III Policy without conducting a reasonable investigation based on all of the available information. PHL's investigation of US Bank's claims on the Doe III Policy failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- •  It is unclear why, after John Doe III's death, PHL was speaking with John Doe III's widow about the policy. She was neither the owner nor beneficiary of the policy.

- •  PHL's stated concern about John Doe III's lack of consent to the policy is undermined by documents in PHL's possession. PHL's files included numerous documents signed (some notarized) by John Doe III indicating his consent to the policy. For example, he signed the policy application, an authorization form to release medical information to PHL, a policy acceptance form, and numerous other documents related to obtaining financing for the policy. John Doe III also had to submit to medical examinations to obtain the policy.

- •  PHL also seems to have disregarded or ignored the notarized copy of the acknowledgment and consent form signed by John Doe III and his wife, which US

23

Bank provided to PHL.  There is no indication that PHL discussed this document with John Doe III's widow, even after being provided with the document.  A reasonable insurer would have made use of all of this available information in its investigation.

- PHL's investigation appears one-sided and incomplete.  PHL did not provide US Bank with information in its possession, including information about PHL's discussions with John Doe III's widow, so that US Bank could provide information to respond to PHL's purported concern.  Instead, PHL asked US Bank for documents that PHL already had and that US Bank could not reasonably be expected to have, such as personal private information about John Doe III's finances and estate plan.

- If PHL believed these documents were relevant to insurable interest, PHL should have been obtained them from John Doe III at the time of underwriting, not demand them from a third party that purchased the policy years later after he has passed away.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to conduct a reasonable and timely investigation in the claim settlement process.

3.     **Failure to Affirm or Deny Coverage.**  PHL failed to timely affirm or deny coverage of US Bank's claims on the Doe Policies.  It does not appear that PHL ever told US Bank that it was contesting the policy until after US Bank sued PHL.  This failed to meet acceptable standards of claims-handling practices within the life insurance industry.  See above.

- PHL also failed to comply with Minnesota rules and regulations with respect to its duty to affirm or deny coverage.  Minnesota provides that, upon receiving a properly executed proof of loss, an insurer shall accept or deny the claim within 60 business days.  If an insurer rejects all or part of a claim on the grounds of a specific policy provision, condition, or exclusion, it must do so in writing and refer to such provision, condition, or exclusion.  PHL did not comply with any of these applicable rules and regulations.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to timely affirm or deny coverage in the claim settlement process.

4.     **No Legitimate Excuse for Not Paying.**  PHL failed to provide a legitimate excuse for not paying death benefits under the John Doe III Policy.  See above.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to provide a legitimate excuse for refusing to pay a claim in the claim settlement process.

5.     **No Standards.**  In light of the above, I believe PHL did not have in place and did not implement adequate standards and procedures for ensuring that claims for death benefits, including the claims on the Doe III Policy, would be promptly processed and investigated. PHL's claims handling standards, and its implementation of those standards, failed to meet acceptable standards of claims-handling practices within the life insurance industry.

•     *Breach of Custom and Practice.*  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to have claim settlement standards in place in the claim settlement process.

3.     <u>**Karen Benjamin, as Trustee of the Jackson Family 2007 Irrevocable Trust v. PHL Variable Ins. Co., United States District Court, Central District of California, Case No. CV12-4556 ("Jackson Case")**</u>

**Background:** [7]

On September 19, 2007, PHL issued Policy No. 97525116 (with a $1.8 million face value) on the life of William F. Jackson ("Jackson Policy").  The owner and beneficiary of the Policy has always been the Jackson Family 2007 Irrevocable Trust ("Jackson Trust").  The Jackson Policy states:  "If the Insured dies while the policy is in force, we will pay the Death Proceeds . . . upon receipt of due proof of death of the Insured no later than two months after receipt of such proof, subject to any applicable provisions of the policy."

On December 14, 2011, Mr. Jackson passed away, while the Jackson Policy was in force. While Mr. Jackson was alive, PHL received $394,600 in premiums under the Policy.

On January 23, 2012, the Jackson Trust timely submitted a proof of claim to PHL, seeking payment of death benefit.  The Jackson Trust did not receive a response to its claim. Over a month later, on February 28, 2012, the Jackson Trust sent a follow-up letter to PHL asking that the claim be paid.

On February 29, 2012, PHL advised the Jackson Trust that it would not pay the claim unless the Jackson Trust completed a PHL form entitled "Certification and Acknowledgement of Trust Agreement for Death Claim Settlement" ("Post-Claim Questionnaire").  According to PHL, the Post-Claim Questionnaire was necessary to establish a policy owner's insurable interest in the insured.

On April 2, 2012, PHL sent a letter reiterating that it would not pay the death benefit unless the Jackson Trust provided the information requested in the Post-Claim Questionnaire. On April 12, 2012, the Jackson Trust sent PHL a letter insisting that PHL had no right to condition payment of the death benefit upon receipt of a completed Post-Claim Questionnaire. The Jackson Trust also provided PHL with a sworn affidavit providing facts pertinent to insurable interest.  On May 7, 2012, PHL again stated that it would not pay the death benefit until the Jackson Trust completed the Post-Claim Questionnaire.

---

[7] Documents reviewed in connection with this case are reflected in, *supra*, Section III ("Documents Reviewed").

25

On May 24, 2012, the Jackson Trust initiated the Jackson Case, seeking payment of death benefit.  On or about August 9, 2012, PHL paid the claim.

**Expert Opinions as to the Jackson Case:**

Based on the record I reviewed in this matter, the following constitute my expert opinions as to the Jackson case.  In this regard, I have identified below matters that parallel the wrongful actions and behavior of PHL I set forth above in the Jane Doe I case.

1.    **Coverage Misrepresentations.**  PHL made misrepresentations regarding coverage under the Jackson Policy, which violates acceptable claims-handling practices in the life insurance industry.

- By telling the Jackson Trust that completion of the Post-Claim Questionnaire was required for payment of the death benefit, PHL misrepresented the terms of the Jackson Policy.  The Jackson Policy states that death benefits will be paid only proof of Mr. Jackson's death - not upon completion of a Post-Claim Questionnaire.  Nowhere does the policy state that the policyholder must complete the Post-Claim Questionnaire.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which prohibit an insurer from misrepresenting policy provisions and other requirements in the claim settlement process.

2.    **Failure to Timely Communicate.**  PHL failed to respond to the Jackson Trust's communications within a reasonable time.  PHL's failure to respond to the Jackson Trust's communications regarding its claim on the Jackson Policy failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- The Jackson Trust first submitted its claim to PHL on January 23, 2012.  PHL failed to respond to the claim.  Only after the Jackson Trust sent a follow-up letter to PHL five weeks later did PHL tell the Jackson Trust that it would not pay the death benefit unless the Post-Claim Questionnaire was completed.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to timely communicate with their claimant in the claim settlement process.

3.    **Failure to Conduct a Reasonable Investigation.**  PHL refused to pay the claim on the Jackson Policy without conducting a reasonable investigation based on all of the available information.  PHL's investigation of the Jackson Trust's claims on the Jackson Policies failed to meet acceptable standards of claims-handling practices within the life insurance industry.

26

- A careful review of the Post-Claim Questionnaire shows that it was simply a delay tactic used by PHL. Even worse, it is designed to elicit information that is mostly irrelevant to the claim itself (as to which liability had become reasonably clear). Indeed, most all of the Post-Claim Questionnaire elicited information from the Jackson Trust that, in the main, was unrelated to appropriate claim-settlement inquiry by PHL. To the contrary, the Post-Claim Questionnaire was a sinister tactic by PHL designed to elicit information to be used later by PHL as a defensive or offensive weapon in litigation.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to conduct a reasonable and timely investigation in the claim settlement process.

4.     **Failure to Affirm or Deny Coverage on a Timely Basis.** PHL failed to timely affirm or deny coverage of the Jackson Trust's claim on the Jackson Policy after receiving proof of death. In fact, PHL does not appear ever to have affirmed or denied coverage.

- PHL also failed to comply with California regulations with respect to its duty to affirm or deny coverage. California regulations provide that, upon receiving a proof of claim, an insurer must accept or deny a claim immediately, but in no event more than 40 days after receiving the proof of claim. PHL did not comply with this requirement.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to affirm or deny coverage within a reasonable time in the claim settlement process.

5.     **No Justification for Not Paying Claim.** PHL failed to promptly provide a legitimate excuse for not paying death benefits under the Policies. See above.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to promptly provide a legitimate reason for not paying a claim under the policy in the claim settlement process.

6.     **No Standards.** In light of the above, I believe PHL did not have in place and did not implement adequate standards and procedures for ensuring that claims for death benefits, including the claims on the Jackson Policy, would be promptly processed and investigated. PHL's claims handling standards, and its implementation of those standards, failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to have in place adequate standards

27

to assure that claims are promptly processed and investigated in the claim settlement process.

### 4.   PHL Variable Ins. Co. v. Bank of Utah, United States District Court, District of Minnesota, Case No. 12-cv-01256-ADM-JJK ("Close Case")

**Background:** [8]

On September 11, 2007, PHL issued Policy No. 97523816 (with a $5 million face value) on the life of William Close ("Close Policy"). The policy was procured by the William Close Irrevocable Trust ("Close Trust"). The sole beneficiary of the Close Trust was Mr. Close's wife, Mrs. Close. Ownership of the Close Policy was subsequently transferred to Bank of Utah, as securities intermediary for Limited Life Assets Services Limited.

On November 18, 2011, Mr. Close passed away, while the Close Policy was in force. On January 4, 2012, Bank of Utah timely submitted a proof of claim to PHL, seeking payment of the death benefit. The Close Policy specified that PHL would pay a submitted claim within two months.

On January 9, 2012, PHL sent a letter to Bank of Utah stating that the beneficiary statement submitted by Bank of Utah needed to be notarized. On January 18, 2012, Bank of Utah sent a letter to Phoenix, enclosing a notarized version of the beneficiary statement. On January 27, 2012, PHL advised Bank of Utah via telephone that its claim was received as of January 23, 2012. PHL stated that the claim would be reviewed within seven business days. Bank of Utah did not receive a response within that time.

Throughout February and March 2012, Bank of Utah telephoned PHL on at least eight separate occasions to inquire about the status of its claim. PHL repeatedly stated that the claim was still under review. On February 22, 2012, PHL advised Bank of Utah that its claim would take longer than normal to process, given its size. On March 2, 2012, PHL told Bank of Utah that its claim was still under review and that they did not know when the processing of the claim would be completed. On March 22, 2012, PHL told Bank of Utah that further investigation of its claim would be required because Mr. Close's retired status, as it was listed on the Close Policy's application, differed from information that PHL had gathered from elsewhere.

On March 23, 2012, Bank of Utah sent a letter to PHL, inquiring about the status of its claim. Bank of Utah reminded PHL of its obligation, under the Policy, to pay the claim within two months. On March 30, 2012, PHL told Bank of Utah that its claim was still being investigated and there was no estimate as to when the investigation would be completed.

On or about May 24, 2012, PHL filed the Close Case, seeking a declaration that the Close Policy is void for lack of insurable interest and seeking to keep the premiums on the Close Policy. PHL still has not paid the claim.

---

[8] Documents reviewed in connection with this case are reflected in, *supra*, Section III ("Documents Reviewed").

**Expert Opinions as to the Close Case:**

Based on the record I reviewed in this matter, the following constitute my expert opinions as to the Close case.  In this regard, I have identified below matters that parallel the wrongful actions and behavior of PHL I set forth above in the Jane Doe I case.

1.     **Misrepresentations.**  PHL made misrepresentations regarding coverage under the Close Policy, which violates acceptable claims-handling practices in the life insurance industry.

- On two separate occasions, PHL stated two unrelated concerns that delayed the processing of Bank of Utah's claim.  First, PHL stated that the claim was being delayed due to its size.  The Close Policy states that the payment of death benefits will be made upon due proof of death.  Nothing in the Close Policy permits a delay of payment on large claims, and PHL did not say this about the other large policies discussed in this report.  Second, PHL said it was investigating whether Mr. Close was actually retired, as stated in the policy application.  However, PHL's own investigation indicates that Mr. Close's widow confirmed he was retired when he completed the policy application.  Moreover, the policy was incontestable.  A reasonable insurer therefore would not delay a claim on an incontestable policy on this basis.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to not misrepresent policy terms and provisions or other relevant matters in the claim settlement process.

2.     **Failure to Timely Respond.**  PHL failed to respond to Bank of Utah's communications within a reasonable time.  PHL's failure to respond to Bank of Utah's communications regarding its claim on the Close Policy failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- Bank of Utah submitted its claim under the Close Policy to PHL on January 4, 2012.  PHL failed to timely respond to Bank of Utah's claim. As a result, Bank of Utah was forced to repeatedly telephone PHL.  Throughout February and March 2012, Bank of Utah telephoned PHL no less than eight times to inquire on the status of its claim.

- PHL's communications with Bank of Utah were incomplete and misleading.  See above.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to timely respond in communications with its claimant in the claim settlement process.

3.     **Failure to Affirm or Deny Coverage.**  PHL failed to timely affirm or deny coverage of Bank of Utah's claims on the Close Policy.  The Close Policy states that any claim brought under it would be processed within two months.  See above.

- Similarly, in Minnesota, an insurer must accept or deny a claim within 60 business days upon receipt and 30 business days to complete investigation and notify claimant of acceptance or denial of claim.  If an insurer rejects all or part of a claim on the grounds of a specific policy provision, condition, or exclusion, it must do so in writing and refer to such provision, condition, or exclusion.  PHL did not comply with any of these requirements.

- *Breach of Custom and Practice***.**  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to promptly affirm or deny coverage in the claim settlement process.

4.     **Failure to Provide a Legitimate Excuse.**  PHL failed to promptly provide a legitimate excuse for not paying death benefit on the Close Policy.  See above.

- *Breach of Custom and Practice***.**  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to provide a legitimate justification for not paying a claim where liability has become reasonable clear in the claim settlement process.

5.     **No Standards.**  In light of the above, I believe PHL did not have in place and did not implement adequate standards and procedures for ensuring that claims for death benefits, including the claims on the Close Policy, would be promptly processed and investigated.  PHL's claims handling standards, and its implementation of those standards, failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- *Breach of Custom and Practice***.**  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to have in place adequate standards for assuring that claims are promptly processed and investigated in the claim settlement process.

5.     **PHL Variable Ins. Co. v. ESF QIF Trust, United States District Court, District of Delaware, Case No. 12-cv-319-LPS ("Griggs Case")**

**Background:** [9]

On or about October 26, 2006, PHL issued Policy No. 97519312 (with a $10 million face value) insuring the life of Roberta Griggs ("Griggs Policy").  The original owner and beneficiary

---

[9] Documents reviewed in connection with this case are reflected in, *supra*, Section III ("Documents Reviewed").

of the Griggs Policy was the Roberta Griggs Insurance Trust III.  Ownership of the Griggs Policy was subsequently transferred to the ESF QIF Trust ("ESF").

On October 14, 2011, Ms. Griggs passed away while the Griggs Policy was in force.  On November 16, 2011, Deutsche Bank Trust Company, as trustee of ESF, provided PHL a copy of Ms. Griggs' death certificate and a claim form for the benefits.

On December 1, 2011, PHL sent a letter to the policyholder making numerous onerous document requests, claiming that the documents were necessary to "ensure that an insurable interest existed at the time the policy was issued."  On January 2, 2012, PHL sent another letter to the policyholder reiterating its demand for documents.

On or about March 15, 2012, PHL filed a lawsuit seeking a declaration that the Griggs Policy is void for lack of insurable interest and seeking to keep all the premiums paid on the Griggs Policy.  PHL claimed that the Griggs Policy is void for lack of insurable interest because of misrepresentations in the Griggs Policy's application regarding Ms. Griggs' net worth and income, as well as her intent to keep the Griggs Policy.

**Expert Opinions as to the Griggs Case:**

Based on the record I reviewed in this matter, the following constitute my expert opinions as to the Griggs case.  In this regard, I have identified below matters that parallel the wrongful actions and behavior of PHL I set forth above in the Jane Doe I case.

1.      **No Standards.**  PHL did not have in place and implement adequate standards and procedures for ensuring that claims for death benefits, including the claim on the Griggs Policy, would be promptly processed, including standards and procedures for the prompt investigation of claims.  PHL's claims handling standards, and its implementation of those standards, failed to meet acceptable standards of claims-handling practices within the life insurance industry.

   •      PHL did not provide any factual basis for why it was seeking to confirm insurable interest on the Griggs Policy after a claim for the death benefit was made.

   •      *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to have in place standards for the prompt investigation and resolution of claims in the claim settlement process.

2.      **Failure to Affirm or Deny Coverage.**  PHL failed to timely affirm or deny coverage of the claim on the Griggs Policy after receiving proof of death.  In fact, it appears that PHL never affirmed or denied coverage of the claim on the Griggs Policy until it filed a lawsuit seeking to invalidate the Policy.  This failed to meet acceptable standards of claims-handling practices within the life insurance industry.

   •      PHL should have notified the policyholder that it was denying coverage and provided the basis for its denial before simply asserting that position through litigation.

31

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to promptly affirm or deny coverage in the claim settlement process.

3. **No Legitimate Justification.** PHL failed to provide a legitimate excuse for not promptly paying the death benefit on the Griggs Policy. See above.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to provide a legitimate justification for not promptly paying a claim that is owing in the claim settlement process.

> **6. <u>Wells Fargo Bank, N.A., Trustee of the Milton Levy 2006-1 Insurance Trust v. PHL Variable Ins. Co., United States District Court, Northern District of Texas, Case No. 3:12-CV-3760 ("Levy Case")</u>**

**Background:** [10]

On October 27, 2006, PHL issued Policy No. 97519119 (with a $5 million face value) on the life of Milton Levy ("Levy Policy"). The policy was procured by the Milton Levy 2006-1 Insurance Trust ("Levy Trust"). Wells Fargo Bank, N.A. currently serves as trustee of the Levy Trust. The Levy Policy states: "If the Insured [i.e., Mr. Levy] dies while the policy is in force, we [i.e., Phoenix] will pay the Death Proceeds . . . within two months after our receipt of due proof of death of the Insured, subject to any applicable provisions of the Policy."

On May 16, 2012, Mr. Levy passed away, while the Levy Policy was in force. On June 7, 2012, the Levy Trust notified PHL of Mr. Levy's death. On June 20, 2012, the Levy Trust provided a copy of Mr. Levy's death certificate to PHL.

During June and into July 2012, the Levy Trust called PHL several times to request a claim form. The Levy Trust called PHL on June 7, 12, 18, and 20, and again on July 2, 2012. PHL's representatives refused to allow the Levy Trust to speak with the person handling its claim.

On July 13, 2012, when PHL finally responded to the Levy Trust, PHL did not provide the Levy Trust with the claim requested. Instead, Phoenix provided a questionnaire titled "Certification and Acknowledgement of Trust Agreement" ("Post-Claim Questionnaire") and demanded that it be completed before processing the claim on the Policy.

---

[10] Documents reviewed in connection with this case are reflected in, *supra*, Section III ("Documents Reviewed").

32

**Expert Opinions as to the Levy Case:**

Based on the record I reviewed in this matter, the following constitute my expert opinions as to the Levy Case.  In this regard, I have identified below matters that parallel the wrongful actions and behavior of PHL I set forth above in the Jane Doe I case.

1.      **Failure to Provide Prompt Communications.**  PHL's failure to respond to the Levy Trust's communications regarding its claim on the Levy Policy failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- The Levy Trust first notified PHL of Mr. Levy's death on June 7, 2012.  On June 20, 2012, the Levy Trust provided a copy of Mr. Levy's death certificate to PHL.  Throughout this period, the Levy Trust repeatedly requested a claim form.  The Levy Trust contacted PHL four times in a five week period with its request.  PHL refused to allow the Levy Trust to speak to the person handling its claim.  It took over one month for PHL to respond to the Levy Trust's request.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to provide prompt and timely communications to its claimant in the claim settlement process.

2.      **No Reasonable Investigation.**  PHL failed to pay the claim on the Levy Policy without conducting a reasonable investigation based on all of the available information.  PHL's investigation of the Levy Trust's claims failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- A careful review of the Post-Claim Questionnaire shows that it was simply a delay tactic used by PHL.  Even worse, it is designed to elicit information that is completely irrelevant to the claim itself (as to which liability had become clear).  Indeed, most all of the Post-Claim Questionnaire elicited information from the Levy Trust that PHL was not authorized to obtain for purposes of settling claims under the Jackson Policy.  To the contrary, the Post-Claim Questionnaire was a sinister tactic by PHL designed to elicit information to be used later by PHL as a defensive or offensive weapon in litigation.

- *Breach of Custom and Practice*.  In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to provide for a reasonable investigation in the claim settlement process.

3.      **Failure to Affirm or Deny Coverage.**  PHL failed to timely affirm or deny coverage of the Levy Trust's claim.  In fact, it does not appear that PHL ever affirmed or denied coverage of the Levy Policy.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to promptly affirm or deny coverage in the claim settlement process.

4. **No Legitimate Justification.** PHL failed to promptly provide a legitimate excuse for not paying death benefits under the Levy Policy. See above.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to promptly provide a legitimate justification for not paying claims, where liability is reasonably clear in the claim settlement process.

5. **No Standards.** In light of the above, I believe PHL did not have in place and did not implement adequate standards and procedures for ensuring that claims for death benefits, including the claims on the Levy Policy, would be promptly processed and investigated. PHL's claims handling standards, and its implementation of those standards, failed to meet acceptable standards of claims-handling practices within the life insurance industry.

- *Breach of Custom and Practice*. In all of this, PHL's actions here are inconsistent with and constitute a breach of their obligations and responsibilities under custom and practice in the industry, which require an insurer to have in place adequate standards for assuring claims are promptly investigated and resolved in the claim settlement process.

**Expert Conclusions as to PHL's Overall Conduct.** In light of all this, it is fair to say that the wrongful conduct and behavior exhibited by PHL in the Jane Doe I Case occurred in other cases with such a frequency and regularity to suggest that PHL engaged in a systemic strategy to deny valid death benefit claims.

## C.    Other Expert Opinions Relevant to the Above

**Expert Opinion: PHL had an Economic Incentive to Delay Claim Payment and Claim Settlement.** Depending on how it accounted for the claims at issue here (both the Jane Doe I claims and the claims supporting the general business practice matter) and related rates of return in the market, PHL likely had an economic interest in delaying and in denying these claims. This is so to the extent that the interest PHL paid on a claim (typically from the time a legitimate claim is filed) is less than the interest PHL earned in the market during the pendency of the claim. Further, depending on accounting treatment, PHL may not have been required to carry these claims as a liability in the years they were incurred and in doing so maximizes related cash flow and earnings statements. Finally, by forcing litigation, PHL knows that on average, it is likely to resolve claims for less than the face amount owing under such policies. In all of this, PHL places its financial interests above those of policy owners presenting legitimate claims.

**Expert Opinion: Further Support for PHL's Systemic Behavior in Resisting, Denying, and Delaying Valid Death Benefit Claims.** In further support of my expert opinion

34

that PHL's wrongful claim practices in the Jane Doe I Case are more than just isolated incidents, but reflect systemic behavior to resist, deny, or delay valid death benefit claims, I note that PHL's rate of resisting and denying death benefit claims far exceeds that of the life insurance industry in general as follows:

- In 2009, PHL had $22,000,000 in outstanding death benefits resisted/denied, while PHL incurred $177,880,128 during the year. This was a resistance/denial rate of 12.37%.

- In 2010, PHL had $36,000,000 in outstanding death benefits resisted/denied, while PHL incurred $222,196,553 during the year. This was a resistance/denial rate of 16.20%.

- In 2011, PHL had $34,000,000 in outstanding death benefits resisted/denied, while PHL incurred $162,922,467 during the year. This was a resistance/denial rate of 20.87%.

- In 2011, the industry average in outstanding death benefits resisted/denied against death benefits incurred in the year was 0.58%. PHL's resistance/denial rate in 2011 was thus thirty-six times the industry average, or 36,000%.

- PHL's rate of resistance/denial has increased over each of the last three years and is likely to increase again in 2012.

- PHL has resisted at least seven claims on eight policies totaling $54,800,000 during a seven-month period between November 2011 and June 2012: Griggs Policy ($10,000,000) (November 16, 2011); John Doe III Policy ($3,000,000) (December 22, 2011); Close Policy ($5,000,000) (January 4, 2012); Jackson Policy ($1,800,000) (January 23, 2012); Jane Doe Policy I ($10,000,000) (February 23, 2012); Jane Doe Policy II ($10,000,000) (February 23, 2012); John Doe II Policy ($10,000,000) (January 30, 2012); Levy Policy ($5,000,000) (June 20, 2012).

   *Conclusion as to this Expert Opinion.*  In all of this, the *amount* of death benefits resisted/denied is an important gauge of an insurer's claims handling practices because the financial benefit to an insurance company from resisting or denying claims is measured by the *amount* it resists or denies, not the *number of claims* it resists or denies.

   **Expert Opinion:**  PHL has an incentive to resist payment of death benefits in light of PHL's recent financial difficulties and those of its parent company, The Phoenix Companies, Inc. PHL likely was influenced by these considerations. For example:

- According to PHL's 2008 Form 10-K, PHL's ultimate parent company, The Phoenix Companies, Inc., lost approximately $1.5 billion in shareholder equity.

35

- Between September 19, 2008 and March 6, 2009, the share price of PHL's parent company, The Phoenix Companies, Inc. (NYSE:PNX), fell from $13.98 per share to $0.29 per share.

- In 2012, PHL's Audit Committee concluded that PHL's previously issued audited financial statements for the years ending December 31, 2011, 2010, and 2009, and PHL's unaudited financial statements for the quarters ending June 30, 2012, March 31, 2012, September 30, 2011, June 30, 2011, and March 31, 2011, would have to be restated because of accounting errors "primarily related to the accounting for an intercompany insurance treaty" with Phoenix Life Insurance Company.  PHL reported that these errors were believed to be "material," and could result in a loss of as much as 15% of stockholder equity of $626.7 million at June 20, 2012, or approximately $94 million.

- PHL raised the cost of insurance rates on its policies in 2010, and US Bank sued PHL claiming that these increases were illegal.  Within seven months, PHL had resisted seven claims on eight policies totaling $54,800,000.  See above.  It is reasonable to assume that PHL began stepping up its efforts to resist or deny paying claims when US Bank first challenged its rate increases.

The record is clear that, during all relevant times, PHL's was experiencing financial difficulties. In this regard, it is my opinion that PHL's financial condition was a driving force behind its wrongful claim handling.

### D.    Expert Opinions on STOLI and the Secondary Market

Because, in some of the cases cited above, PHL asserts as a defense an allegation that the policies at issue were so-called STOLI[11] (by whatever name) from the outset or otherwise prearranged purchases by investors, I set out below expert opinions that provide a context to the secondary market within which to evaluate such allegations.

**Expert Opinion:  Benefits of the Secondary Market.**  The secondary market for life insurance policies has evolved significantly over the years, with growth accelerating in the last ten or so years.  Prior to this vibrant market, insureds had only two options to rid themselves of insurance they no longer desired:  (1) they could stop paying premiums (in which case their policies would lapse; and (2) they could surrender their policies back to their insurers for a minimal cash surrender value.

This state of affairs resulted in huge windfalls to life insurers.  In the case of lapsed policies, insurers collect premiums for years without ultimately having to pay out anything. Even in the case of surrendered policies, insurers collect premiums for years and only have to pay out a small fraction of the sums collected.  As a former Commissioner of Insurance, it is my view that this imbalance is unfair and requires a market solution.

---

[11] In citing PHL's use of the term "STOLI," I do not agree with its definition nor do I agree that any of the policies at issue here were void or voidable based on PHL's STOLI allegations.

With the emergence of a vibrant secondary market, the balance of power between insurers and insureds changed dramatically.  Insureds now have the option to sell their policies on the secondary market at prices up to ten times their policies' cash surrender value.[12]  In sum, then, the secondary market provides consumers with a real opportunity to receive more value for their policies than they otherwise would receive.  The secondary market also makes life insurance more attractive to *potential* insureds, who may be considering buying a life insurance in the first instance.

The benefits of the secondary market are also consistent with the investment-driven nature of modern insurance.  Today, insureds buy policies not simply to provide benefits for their families at death but also for investment purposes (as exemplified by the build-up of cash value in their policies).  The secondary market allows insureds to treat their policies as investments, with the full range of options that come with most other investments, including the ability to sell the investment (policy) for a profit.

Because of its many benefits to consumers, the secondary market has grown into a multi-billion dollar industry.  As much as $12 billion per year (face value) in policies have been resold on the secondary market in recent years.  The secondary market also provides significant benefits to investors by offering an investment that is not susceptible to radical market fluctuations.  Institutions such as pension funds and, yes, life insurance companies themselves, are large investors in life insurance policies.

**Expert Opinion:  PHL Knowingly and Actively Participated as a Seller of Policies Likely to Be Re-Sold on the Secondary Market.**  Although some insurers frowned on the secondary market, PHL eagerly embraced the business opportunity presented by it.  Based on my knowledge of the industry and the public record as it relates to this matter, I know that PHL's core business targeted the sales of large polices to elderly insureds likely to re-sell their policies on the secondary market.

This business strategy drastically increased PHL's sales and enriched its executives and sales force.  In support of this conclusion, I cite the following:

---

[12] See, e.g., U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-10-775, LIFE INSURANCE SETTLEMENTS: REGULATORY INCONSISTENCIES MAY POSE A NUMBER OF CHALLENGES (July 2010) (the "GAO Report"), at Appendix III, page 112.

37

- Public records from the relevant time period show the following:[13]

| Year/ | Face Value of Policies Issued |
|---|---|
| 2004 | $2.1 billion |
| 2005 | $2.9 billion |
| 2006 | $4.7 billion |
| 2007 | $7.5 billion |
| 2008 | $7.0 billion |
| 2009 | $1.3 billion |

| Year/ | Total In Force Business (non-term) |
|---|---|
| 2004 | $6.2 billion |
| 2005 | $8.8 billion |
| 2006 | $13.2 billion |
| 2007 | $20.4 billion |
| 2008 | $26.9 billion |
| 2009 | $26.7 billion |

| Year/ | Premium Revenue |
|---|---|
| 2004 | $151.1 million |
| 2005 | $209.9 million |
| 2006 | $314.9 million |
| 2007 | $445.8 million |
| 2008 | $461.8 million |
| 2009 | $233 million |

- ***These Dramatic Numbers Come from Selling Policies Likely to be Re-Sold***.  The public record here makes clear that drastic sales increases at PHL could only have come about as a direct result of PHL actively and aggressively selling large policies to elderly consumers, who were very likely to re-sell the policies into the secondary market.  As a former Commissioner of Insurance, I can state that, when an insurer issues a high proportion of a certain type of policy into a specific market, it does so intentionally.  It is not a mere coincidence.

---

[13] The following data is taken from data reported by PHL in its related NAIC annual statements.

38

- ***PHL's Knowing Solicitation of Agents with Direct Links into the Secondary Market.***  The public record shows that PHL actively courted insurance agents whose primary value to PHL was access to, and high rates of sale success to, elderly insureds who were likely to re-sell purchased polices on the secondary market.

- ***No Discouragement by PHL to Its Agents.***  Unlike some insurers at the time, PHL never directed its agents to stop producing insurance policies that likely would be re-sold on the secondary market.  By contrast, many of PHL's competitors actively discouraged their agents from generating such policies.

- ***Conclusion to this Section.  In sum, all of the documents and records in this matter*** show that PHL's business was selling policies likely to be re-sold into the secondary market.

**Expert Opinion:  PHL's Parent Positioned Itself as an Aggressive Buyer of Policies on the Secondary Market.**  The very class of policies about which PHL now complains is the very class of policies that PHL positioned itself to buy on the secondary market.  During the time period in question, PHL placed specific language in some of its life insurance policies requiring owners to give PHL a right of first offer to buy back policies that the owners wanted to sell on the secondary market.

**Conclusion.**  The record shows that PHL has little or nothing to complain about in connection with the type of policies at issue here—namely, policies that it issued knowing that they likely would be re-sold on the secondary market.  The record makes clear that PHL's financial difficulties were a driving force in its wrongful resistance, denial, and delay of US Bank's claims and claims like them.

## VII.   ADDITIONAL EXPERTISE TO RENDER THESE OPINIONS

Among my positions and experiences, the following were particularly helpful in connection with this assignment, and should be read together with Section II of this report and my attached Curriculum Vitae:

**A.  Formal Education.**

    **1. Bachelors Degree in Mathematics.**  I hold a bachelors degree in secondary mathematics education from the University of Northern Iowa;

    **2. Masters Degree in Education (Psychology).**   I hold a masters degree in educational psychology from the University of Hawaii; and

    **3. Juris Doctor Degree.**   I hold a Juris Doctorate degree from the University of Illinois.

39

**B. Legal Background.**

    **4. Lawyer.** I am a member of the Florida Bar, and have been an insurance lawyer since 1975. I am also licensed to practice law in the states of Iowa and Illinois,[14] and before the U.S. Supreme Court.

**C. Licensure and Certification.**

    **5. Certified Reinsurance Arbitrator.** I am certified by AIDA Reinsurance and Insurance Arbitration Society-United States (sometimes "ARIAS-US") as one of approximately 400+ U.S. certified reinsurance arbitrators, and sit as an arbitrator on disputes between life insurers and their reinsurers.

**D. Insurance Expert.**

    **6. Expert Witness.** I have served as an expert witness throughout the U.S., and have been qualified as a witness in 20 or so states as an expert in open court.

    **7. Consultant to the U.S. Attorney.** By way of example of my various assignments, I have been retained in the past by the U.S. Attorney, Middle District of Florida, as an insurance consultant in a complex civil insurance matter.

    **8. Insurance Consultant: U.S. Department of Justice.** Similarly, I have also been retained by the U.S. Department of Justice as an insurance consultant in a complex insurance case.

    **9. Expert Witness: United States Air Force.** I am also currently serving as an expert witness to the United States Air Force in a complex environmental pollution matter.

    **Expert Witness: Various State Departments of Insurance.** I have also been retained by the Liquidation Division of the Florida Department of Financial Services as an expert witness and have recently testified on its behalf in both Federal Court in Tampa and in Leon County Circuit Court as its expert in complex insurance liquidation matters. I have similarly been retained as an insurance expert by the state of Arizona in a major liquidation case. Likewise, I have been accepted as and testified as an insurance expert before the Arizona, Oklahoma, South Dakota, Nevada and Texas Departments of Insurance.

**E. Reinsurance Arbitrator.**

    **10. Reinsurance Arbitrator, November 2003 to Present.** As indicated above, my background includes extensive exposure to the various reinsurance mechanisms and relationships. Further details are set forth below relating to this experience. In addition, I am a certified ARIAS-US reinsurance arbitrator (*see* immediately below). The relevance

---

[14] This license is currently in inactive status at my request and is eligible for reactivation at any time upon my request.

of this experience to this case is that reinsurers have substantial influence on the behavior
of their underlying life insurers from whom business is ceded.

As of November 2003, I was certified by ARIAS-US as an arbitrator for reinsurance and
insurance matters.  Today, there are more than 400+ individuals so certified by ARIAS-
US in the United States.

ARIAS-US certifies knowledgeable and reputable professionals for service as panel
members in reinsurance and insurance arbitration matters.  The organization's criteria for
certification are as follows:

- 10 years of significant specialization in the insurance/reinsurance industry;

- Arbitration experience–must have completed appropriate credited ARIAS
  seminars;

- A member in good standing of ARIAS-US; and

- Appropriate endorsement from existing members.

## F.  Industry Background.
*

**11.  Chief Executive Officer of a Major Insurance Industry Regulated
Organization—President and CEO of the National Council on Compensation
Insurance (sometimes "NCCI"), 1990–1998**.  NCCI is one of the larger and more
pervasive U.S. insurance organizations.  During my tenure as CEO, NCCI had (and
continues to have) responsibility to accurately price and file pricing for some $12-$15
billion of workers compensation insurance in 40 states throughout the U.S.  NCCI
prepared proposed premium filings for regulators to approve by extracting key data from
its 600 member insurance companies, and then used that data to project necessary
premium changes.  NCCI accomplished this mission through some 1,000 employees,
approximately 600 of which were professionals, and had annual revenues of $150
million.

**Regulated by California and Connecticut.**  While I was President and CEO of NCCI,
the company did business in approximately 40 states, including California and
Connecticut.  As such, the company was governed by the California and Connecticut
Insurance Code (and continues to be so governed today), including all applicable
provisions relating to California insurance law (as it was governed as well by the balance
of the states in which it did business).  In addition, NCCI was subject to pervasive
regulatory oversight by the CDOI and the Connecticut Department of Insurance (CT
DOI).  Finally, NCCI was subject to the applicable jurisdiction of all California's and
Connecticut's state and federal courts.  As a result, I am generally familiar with
applicable California insurance laws, regulations, and related civil proceedings.

41

**Life Insurance Program.**  As CEO, I had daily exposure and responsibilities to the U.S. workers' compensation program as administered by the various states.  This program constitutes one of the largest life insurance programs in the world, with some 100 million worker lives insured (of course, other important coverages are provided through workers compensation, most notably, wage replacement and medical coverage).

**Insurance Company Practices.**  In addition, and relevant to this case, NCCI had a vested interest in member insurers' reputation for fairness because it impacted regulatory attitudes toward NCCI's premium approval process.

**Sales Practices.**  In addition, and relevant to this case, NCCI had a vested interest in member insurer sales practices in that the industry's reputation for fair sales practices ultimately impacted regulatory attitudes toward NCCI's premium approval process.

**Agent and Broker Practices.**  Most all workers' compensation products are sold through agents and brokers and as such, as CEO of NCCI, my responsibilities included creating and sustaining liaison with all of the operative U.S. agent associations and communities. I have had extensive exposure to agent and insurer practices and procedures.

**Industry Standards of Practice.**  While President and CEO of NCCI, I visited, physically toured, and reviewed more than 400 insurance companies.  I also gained direct exposure to the procedures, processes, and standard industry practices of the U.S. insurance community and its agents.  As stated, most all workers' compensation products are sold through agents, and accordingly as CEO of NCCI, my responsibilities included creating and sustaining liaisons with all of the operative U.S. agent associations and communities.  Furthermore, I have had extensive exposure to agent and insurer practices and procedures.  In addition, regarding workers' compensation, many of these companies were also licensed to sell life insurance.

**12.  General Counsel and Director of Government Relations to the American Academy of Actuaries (Washington D.C.), 1980-1983.**  I served as General Counsel and Director of Government Relations for the American Academy of Actuaries (sometimes "the Academy").  My responsibilities in this position included advising on admissions, discipline, federal antitrust law, and general corporate law.  I represented this 10,000-member professional organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance and Labor, and House Committees on Education, Labor, Energy, and Ways and Means) and the various federal regulatory agencies.

**Life Insurance Companies: Agents and Brokers.**  The Academy is the professional organization of actuaries, and includes qualified actuaries from all disciplines and all forms of insurers.  The Academy's members had affiliations with virtually every life insurance company in the U.S.  The Academy's Board of Directors likewise was comprised of leading insurance company executives from such companies whose duties included that of sales oversight.

42

**13.  Risk Metrics Corporation: Marketing to Agents and Brokers.**  I co-founded this Florida-based information company in 1998.  Risk Metrics (including Datalister, Inc.) gathers and sells public data relating to workers' compensation insurance to a wide range of insurance-oriented customers, including insurance agents and brokers.   Within the last number of years, I have sold my interest in this corporation.

**14. Attorney in Private Practice.**  As an attorney in private practice, I represented a number of agent and insurer interests, and became familiar with regulatory and industry standards of practice.  Those interests included the position of Iowa Counsel to the Property Casualty Insurers Association of America ("PCIAA").

**Life Issues.**  Those interests also included intimate involvement with the agent community as counsel to the:

Professional Insurance Agents of Iowa; and

Iowa Association of Life Underwriters (i.e., life insurance agents).

My specific duties as counsel to both the Professional Insurance Agents of Iowa and the Iowa Association of Life Underwriters included an in-depth familiarity with life insurance products and insurance agents and their issues.

## G.  Regulatory.

**15. Commissioner of Insurance, Iowa, 1986-1990.**  As Insurance Commissioner appointed by Governor Terry Branstad in July 1986, I was responsible for the regulatory oversight of all insurance companies, agents, and brokers authorized to conduct business in the state of Iowa.  My Department was responsible for solvency oversight, insurance company examinations, financial and accounting matters of insurance companies, consumer protection, agent and broker licensing, and oversight of the property and casualty and life insurance company practices.  In particular, that oversight included the responsibility of overseeing practices of life insurance agents and brokers.  In addition, I oversaw the state regulation of the securities industry, with Iowa's Superintendent of Securities reporting directly to me.

**Regulatory Oversight:  Life Insurer Practices.**  As Insurance Commissioner, my responsibilities included oversight over the education, licensing, discipline, and general supervision of all life insurance companies and all life insurance agents in the state of Iowa.  Consequently, I am very familiar with the responsibilities and applicable duty of care that come to bear upon life insurance companies and their agents.

**Regulatory Oversight:  Life Insurance Agent Practices: Prosecutions.**  As Insurance Commissioner, I also had day-to-day responsibility to assure that all relationships carried out by insurance companies doing business in the state met all of their duties, obligations and statutory and regulatory responsibilities as they conducted business with their agents. This included oversight over (i) screening for character and competency on a pre-

licensure basis, (ii) licensing, (iii) revocation of licenses, (iv) continuing education and its administration and enforcement, (v) accounting and (vi) agent relationships with their insurers.

**Regulatory Oversight: PHL.** As Iowa Commissioner of Insurance, I had responsibility for the direct oversight and supervision of PHL in that PHL was admitted to do business in Iowa.

**Examination of Life Insurance Companies.** As Insurance Commissioner, I directed and oversaw the examination of all insurance companies authorized to do business in the state of Iowa. Those examinations included a focus on both financial matters (so-called triennial examinations of insurers—more than 100 such examinations were conducted while I was Commissioner) and examinations of specific complaints about insurers (so-called Market Conduct Examinations—more than 50 such exams were conducted while I was Commissioner).

**Market Conduct Examinations of Life Insurer Practices Including Practices With Their Agents.** Market Conduct Examinations focused on marketplace issues such as those at issue in this case, specifically examining life insurance companies as to compliance with their agent and policyholder duties. Concurrent with such exams, I personally reviewed and approved the final examination reports before they were issued. In addition, in many of these instances, I visited the subject life insurer before the examination report was issued. These visits involved walking the floors of such insurance companies; in other words, reviewing their affected operations first-hand.

**Prosecution of Life Insurance Companies for Violations of Standard of Care.** As Insurance Commissioner, I employed a full-time team of lawyers who fielded consumer complaints relating to all areas of life insurers as well as premium finance companies. Indeed, many of these complaints as well as results of Market Conduct Examinations resulted in formal action under the state's Administrative Procedures Act, with the life insurer's license to conduct business in the state at risk for failing to adhere to their duties. At times, I served as the Hearing Officer on such matters.

**Major Insurance State.** Iowa has approximately 1,000 authorized property and casualty insurance companies, more than 500 life insurance companies, and an unusually large number of domestic insurance companies. As such, insurance regulation in that state is a serious job.

**16. National Association of Insurance Commissioners, 1986-1990.** Concurrent with my service as Iowa Insurance Commissioner, I served as a member of the NAIC. The NAIC is an organization of the Insurance Commissioners of all 50 states, and meets quarterly in locations throughout the U.S. to consider and evaluate national insurance issues. Further, the organization is professionally staffed with more than 100 personnel. The organization is based in Kansas City, Missouri. The NAIC considers all major insurance issues, and then promulgates model insurance laws and regulations, which are routinely (but optionally) adopted at the individual state level.

**NAIC Chairmanships–Chairman of the Midwest Zone.**  I was elected by my fellow Insurance Commissioners from the Midwest Zone (composed of the Midwest states, which constitutes approximately one quarter of all of the states) to provide leadership and representation of the Midwest before the balance of the states. This position included a position on the Executive Committee of the NAIC, as well as major responsibilities relating to the assignment of states (and their related examiners) to specific examinations, both triennial and Market Conduct.

**NAIC Leadership—Member of the Executive Committee.**  I also served as an elected member of the Executive Committee of the NAIC, the body that served as the steering committee of the organization, providing leadership between full membership meetings and recommendations to the full membership as to complex or politically-charged issues within the organization.  In addition, this position included oversight responsibility over the following NAIC Committees: A, B, C, D and E.

**NAIC Chairmanships–Chair of the Life Insurance Committee: Underwriting Issues.**  As a member of the NAIC, I served as both Vice-Chairman and Chairman of the NAIC Life Insurance Committee.  The charge of this Committee was oversight over all issues relating to life insurance products as well as life insurers, including practices such as underwriting.

**NAIC Chairmanships—Chair of the Universal Life Insurance Task Force.**  In addition to chairing the Life Insurance Committee, I also chaired the Universal Life Insurance Task Force.

**NAIC Chairmanships—Chair of the Life Insurance Product Development Task Force.**  I also chaired the Life Insurance Product Development Task Force.  While Chairman of this Task Force, I led the development of model disclosure statements for universal and indeterminate premium life products designed to assist consumers in their comparison of different types of life insurance products.

**Other NAIC Chairmanships.**  I also served in a number of NAIC capacities, including Chairman of the Financial Services and Insurance Regulation Task Force.

**Member—Commercial Lines Committee.**  In addition, I served as a member of the NAIC Commercial Lines Committee.  This committee considered all issues relating to commercial lines policies.

My service on the following NAIC Committees was also helpful in this regard:

- Member, the Blanks Committee;
- Member, Guarantee Fund Committee;
- Member, Rehabilitator and Liquidators Committee;
- Member, Casualty Actuarial Committee;

- Member, Commercial Lines Committee;

- Member, Valuation of Securities Committee;

- Member, International Insurance Relations Committee;

- Member, Accounting Practices and Procedures Committee; and

- Member, State and Federal Legislative Committee.

**Ongoing Regulatory Involvement.**  In the years since leaving the regulatory ranks, I have continued to be closely involved with the NAIC and the regulatory community.  As President and CEO of NCCI, I was in regular attendance at meetings of the NAIC.  I continue to attend these meetings and to be actively engaged with the regulatory process. Included in attendance at NAIC meetings were my observations at the NAIC of the ongoing regulation of life insurers and their agents.

**17.  First Deputy Iowa Insurance Commissioner**, **1976-1978**.  As First Deputy Insurance Commissioner, I had oversight responsibility over all facets of insurance regulation, including oversight of the property and casualty division, the life insurance division, agent licensing, consumer complaints, and premium finance companies.  As First Deputy Commissioner, the functions of overseeing all aspects of life insurers belonged to me.

Furthermore, in this position, I had extensive exposure to and direct responsibility for all facets of life insurers' activity, including oversight over insurers' relationships.

**Regulatory Oversight:  Life Insurance Agent Practices.**  As First Deputy Insurance Commissioner, I also had day-to-day responsibility to assure that all relationships carried out by insurance companies doing business in the state met all of their duties, obligations and statutory and regulatory responsibilities as they conducted business with their agents. This included oversight over (i) character and competency screening on a pre-licensure basis, (ii) licensing, (iii) revocation of licenses, (iv) continuing education and its administration and enforcement, (v) accounting and (vi) agent relationships with their insurers.   I am very familiar with the responsibilities and applicable duty of care that come to bear upon insurance companies in their relationships with their agents.

**Regulatory Oversight—Life Insurer Practices.**  In addition to expertise as to policy forms and coverage issues, as First Deputy Insurance Commissioner, my responsibilities included oversight over the education, licensing, discipline and general supervision of all life insurance companies and their agents in the state of Iowa.  I am very familiar with the responsibilities and applicable duty of care that come to bear upon life insurance companies.

**Regulatory Oversight: PHL Life Insurance Company.**  As First Deputy Commissioner of Insurance, I had daily responsibility for the regulatory oversight of most all of PHL's operations in that PHL was an Iowa admitted insurer.

46

**Financial Examination of Life Insurance Companies.** As First Deputy Insurance Commissioner, I supervised (along with the Chief Examiner) the examination of all insurance companies authorized to do business in the state of Iowa. Those examinations included a focus on both financial matters (so-called triennial examinations of insurers– more than 100 such examinations were conducted while I was First Deputy Commissioner) and examinations of specific complaints about insurers (so-called Market Conduct Examinations–more than 50 such exams were conducted while I was First Deputy Commissioner).

**Prosecution of Life Insurance Companies and Their Agents for Violations of Standard of Care.** As First Deputy Insurance Commissioner, I employed a full-time team of lawyers who fielded consumer complaints relating to all areas of life insurers as well as premium finance companies. Indeed, many of these complaints, as well as results of Market Conduct Examinations, resulted in formal action under the state's Administrative Procedures Act with the life insurer's or agent's license to conduct business in the state at risk for failing to adhere to their duties. At times, I served as the ALJ on such matters.

**18. Iowa Assistant Attorney General Assigned to the Insurance Department**, 1975-**1976**. As Assistant Attorney General, I had departmental prosecutorial responsibilities for violations of the Insurance Code under the state's APA, including those violations committed by life insurance companies and their agents and brokers. The Attorney General responsibility also included issuing Attorney General Opinions as to the construction of insurance laws and regulations. In short, I served as the Insurance Department's General Counsel.

**19. Legal Counsel to Iowa House of Representatives**.   As legal counsel to the Iowa House of Representatives in the 1975 session, I provided counsel on all relevant caucus issues as well as the following support:

- Researched pending legislation;

- Prepared memorandums in support of proposed legislation;

- Provided legal advice; and

- Participated in bill drafting, including that relating to life insurance and life insurance agents.

**20. Lecturer at the Iowa Bar Review School, 1985-1990**. I was invited to provide the insurance content review material and lecture for the insurance section of the bar review course in Iowa. Included in this lecture was extensive law applicable to the interpretation and construction of laws and regulations affecting life insurance companies, including practices relating to their agents. I authored this material and provided this lecture to students studying to pass the Iowa bar for approximately five years, until accepting the position of CEO of NCCI in Florida.

**21. Chief of Staff to the U.S. Congress.** I served as an Chief of Staff to the U.S. Congress in Washington D.C. to an Iowa Congressman for approximately one year. Among other activities, I participated in legislative drafting of insurance and reinsurance legislation.

**22. Elected Member of the Florida House of Representatives: Member of the and Vice Chairman of the House Insurance Committee.** I am also currently serving as an elected member of the Florida House of Representatives for House District 87 (Boca Raton and Delray Beach; renamed House District 89 in the 2012 redistricting). Among others, I serve on the House Insurance Committee, where I am also Vice Chairman of that Committee, which has oversight over all insurance activities in the state of Florida, including that of oversight over life insurers, their agents and brokers and their relationships with their insureds and those related to their insureds.

Signed electronically and dated this 14th day of January, 2013;

# William D. Hager

William D. Hager

48

# APPENDIX A

# WILLIAM D. HAGER
# CURRICULUM VITAE

## PRESIDENT, INSURANCE METRICS CORPORATION
BOCA RATON, FLORIDA - JANUARY 2000 to PRESENT

Mr. Hager formed Insurance Metrics Corporation in early 2000. The focus of this Corporation is three-fold:

1. The provision of reinsurance arbitration service,
2. The provision of expert insurance witness services, and
3. The provision of non-litigation insurance consulting.

## CERTIFIED REINSURANCE ARBITRATOR

Certified by ARIAS (AIDA Reinsurance and Insurance Arbitration Society) as one of some 400+ certified reinsurance arbitrators in the U.S. ARIAS certifies qualified arbitrators and serves as a resource for parties involved in related disputes. ARIAS provides procedural guidelines, best practices and a code of ethics for its members. Certified arbitrators must be knowledgeable and reputable and meet minimum criteria as follows:

1. Industry Experience. At least 10 years of significant specialization in the insurance/reinsurance industry;
2. Arbitration Experience. Completed at least three ARIAS conferences or workshops; and
3. Member of ARIAS. Be an individual member in good standing of ARIAS.

## ELECTED MEMBER OF THE FLORIDA HOUSE OF REPRESENTATIVES
NOVEMBER 2010 to PRESENT

Mr. Hager was elected in November 2010 to a two year term to the Florida House of Representatives in Tallahassee Florida. Hager represents House District No. 87, which consists of northern portions of Broward County and portions of Southeastern Palm Beach County. Cities represented in Palm Beach County include Boca Raton, Boynton Beach; Briny Breezes; Delray Beach; City of Golf; City of Gulfstream; Highland Beach; Hypoluxo; Lantana; Manalapan; Ocean Ridge and in Broward County, Deerfield Beach. The District encompasses about 170,000 Floridians. Hager serves on the following committees or subcommittees by appointment: Insurance and Banking; Civil Justice; Economic Development; Judiciary; and Pre K-12 Appropriations.

**PRINCIPAL, COMP WIZARDS LLC**
NOVEMBER 2008 to PRESENT

Workers' compensation consultation services are offered for high risk industries such as construction, mining, and hazardous waste, as well as professional employer organizations (PEOs). Audits, the workers comp classification system, e-mod analysis, high deductibles, retros, and scheduled ratings are analyzed by Mr. Hager and skilled actuaries who are highly experienced in workers compensation.

**DEPUTY MAYOR (2004-2005) AND CITY COUNCIL MEMBER**
CITY OF BOCA RATON, FLORIDA - APRIL 2002 to 2009

Mr. Hager was elected to a two-year term on the Boca Raton City Council, effective April 1, 2002. During his successful first term Council Member Hager focused on the city budget, quality of citizen services, increased educational opportunities and development plans. He was re-elected to a second two-year term without opposition, effective April 1, 2004. At the same time Councilman Hager was also appointed Deputy Mayor, and he held this position for one year until 2005. Mr. Hager was subsequently re-elected to a third term of office in March of 2006, also without opposition, with that term running through March of 2009. As City Councilman and Deputy Mayor, Mr. Hager participated in the oversight of the Boca Raton City Government. He served as an elected member of the Boca Raton City Council through early 2009.

**CENETEC, L.L.C.**
BOCA RATON, FLORIDA - JANUARY 2000 to JANUARY 2002

In early 2000, Mr. Hager co-founded Cenetec along with a group of entrepreneurs serving as its CEO and Chairman of the Board. Cenetec served as a for profit accelerator designed to help pioneering entrepreneurs turn their most innovative Internet and high technology products and services into successful companies. Cenetec enabled a number of early stage companies to effectively transform themselves into revenue producing enterprises. Cenetec currently holds positions in a number of such companies.

**CO-FOUNDER, RISK METRICS CORPORATION**
BOCA RATON, FLORIDA - 1998 to 1999

Co-founded this information company in 1998. Risk Metrics gathers and sells public data to a wide range of customers. Mr. Hager recently sold his shares in Risk Metrics and no longer holds a position in the Company.

**PRESIDENT AND CHIEF EXECUTIVE OFFICER, NCCI, INC.**
BOCA RATON, FLORIDA - 1990 to 1998

Mr. Hager was appointed President and CEO of NCCI in May 1990. NCCI is the nation's largest workers compensation and health care informatics corporation. Headquartered in Boca Raton, Florida, the corporation provides rate making services, database products, software, publications and consultation services to state funds, self-insureds, independent bureaus, agents, regulatory authorities, legislatures and more than 700 insurance companies. While under Mr. Hager's leadership, NCCI had annual revenues approaching $150 million, NCCI employed 1,000 people located in 20 offices around the United States and was and is the licensed statistical and rate advisory organization in nearly 40 states. During Hager's leadership, NCCI had annual pricing responsibility for some $16 billion of workers compensation premium and responsibility to gain regulatory approval of that pricing.

During Hager's tenure, NCCI doubled revenues (from $70 million to $150 million), reduced loss cost inadequacy to nearly zero (down from 25% inadequacy), brought residual markets to an underwriting break-even point (down from $2 billion in annual underwriting losses) and provided the intellectual foundation for $1.5 billion in statutory reform. Concurrently, the organization was right-sized (head count reduced from 1,500 to 1,000), firepower was substantially increased (technical and professionals increased from 40% to 85% of the employment base), and the organization was converted from a rate bureau to a contemporary, competitive information company.

Specific expert skills that emanate from this position include:

Reported to a Board of Directors consisting of the lead insurance industry CEOs;

Oversaw an actuarial department with 150 employees;

Directed rate filings totaling about $100 billion of premium consisting of about 500 complex rate filings; as such, I am very familiar with the rate making process, the strategy relating to filings and the organizational intent of all rate making organizations;

Intensive management of the federal antitrust exposure of NCCI. As an organization that lawfully promulgated rates on behalf of competitors, this exposure was intensive and pervasive;

Positioned to provide powerful and pivotal strategic guidance and testimony to maximize either the resistance to a proposed rate filing or its approval. Working with a former NCCI FCAS, we are able to zero in on the relevant features of these rate filings;

Positioned to provide pivotal expert testimony as to whether an insurer's behavior conforms or fails to conform to industry practices. ;

3

Damages, including punitive damages as appropriate, regarding workers    compensation insurers; and

RICO matters.

---

## INSURANCE COMMISSIONER, STATE OF IOWA
DES MOINES, IOWA - 1986 to 1990

As Insurance Commissioner appointed by Governor Terry Branstad in July 1986, Mr. Hager was responsible for the regulatory oversight of all insurance companies, agents and brokers authorized to conduct business in the state of Iowa. He directed departments responsible for solvency oversight, consumer protection, agency licensing, and the administration of property and casualty, life and health insurance industries. In addition, Mr. Hager oversaw state regulation of the securities industry with Iowa's Supervisor of Securities reporting directly to him.

Mr. Hager brought contemporary technology to the Insurance Division. He pushed for aggressive legislation resulting in increased prosecution of agents and companies. For example, in 1986, $16 million was recovered from insurers for Iowa consumers. Under his direction, the division spearheaded an effort to attract new insurance operations to Iowa. Under this program, 3,000 new insurance jobs were added in 1988 alone. The program continues to date and is nationally recognized as a model of a constructive environment for attracting insurer operations. He was also responsible for implementing an assertive senior citizens advocacy program to educate the elderly on insurance purchases. Mr. Hager also strengthened rate oversight by leading the effort to hire an FCAS within the Department. Under Hager's leadership the FCAS was paid substantially more than Hager and even more than the Governor of the State.

The most important and yet least visible regulatory tool for an insurance commissioner is regulating for solvency. Mr. Hager was recognized for tenacious solvency regulation. During his term, several preexisting insolvencies were brought to completion and closed out. Furthermore, a number of marginal domestic insurers were declared insolvent and liquidated. Mr. Hager also facilitated a preemptive sale of a $4 billion Iowa domestic insurance company (Integrated Resources Life Insurance Co.) when its parent teetered on insolvency. The department worked with the insurer when a "run on the bank" was imminent and led a rapid sale of the insurer preempting a probable major insolvency. Under the terms of the sale all policyholders were made whole.

The department also recommended and supported state and federal prosecution of several insurance executives (e.g., American Excel) who committed financial fraud.

Specific expert skills that emanate from this position include:

- Responsible for oversight, interpretation and application of entire Iowa insurance code, which is analogous to most states;

4

- Interpretation and application of insurance laws and regulations to specific fact settings on a daily basis;

- Functioned frequently as an APA Hearing Officer, applying insurance law to specific contested facts and rendering scores of written opinions. Topics included rate proposals for workers comp, property/casualty, life and health; agents and insurer license revocations; unfair trade practice matters; and declaration of insolvencies;

- Working familiarity with SAP (vs. GAAP);

- Merger/acquisition approvals;

- Examination process;

- Reinsurance/ Bulk Reinsurance approvals.

## NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS (NAIC), 1986 – 1990.

Concurrent with his service as Iowa Insurance Commissioner, Mr. Hager served as a member of the NAIC. The NAIC is an organization of the insurance commissioners of all 50 states and meets regularly in locations throughout the U.S. to consider and evaluate national insurance issues. The NAIC considers all major insurance issues and formulates responsive model insurance laws and regulations, which are then routinely (but optionally) adopted at the individual state level. In addition, the NAIC promulgates and updates the key insurer financial reporting format, namely the NAIC Annual Statement Blank. The organization is based in Kansas City, Missouri and is staffed by well over 100 personnel.

**NAIC Chairmanships – Chairman of the Midwest Zone.** Mr. Hager was elected by his fellow Insurance Commissioners from the Midwest Zone (composed of the Midwest states, constituting about one quarter of all of the states) to provide leadership and representation of the Midwest before the balance of the states. This position included a position on the Executive Committee of the NAIC as well as major responsibilities relating to the assignment of states (and their related examiners) to specific examinations, both triennial and Market Conduct.

**NAIC Leadership: Member of the Executive Committee.** Mr. Hager also served as an elected member of the Executive Committee of the NAIC, the body that served as the steering committee of the organization, providing leadership between full membership meetings and providing recommendations to the full membership as to complex or politically charged issues within the organization.

**NAIC Chairmanships – Chairman of the Life Insurance Committee.** As a member of the NAIC, Mr. Hager served as both Vice Chairman and Chairman of the NAIC Life Insurance Committee. The charge of this Committee was oversight over all issues relating to life insurance products (including illustrations) as well as life insurers. This position and my four years of

service at the NAIC exposed me to Mr. Hager to all aspects of life insurer operations and responsibilities.

**NAIC Chairmanships: Chair of the Universal Life Insurance** Task Force. In addition to chairing the Life Insurance Committee, Mr. Hager also chaired the Universal Life Insurance Task Force. The responsibility of this Committee included oversight of emerging life insurance products such as universal life.

**NAIC Chairmanships: Chair of the Life Insurance Product Development Task Force**. Mr. Hager also chaired the Life Insurance Product Development Task Force. While chairman of this task force, he led the development of model disclosure statements for universal and indeterminate premium life products designed to assist consumers in their comparison of different types of interest sensitive life insurance products, after a survey of the states determined regulatory problems existed with these products.

**NAIC Chairmanships Chair of the Financial Services and Insurance Regulation Task Force.** Mr. Hager also served as Chair of the Financial Services and Insurance Regulation Task Force and Member of the Executive Committee. Working with the other U.S. financial industries, this Task Force had responsibility to reconcile issues relating to non-insurance financial matters (e.g., banking and securities) in their intersection with insurance and insurance regulation.

**NAIC** – Other Committees. In addition, he also served on the following NAIC committees:

- Member, the Blanks Committee
- Member, Guarantee Fund Committee
- Member, Rehabilitator and Liquidators Committee
- Member, Casualty Actuarial Committee
- Member, Commercial Lines Committee
- Member, Valuation of Securities Committee,
- Member, International Insurance Relations Committee
- Member, Accounting Practices and Procedures Committee and
- Member, State and Federal Legislative Committee.
- Specific expert skills in regard to NAIC include:
- Eight years of direct hands on experience at the NAIC as a regulator
- Very familiar with the NAIC mechanisms
- Conversant with and adept at applying NAIC publications to litigation (e.g., Examination Manuals; Liquidation Manuals; Accounting Manuals; SVO Office, etc.)
- Working with recognized regulatory focused CPA's, Mr. Hager is able to provide specific and finite insurance/liquidation accounting expert testimony.

**Ongoing Regulatory Involvement.** In the years since leaving the regulatory ranks, he has continued to be closely involved with the NAIC and the regulatory community. As President and CEO of NCCI, he was in regular attendance at meetings of the NAIC and continues to currently attend these meetings and to be actively engaged with the regulatory process.

## PRACTICING ATTORNEY, HAGER & SCHACHTERLE
DES MOINES, IOWA - 1983 to 1986

Following his time in Washington, D.C., Mr. Hager returned to Des Moines and opened his own law firm in 1983. The firm specialized in corporate insurance, regulatory insurance and employee benefit matters. The firm also provided general legal services. Mr. Hager represented numerous clients (companies and agents) in regulatory matters before the Iowa Insurance Department.
Representative matters included:

- Policy forms approval
- Rate approval
- Insurer disciplinary matters
- Agent disciplinary matters, and
- Insurer merger acquisition and holding company matters

Mr. Hager also lobbied on behalf of insurers at the state legislature and NAIC level.
Representative clients included the:

- Property Casualty Insurance Association of America ("PCIAA");
- The Iowa Professional Insurance Agents Association (PIA), and the
- Iowa Association of Life Underwriters (IALU)

## GENERAL COUNSEL AND DIRECTOR OF GOVERNMENT RELATIONS
## AMERICAN ACADEMY OF ACTUARIES
WASHINGTON, D.C. - 1980 to 1983

Mr. Hager served as General Counsel and Director of Government Relations for all Academy activities, including advising on admissions, discipline, federal antitrust and general corporate law. He represented the 10,000 member organization before Congress (e.g., Senate Committees on Banking, Commerce, Finance and Labor, and House committees on Education, Labor, Energy, and Ways and Means). He also represented the Academy before federal regulatory agencies, including the:

- Pension Benefit Guaranty Corporation
- Health Care Financing Administration, and
- The United States Department of Labor
- His additional duties included daily monitoring and reporting of all Congressional and regulatory activities affecting the profession.

While at the Academy Mr. Hager was also chief staff support to the following Academy Committees/functions:

- Committee on Discipline

7

- Committee on Risk Classification
- Committee on Guides to Professional Conduct
- And several others

Mr. Hager worked with Academy committees that subsequently provided the impetus for the creation of a national actuarial standards board that later became the Actuarial Standards Board (ASB).

Specific expert skills in this position include:

- Author of "The Emerging Law of Actuarial Malpractice"
- Working knowledge of Actuarial Professional Standards, including conversance with the pronouncements of the Actuarial Standards Board
- Adherence of the particular work product (or professional ethics) to actuarial professional standards
- Applicable expert conclusions
- Knowledge of the organization and structure of the actuarial profession; the profession's players; and the interaction of actuarial science and insurance
- Ability to optimize actuarial malpractice and rate proposal cases
  - Cross examination assistance of opposing actuarial experts
  - Expert testimony as to standards (work product and ethics)

**ADMINISTRATIVE ASSISTANT TO REPRESENTATIVE TOM TAUKE**
**U.S. HOUSE OF REPRESENTATIVES**
WASHINGTON, D.C. - 1979 TO 1980

Mr. Hager served as Administrative Assistant in Washington D.C. to Iowa Congressman Tom Tauke (Republican from Dubuque) for one year. His duties included the following:

- Coordinated district operations from Washington, D.C.
- Supervised office accounts
- Supervised district grant applications and
- Managed a staff of 14

**CHIEF DEPUTY, IOWA INSURANCE DEPARTMENT**
**DES MOINES, IOWA 1976 TO 1978**

Reported directly to Commissioner Herb Anderson. Mr. Hager supervised the following divisions within the Department:

**Life and Health Division.** The Life and Health Division was responsible for oversight of all life and health policy forms approvals as submitted by insurers. Additionally, this division was also responsibly for all related Life/Health rate change proposals.

8

**Property Casualty Division.** The Property Casualty Division was responsible of oversight of all property casualty policy forms approvals as submitted by insurers. Additionally, this division was responsible for all related property/casualty rate change proposals.

**Complaints Division.** This division was responsible for the processing and oversight of all consumer complaints received by the Insurance Department. In the Department's resolution of such complaints and where patterns of insurer and agent wrong doing arose, to prosecute the insurers/agents under the Iowa Administrative Procedures Act. Mr. Hager personally led the Administration Prosecution of scores of such cases.

**Agents Licensing Division.** This application was responsible for overseeing all agent-licensing applications.

In addition to the above, Mr. Hager supervised initiation of formal administrative actions relating to departmental rules, companies (i.e., mergers, holding company activities and disciplinary activity), and agents (i.e., disciplinary).

## IOWA ASSISTANT ATTORNEY GENERAL
DES MOINES, IOWA - 1975 TO 1976

Assigned to the Department of Insurance, serving as the Department's General Counsel. In that capacity, he:

- Represented the Department in all state and federal litigation;
- Prepared briefs for the Department's use in agency administrative hearing
- Provided day-to-day legal guidance to the Commissioner as to all relevant matters
- Prepared and issued Attorney General Opinions relative to insurance matters
- Interpreted state insurance law and regulations
- Prosecutor for APA hearings on behalf of the Insurance Department

## LEGAL COUNSEL TO THE REPUBLICANS, IOWA HOUSE OF REPRESENTATIVES
DES MOINES, IOWA - 1975 SESSION

Retained by the Republicans of the Iowa House of Representative as their legal counsel for 1975 Session. In this position, Mr. Hager provided legal counsel on all relevant caucus issues and provided the following staff support:

- Researched pending legislation
- Prepared memorandums in support of proposed legislation
- Provided legal advice, and
- Participated in bill drafting
- Worked the floor of the legislature as to specific legislation

9

**MATHEMATICS TEACHER, KALAKAUA INTERMEDIATE SCHOOL**
KALIHI DISTRICT, HONOLULU HAWAII - 1970-1972

Taught junior high mathematics and Hawaiian history in a school with a significant population of Hawaiian students during academic years 1970-71 and 1971-72.

**EDUCATIONAL BACKGROUND**

- University of Northern Iowa, Cedar Falls, Iowa
  Bachelor of Arts degree, Secondary Mathematics Education, 1969
- University of Hawaii, Honolulu, Hawaii
  Master of Education Degree, Psychological Counseling, 1972
- University of Illinois, Champaign, Illinois
  Juris Doctor,1974

**BAR ADMISSIONS AND OTHERS**

Florida, by exam 2004;
Illinois, by exam 1975 (this license is currently in inactive status);
Iowa, by exam 1975;
United States Supreme Court 1978

Member, the Iowa State Bar Association, Sections[1] on:
- Administrative Law,
- Commercial and Bankruptcy Law,
- Corporate Counsel,
- Government Practice,
- Health Law,
- Litigation,
- Trade Regulation and
- Workers Compensation.

Member, American Bar Association, and Member of the following Sections:
- Administrative Law and Regulatory Practice,
- Antitrust Law,
- Health Law and
- Tort, Trial and Insurance.

---

[1]   Committee and section membership varies from year to year with each bar membership.

**COMMUNITY**

- Member of the Board and Immediate Past Vice Chairman of the Board, Boca Raton Community Hospital
- Co-Chairman (w/ Beth and Mr. Richard Gold) of the 2001 American Cancer Society's Ball (Boca Raton)
- Ball Chairman (w/ Beth) 1999 Boca Raton Community Hospital
- Ball Co-Chair (with Beth and with Mike and Kathy Arts and John and Susan Welchel) of the 1998 Boca Raton Historical Society Ball
- Ball Chair (w/ Beth) of the 1997 American Heart Association Ball
- Board of Directors, National Conference of Christians and Jews of Southeast Florida
- Board Member, past Chair, Boca Raton Chamber of Commerce
- Member of the Session and current Stewardship Campaign Chairman, First Presbyterian Church (Delray Beach)
- Past Board Member, Past Chair, Florida Atlantic University Executive Advisory Board, College of Business
- Past Board Member, Past Campaign Chair, United Way of Palm Beach County
- Past Chair, March of Dimes Walk America
- Advisory Committee to the Board: Pinecrest School, Fort Lauderdale, Florida

**AWARDS**

- Sun Sentinel Excalibur Award for Business Leaders in South Florida (awarded for excellent business practices)
- Silver Medallion Award, National Conference of Christians and Jews (awarded for ecumenical work in the community between all ethnic groups)
- Business of the Year (to NCCI), 1996 as CEO
- Scores of others

**PROFESSIONAL**

- Partner, Silicon Beach Venture Capital, Inc., a venture capital firm located Boca Raton.
- Elected Councilman of the City of Boca Raton; term ran through 2009.

**AUTHOR**

- Numerous Iowa Attorney General Opinions (1975-76)
- Antitrust Guide, American Academy of Actuaries (1982)
- Numerous other articles in various publications while General Counsel and Director of Government Relations to the American Academy of Actuaries (1980-1983)

11

- Numerous articles in various publications while Iowa Commissioner of Insurance (1986-1990)
- Author (and lecturer) of the Insurance Course of the Iowa Bar Review (@ 1985- 1991)
- Numerous Hearing Officer Decisions under the Iowa Administrative Procedures Act (1978-1980; 1986-1990)
- Numerous articles about the US Workers Compensation System while President and CEO of NCCI (1990-1997)
- Law Review Article: William D. Hager, ***The Authority of the States over Debtor Coercion by the Federal Savings and Loan Associations, ***27 Drake Law Review 651 (1977)
- Law Review Article: William D. Hager and Paul Noel-Chretien, ***"The Emerging Law of Actuarial Malpractice,"*** 31 Drake L.Rev. 831 (1982)
- Law Review Article: William D. Hager & Larry Zimpleman, ***"The Norris Decision, Its Implications and Applications,"*** 32 Drake L. Rev. 913 (1983)
- Numerous other articles

## PRESENTATIONS

- Numerous presentations to various groups while Iowa Assistant Attorney General
- Numerous presentations to various groups while Iowa First Deputy Insurance Commissioner
- Numerous presentations to various actuarial organizations/programs while General Counsel and Director of Government Relations of the American Academy of Actuaries
- Numerous presentations to various groups/organizations while a practicing attorney in Des Moines
- Numerous presentations to various groups while Commissioner of Insurance
- Numerous presentations to various groups while President and CEO of NCCI
- Numerous presentations to the high technology community in recent positions

## PERSONAL

Bill and his wife, Dr. Beth King, reside in Boca Raton and have two daughters. Beth is an assistant professor of nursing at Florida Atlantic University; Bill is a highly marginal golfer, he teaches Sunday School at the First Presbyterian Church in Delray Beach, where he also serves as an Elder.

## CONTACT INFORMATION

William D. Hager
President
Insurance Metrics Corporation
301 51st Street; Suite 1240
Boca Raton, Florida 33431
T: (561) 995-7429
F: (561) 431-0596
E: bhager@expertinsurancewitness.com

# APPENDIX B

**APPENDIX B**

**REPRESENTATIVE ARTICLES AND SPEECHES**

**WILLIAM D. HAGER**

## REPRESENTATIVE ARTICLES AND SPEECHES

## WILLIAM D. HAGER

Mr. Hager has given many speeches and written scores of articles. Set out below is a representative sample of his articles and speeches.

### Law Review Articles

1. William D. Hager & Paul-Noel Chretien, *The Emerging Law of Actuarial Malpractice*, 31 DRAKE L. REV. 831 (1982).

2. William D. Hager & Larry Zimpleman, *The Norris Decision, Its Implications and Application*, 32 DRAKE L. REV. 913 (1983).

3.  William D. Hager, *The Authority of the States Over Debtor Coercion By the Federal Savings and Loan Associations*, 27 DRAKE L. REV. 651 (1977).

3a. William D. Hager & James G. Leach, *An Unsolicited Addition to the Wachtell, Lipton Takeover Response Checklist: The Merger of Revlon and McCarran-Ferguson,* 41 Federation of Insurance & Corporate Counsel 189 (1991).

### Amicus Curiae Brief

4.  Brief of Amicus Curiae American Academy of Actuaries, Arizona Governing Comm. v. Norris, 463 U.S. 1073 (1983)(No. 82-52).

### Conference Proceedings

5. William D. Hager, *Actuarial Malpractice - Real and Otherwise*, 31 Conf. of Actuaries in Pub. Prac. Proc. 334 (1981).

6.  William D. Hager, *Actuarial Malpractice - The Emerging Law and Growing Exposure*, 32 Conf. of Actuaries in Pub. Prac. Proc. 480 (1982).

7.  William D. Hager, *The Emerging Law of Actuarial Malpractice*, 32 Conf. of Actuaries in Pub. Prac. Proc. 496 (1982).

8.  William D. Hager, *Actuarial Liability*, 35 Conf. of Actuaries in Pub. Prac. Proc. 627 (1985).

9.  William D. Hager, *The Emerging Law of Actuarial Malpractice*, 35 Conf. of Actuaries in Pub. Prac. Proc. 643 (1985).

10. William D. Hager, *The Workers' Compensation Crisis*, 41 Conf. of Consulting Actuaries 351 (1992).

**Periodical Articles**

11. William D. Hager, *Three Questions Regarding Enjoining Operations of RRGs and PGs*, Risk Retention Rep., Sept. 1989 at 155.

12. William D. Hager, *Ohio Takes Leading Role in Tracking Workers Comp Fraud*, Bus. Courier, Feb. 10, 1977.

13. William D. Hager, *Breathe Life Into Safety Education Programs*, The Bus. J. of Jacksonville, Oct. 21, 1996.

14. William D. Hager, *Prepare Employees For Overseas Travel Risks*, The Bus. J. of Jacksonville, Oct. 25, 1996.

15. William D. Hager, *States Provide Incentives for Drug Free Workplaces: Workers Comp Offers Discounts*, Cincinnati Bus. Courier, May 9, 1997.

16. William D. Hager, *Return to Work Programs*, Rough Notes Rep.

17. William D. Hager, *Stress Busters Designed to Relieve On the Job Burnout*, Rough Notes Rep.

18. William D. Hager, *Quality Process in the Workplac*e, Rough Notes Rep.

19. William D. Hager, *Modifying the Workplace to Eliminate Repetitive Stress Syndrome*, Rough Notes Rep.

20. William D. Hager, *Employers Should Take Precautions With Pregnant Workers*, Health Care Monthly, May 9, 1997.

21. Megan Santosus, *Cross Purposes*, CIO Mag., Nov. 1, 1994 (chronicling the technological transition Hager led while President of Nat'l. Council Comp. Ins. (NCCI), Boca Raton, Fla.).

22. William D. Hager, *Lifting Awareness on Experience Ratings*, PRSIM Points (WCSIT and ISDA, Springfield, Ill.), Spring / Summer 1996.

23. William D. Hager, *The Workers' Compensation Crisis: Addressing the Real Problem*, Spring 1992 F. of the Cas. Actuarial Soc'y 189.

24. William D. Hager, *NCCI States Its Case*, Indep. Agents Mag., May, 1994.

25. Interview with William D. Hager, President, NCCI, *in* BNA Workers Comp. Rep., Dec. 11, 1990 at 1.

26. William D. Hager, *Introduction* to BRUCE N. BARGE AND JOHN G. CARLSON, THE EXECUTIVE'S GUIDE TO CONTROLLING HEALTH CARE AND DISABILITY COSTS (1993).

**Speeches**

27.  William D. Hager, Perspectives of the Nineties, Address at Connecticut Insurance Day (Apr. 4, 1995).

28. William D. Hager, The State of Workers Compensation, Address at the American Association of State Compensation Insurance Funds Conference (Aug. 1993).

29. William D. Hager, The State of Workers Compensation, Address Before the Minnesota Chapter of the Chartered Property Casualty Underwriters Society (Nov. 4, 1993).

30. William D. Hager, Major Workers Compensation, Address Before the Chartered Property Casualty Underwriters Society (Nov. 8, 1995).

31. William D. Hager, Workers Compensation Fraud, Address at the American Risk and Insurance Association Annual Meeting (Aug. 11, 1997).

32. William D. Hager, Cycles in Workers Comp, Address at the American Association of State Compensation Insurance Funds Annual Conference (Aug. 18, 1997).

33. William D. Hager, NCCI: Enhanced Products and Services, Address at the Annual Corporate Advisory Board of the PMA Insurance Group (May 2, 1997).

34. William D. Hager, The State of Workers Compensation, Address at the Independent Insurance Agents of Iowa Convention (May 15, 1997).

35. William D. Hager, The Future of Rating Bureaus, Address at the Casualty Actuarial Society Spring Meeting (May 19, 1997).

36. William D. Hager, The State of Workers Compensation, Address Before the Maryland Workers Compensation Educational Association (Sept. 15, 1997).

37.  William D. Hager, The Future of Workers Compensation, Annual Address at the Meeting and Annual Issues Symposium of NCCI (1991-1997).

38.  William D. Hager, What State Departments of Insurance Should Expect from Casualty Loss Reserve Specialists.  1987 Casualty Loss Reserve Seminar.

39.  William D. Hager, The Unfair Claims Practices Act – Sword and Shield: The Corporate Compliance and Executive Planning Super Conference – Governance: Sarbanes-Oxley and Beyond; (September 4, 2003).

40.  William D. Hager, Actuarial Malpractice; The Conference of Consulting Actuaries; (November 3, 2003);

41.  William D. Hager, Contributor and Periodic Guest as to Insurance Issues: the Nationally Syndicated Weekly Radio Show: It's Your Money with host Bill Bailey (2003; 2007).

**Risk Retention Litigation.**

42.  *Frontier Insurance Company, Inc. et al. v. William D. Hager, Commissioner of Insurance of the State of Iowa,* #F87-645-E (U.S. District Court for the Southern District of Iowa).

43.  *Swanco Insurance Company v. Hager*, 877 F.2d 353 (8th Cir. 1989), cert. Denied, 493 U.S. 1057, 110 S.Ct. 866, 107 L.Ed. 2d. 361 (11th Cir. 1990).

**End of This Document**

# APPENDIX C

**APPENDIX C**

**CASES IN WHICH WILLIAM HAGER**

**HAS BEEN DEPOSED OR TESTIFIED**

**WITHIN THE LAST FOUR OR MORE YEARS**

Alabama Municipal Insurance Corporation v. Alliant Insurance Services, Inc. F.K.A Driver Alliant Insurance Services, In the United States District Court Middle District of Alabama Northern Division, Case No. 2:09-cv-00928-WKW-CSC, 01/11 D; 03/11 T

Algeo vs. MassMutual Life Insurance Co.; In the U.S. District Court for the Northern District of OK; No. 4:05 cv 00734-TCK-FHM; Case No. CJ-2005-6714;

Alicia Diagnostic v. Maryland Casualty Company, 18th Judicial Circuit of Florida, Case No. 05-CA-1842-15-L, 01/11 D;

Argus Fire & Casualty v. American Superior Insurance Company; 11th Judicial Circuit of Florida; Case No 98-02512-CA 27; D;

Ario vs. Penn Treaty Network America Insurance Company, In the Commonwealth Court of Pennsylvania, Case No. 5 M.D. 2009, 11/10 D;

Arrowood v. TIG – 11th Judicial Circuit, Miami-Dade County, Florida, 12/11 D;

Bertelsen vs. Allstate Insurance Company; In the Circuit Court; Second Judicial Circuit; State of South Dakota; County of Minnehaha; Civ. 07-5112;  01/10 D; 01/12 T;

Bowman vs. Medi Share; In the District Court for Creek County; State of Oklahoma; Bristow Division; Case No BCJ 2006 067; 08/07 D;

Bright v. Ohio National Life Assurance Co., United States District Court, Northern District of Oklahoma; Case No. CIV-11-475; 03/12 D;

Cayces Excavation vs. Florida Employers Insurance Service Corp; In the Circuit Court of the Twelfth Judicial Circuit; In and For Sarasota County, FL; Case No. 2000 CA 011039- NC; 01/10 D;

Commerce and Industry Insurance Company vs. Bruce Olson Construction, Inc. et al; Superior Court of the State of California; In and For the County of Place; Tahoe Division; Case No TCV 1140; Davison One; 03/08 D T;

Curry vs. Mel Foster Company; In Iowa District; 03/10 D;

Dale v. ALA Acquisitions, I Inc.; In the U.S. District Court for the Southern District of Mississippi; Jackson Division; C.A. No. 3:00 VC 359LN; D

Delorey v. Evanston Insurance Company, Circuit Court of the 13th Judicial Circuit, Florida, Case No. 05-4373, 01/11 D;

Delorey v. Markel Insurance Co. and Evanston Insurance Co; In the 13th Judicial Circuit; Hillsborough County, Florida; Case No. 05-4373; 01/11 D;

Divens vs. Lorin Grant Hobart; In the Circuit Court of the First Judicial Circuit; In and For Santa Rosa County, FL Case NO 05 531; 10/09 D;

DK Productions, Inc., et al vs. Employers Insurance Company of Nevada; District Court of Clark County Nevada; Case No. A466728; 06/06 T;

2

Evans v. Certain Underwriters at Lloyds of London, et al., 17th Judicial Circuit of Florida, Case No. 06-CACE-013343 (12), 11/10 D;

Exchange Financial, Inc v. Federal Insurance Company et al. al.; District Court of Iowa for Polk County; Case No. LACL 105 076; 11/08 D;

FalconTrust Group, Inc. vs. Zurich U.S., et al., Circuit Court of the 11th Judicial Circuit, Florida, Case Nos. 07-6199 CA 40 and 07-14016 CA 40, 10/08 D; 12/10 T;

Farm Bureau Mutual Ins Co. v. Mary Jaegar, District Court of Cherokee County, Kansas; Case No. 2011-cv-110; 04/12 D;

Farm Stores v. Zenith Insurance Co., In the 11th Judicial Circuit; Miami, Florida; case no. 99-25900-CA-01; 10/11 D;

Gagne vs. State Farm; United States District Court; Southern District of Mississippi; Southern Division; Cause No 1 06 CV 00711 LTS RHW; 11/08 D;

Gianzero v. Wal-Mart; In the United States District Court for the District of Colorado; Case No. 1:09-CV-006546; 07/11 D;

Glick vs. Tri Insurance Underwriters, Inc.; Circuit Court; 15th Judicial Circuit; Palm Beach County, FL; Case No. 502 007 CA 006495 XXXX MB Division AI; 02/09 D;

Goldstein vs. Maryland Casualty Co; In the United States District Court; Southern District of FL; Ft. Myers Division; Case No. 08 14260- CIV-Martinez/Lynch; 10/09 D;

Great American Insurance Company of New York vs. Great Southwest Express Co. and the Goodyear Tire and Rubber Co; In the Superior Court of Henry County; State of Georgia; Civil Action 02-CV-2967-C; 06/09 D;

Greene, Commissioner of Insurance, as Liquidator v. AMS Life Insurance Company; CV 1992-005232; Superior Court of Arizona, Maricopa County;  DT;

Gressler vs. The Medical Protective Company; In the District Court; 116th Judicial District; Dallas County TX; Cause No 05-10027-F; 11/07 D;

Hazelton v. Sonic Automotive, Inc., 13th Judicial Circuit of Florida, Case No. 02- 12274, 01/11 D;

Hoffman v. Continental Casualty; In the United States District Court for the Western District of Oklahoma; Case No. 11-CV-911; 10/12 D;

Horowitz v. USAA, 15th Judicial District of Florida, Palm Beach County, Florida, Case No. 502011-cv-09597, 08/12 D;

In re Poe in Bankruptcy; In the US Bankruptcy Court; Middle District of FL; Tampa Division; Case NO. 06-bk-04292;  01/10 D;

Koken vs. Deloitte & Touche LLP, In the Commonwealth Court of PA, Civil Action, Law; Docket NO 734 MD 2002; 08/07 D;

Kondracki v. Metro Taxi and Pinnacol Assurance, State of Colorado Office of Administrative

Courts; W.C. No. 4-782-175; 04/11 T;

Krummell vs. North American Company; In the United States District Court for the Central District of CA; Case No. 08-01509; 04/10 D;

Kurtz vs. Ensz & Jester P.C. et al; In the Circuit Court of Jackson Co. Missouri at Independence; Case No 0716 CV 32494; 06/09 D;

Lloyds v. Millan, 11th Judicial Circuit, Miami-Dade County, Florida, Case No. 08-22674, 09/11 D;

Loukas v. Metropolitan Life Insurance Company; In the Judicial Circuit Court of FL; DT;

Mercy Medical Center vs. Aultman Health Foundation; In the Court of Common Pleas; Stark County, Ohio; Case No. 2007-CV-05277;  03/10 D;

Midamar Inc. v. Firemen's Fund Insurance Company; In the Iowa District Court; County of Linn; Case No. LACV No. 053 826; 01/09 D;

Monogahela Power Company v. Certain Underwriters at Lloyds, In the Circuit Court for Washington County, Maryland, Case No 21-C-03-16733-DJ; 11/10 D;

Mortgage Payment Protection, Inc. vs. Cynosure Financial, Inc.; In the United States District Court; Middle District of FL; Orlando Division; Case No. 6:08-cv-1212-Orl-22DAB;

Niles vs. Christian Care Ministry, Inc; In the United States District Court for the Western District of Oklahoma; Case No. Civ. 09-20-l; 03/10 D;

Norych vs. Admiral Insurance Co; United States District Court Southern District of  Florida; Case No 08- 60330; 12/09 D;

Olear Organization, Inc. v. Wells Fargo Ins.; In the 9th Judicial Circuit in and for Orange County, Florida; Case No. 2009-CA-034659; 11/11 D;

Premium Assignment Corporation v. Auto-Owners Insurance Co., In the Second Judicial Circuit; Leon County, Florida; Case no. 2010-ca-527; 07/11 D;

Penn Mutual Life Insurance Co. v. Jacqueline Hudkins; United States District Court Southern District of New York; Case No. 09-cv-7023; 05/11 D;

Poe Insurance Managers, Debtor; In the United States Bankruptcy Court; Middle District of FL; Case No. 06-bk-04292-CPM; 05/10 D;

Quintec, S.A. v. Aon Risk Services; In the 11th Judicial Circuit Court of FL; Case No 00 28626 CA 20; 05/06 D;

Reed v. AMCO Insurance Co.; United States District Court District of Nevada; Case No. 3:09-cv-00328; 05/11 D;

Roush v. Liberty Mutual, United States District Court, Middle District of North Carolina, Case No. 1:09-cv-472; 05/12 D;

Sadel vs. Berkshire Life Insurance Company of America; In the United States District Court for the Eastern District of PA; Case No. 2:09-cv-00612-MSG; 05/10 D;

Scottsdale Insurance Company vs. Market Finders Insurance Corporation; U.S. District Court; Middle District of FL; Tampa Division; Case No 8 06 CV 01404 JSM EAJ; 12/07 D;

Sea Oaks vs. Indian Harbor Insurance Co.; In the Circuit Court; In and For Indian County, FL; 10/09 D;

Sentry Insurance et al vs. John Bond Atkinson; In the Circuit Court for Hillsborough County FL; Case No 05 09466; 03/08 D;

Settlement Funding, LLC v. AXA Equitable Life Insurance Co., In the United States District Court for the Southern District of New York, Case No.: 09-CV-8665-HB, 09/10 D; 10/10 T;

Sokhoeun Say vs. Keith C. Graves; In the Circuit Court of the fourth Judicial Circuit In and For Duval CO. FL; Case No. 16-2008-CA-010157; 11/09 D;

Southern Owners Insurance Co vs. John Hayden; In the United States District Court; Southern District of FL; Ft. Pierce Division; Case No. 08-14381-Martinez/Lynch; 12/ 09 D;

State Farm Lloyds Appeal Before the Commissioner of Insurance re Rates for Residential Property Insurance; TDI Docket NO. 2562 A; 06/09 D;

State of Connecticut vs. Acordia, Inc.; In the Superior Court Judicial District of Hartford at Hartford; Doc No HHD CV 402 731 4S (X09); 12/09 DT;

State of Florida vs. Brent Tyler Atkinson; In the Circuit Court of the 20th Judicial Circuit In and For Charlotte Co. FL; Criminal Action; Case No. 08-0001 73 CF (JFP); 06/09 D;

State of Florida, Department of Financial Services, Office of Insurance Regulation vs. Assured Premium Finance Corp; In the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida; Subsidiary Case No. 02-1128-C;

Stokes vs. Life Insurance Company of North America; United States District Court for the District of Idaho; Case No CV 06 411 S LMB; 05/08 D;

Superior National Insurance Group v. Foundation Health Systems Inc; Case No. LA CV 02-5155PA; In the United States District Court, Central District of California;

Thompson v. State Farm Insurance Company, 10th Judicial Circuit of Florida, Case No. 2008 CA004802, October 22, 2010, State Farm/Thompson, 09/10 D;

Tiara Condominium Association vs. Marsh USA Inc.; Case No 08 CV 80254; United States District Court; Southern District of FL; Case No 08 CV 80254; 11/08 D;

Tome v. State Farm Fire and Casualty Co., In the Circuit Court of the 15th Judicial Circuit; Palm Beach County, Florida; Case No. 502008CA18853; 01/11 D;

U.S. v. Dennis Siamis; In the U.S. District Court for the Northern District of Iowa; 05/06 T;

U.S. vs. Keith LaMonde et. al; U.S District Court; Middle District of Florida; Criminal Division; Case No. 6:05-cr-131-Orl-19KRS; 12/07 T;

Wells Fargo v. American General Life Ins. Co., 153rd District, Tarrant Co., Texas, Case No. 153-247206-10, 3/12 D;

West Coast Insurance Company vs. Life Brokerage Partners; In the United States District Court for the Southern District of FL; Case No. 08-80897-Civ; 04/09 D;

Wrubel v. John Hancock Insurance Company, USDC Eastern District of New York, Case No. 11-cv-01873, 7/12 D;

**End of document.**